Form #42

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT DEPT. OF THE TRIAL COURT

CIVIL ACTION

[SEAL]

No.

MICHAEL D. SULLIVAN

——————————————— , Plaintiff (s)

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND
REASSURE AMERICA LIFE INSURANCE COMPANY

——————————————— , Defendant(s)

(TO PLAINTIFF'S ATTORNEY :
    PLEASE INDICATE TYPE OF ACTION INVOLVED :—
    TORT — MOTOR VEHICLE TORT — CONTRACT —
    EQUITABLE RELIEF — OTHER.)

### SUMMONS

TO THE ABOVE-NAMED DEFENDANT: REASSURE AMERICA LIFE INSURANCE
COMPANY

You are hereby summoned and required to serve upon ........ ...... ......... ......... ......

.The .Plaintiff,. by. and. through. Counsel,. Michael. J.. Malloy,. Esq

plaintiff's attorney, whose address is 105 Washington St. #9, N. Easton, MA .
                                                                02356

an answer to the complaint which is herewith served upon you, within (20) days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.
You are also required to file your answer to the complaint in the office of the Clerk of this
Court at .   Taunton.    ....... either before service upon plaintiff's attorney or within a
reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim
any claim which you may have against the plaintiff which arises out of the transaction or
occurrence that is the subject matter of the plaintiff's claim or you will thereafter be
barred from making such claim in any other action.

Witness, Hon. Barbara J. Rouse, Adm. Justice of the Superior Court Dept. of the Trial
Court, at Taunton, the ....... ...15th......................... day of.....December.............., in the year
of our Lord two thousand and . Four (4) ...

*Magistrate*

**NOTES.**

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If
   a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. If the Commonwealth or an officer of agency thereof is a defendant, the time to be inserted is 60 days.

NOTICE TO DEFENDANT — You need not appear personally in Court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

Form #42

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT DEPT. OF THE TRIAL COURT

CIVIL ACTION

[SEAL]

No.

MICHAEL D. SULLIVAN
—————————————————— , Plaintiff (s)

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND
REASSURE AMERICA LIFE INSURANCE COMPANY
—————————————————— , Defendant(s)

(TO PLAINTIFF'S ATTORNEY :
    PLEASE INDICATE TYPE OF ACTION INVOLVED :—
    TORT — MOTOR VEHICLE TORT — CONTRACT —
    EQUITABLE RELIEF — OTHER.)

### SUMMONS

TO THE ABOVE-NAMED DEFENDANT: REASSURE AMERICA LIFE INSURANCE COMPANY

You are hereby summoned and required to serve upon ...... ...... ........... ........... ......

.The .Plaintiff,. by. and. through. Counsel,. Michael. J.. Malloy,. Esq.
plaintiff's attorney, whose address is 105 Washington St. #9, N. Easton,MA ;
                              02356
an answer to the complaint which is herewith served upon you, within (20) days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.
You are also required to file your answer to the complaint in the office of the Clerk of this
Court at .  Taunton. ...... either before service upon plaintiff's attorney or within a
reasonable time thereafter.

    Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim
any claim which you may have against the plaintiff which arises out of the transaction or
occurrence that is the subject matter of the plaintiff's claim or you will thereafter be
barred from making such claim in any other action.

    Witness, Hon. Barbara J. Rouse, Adm. Justice of the Superior Court Dept. of the Trial
Court, at Taunton, the ...... 15th.................... day of.....December............, in the year
of our Lord two thousand and . Four (4) ...

*Magistrate*

NOTICE TO DEFENDANT — You need not appear personally in Court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

### NOTES.

1.  This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2.  When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3.  If the Commonwealth or an officer of agency thereof is a defendant, the time to be inserted is 60 days.

JSC 74

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, S.S.

SUPERIOR COURT DEPT.
DOCKET NUMBER:

| | |
|---|---|
| MICHAEL D. SULLIVAN<br>    Plaintiff<br><br>v.<br><br>THE PRUDENTIAL INSURANCE<br>COMPANY OF AMERICA,<br>REASSURE AMERICA LIFE<br>INSURANCE COMPANY, et. al.<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

## **PARTIES**

1.     The Plaintiff, Michael D. Sullivan (hereinafter referred to as the "Plaintiff"), is an individual who resides at, 40 Spooner Street, North Easton, MA 02356, Bristol County, Commonwealth of Massachusetts.

2.     The Defendant, The Prudential Insurance Company of America (hereinafter referred to as "Defendant(s)"), is a foreign insurance company licensed in the State of Massachusetts with a principal place of business at 213 Washington Street, 9ᵗʰ Floor, Newark, N.J. 07102.

3.     The Defendant, Reassure America Life Insurance Company (hereinafter referred to as "Defendant(s)"), is a foreign insurance company licensed in the State of Massachusetts with a principal place of business at 1275 Sandusky Road, Jacksonville, IL 62650.

1

## SUMMARY OF THE FACTS

4.     On or about May 28, 1987, the Plaintiff and the Defendants entered into a contractual agreement between the above stated parties for long term disability coverage to the Plaintiff by the Defendant in exchange for the consideration of payments by the Plaintiff of premium(s) to the Defendant. (See attached, Exhibit A-Long Term Disability Contract, Policy Number H5 518 149).

5.     On or about January 9, 2002, the Plaintiff was injured as a result of a fall in his home at 40 Spooner Street, North Easton, Massachusetts resulting in permanent injury to his lower back, legs, muscular skeletal region and neurological functioning.

6.     On or about June 5, 2002, the Plaintiff filed a claimants initial statement accompanied with initial attending physicians statement for total disability with Reassure America Life Insurance Company as directed by the Prudential Insurance Company of America. (See attached Exhibit B- Clients Initial Statement dated 6/5/02).

7.     On or about September 5, 2002, Reassure America Life Insurance Company, by and through its claim specialist, Pamela Jacques, DI denied the Plaintiff's claim on Prudential Individual Disability Income Policy No. H5 518 149. (See attached Exhibit C-Initial denial of benefits to Plaintiff dated 9/5/02).

8.     On or about January 23, 2003, the Plaintiff sent formal written demand to the Defendants for payment of policy provisions and/or settlement pursuant to Massachusetts General Laws C.93A and 176D et. seq. via certified mail returned receipt requested No. 7002 0860 0006 9637 2543 to the Defendants that was received on January 29, 2003 by Pamela Jacques on behalf of Reassure America Life Insurance Company.

9.     On or about January 30, 2003, the Defendants Reassure America received a correspondence from the Plaintiff, by and through his counsel, requesting reconsideration of the Defendant's denial of policy benefits.

10.     On or about March 25, 2003, the Defendant Reassure America denied the Plaintiff's claim for benefits according to their original determination. (See

attached Exhibit D- Reconsideration of initial denial of benefits to Plaintiff dated 3/25/03).

11.    On or about December 10, 2003, the Plaintiff, by and through counsel, filed an appeal and additional reconsideration with newly ascertained medical reports submitted therein by Dr. Albert Ackil, neurologist, dated August 28, 2003 and Dr. Simcha J. Weller, neurological surgeon, Beth Israel Deaconess dated September 23, 2003 with referenced supporting M.R.I conclusions and findings from the Brockton Regional M.R.I.center dated July 24, 2003 supporting Plaintiff's initial, present and future total permanent disability. (See attached Exhibit E- Reconsideration: Michael D. Sullivan dated 12/10/03).

12.    On or about February 11, 2004, at the request of the Defendant Reassure America Life Insurance Company, the Plaintiff met with MPO Consulting, Mary Paine O'Malley, vocational consultant, engaged by the Defendant complete an occupational analysis of the occupation of the Plaintiff.

13.    On or about April 27, 2004, MPO Consulting, Mary Paine O'Malley, vocational consultant, engaged by the Defendant produced her occupational review report that were inconsistent with the objective and subjective findings and conclusions of primary medical treating sources and arbitrary and capricious, riddled with conjecture and surmise and fatuous at best. ( See attached Exhibit F- Occupational review report of MPO Consultant dated 4/27/04).

14.    On or about June 24, 2004, the Plaintiff supplied the Defendant the supplemental report of activities by Plaintiff and supplemental attending physicians statement of Dr. Albert Ackil, MD., consistent with original diagnosis prognosis and findings and conclusions. (See attached Exhibit G- Supplemental Report of Activities by Plaintiff and Supplemental Attending Physicians Statement of Dr. Albert Ackil, dated 6/28/04).

15.    On or about November 23, 2004, the Defendant continued to deny the Plaintiff benefits pursuant to their original determination yet, indicates some two (2) years and ten (10)months later, an initial inquiry into an Independent Medical Evaluation of the Plaintiff so as to further deny and delay benefits frivolously. ( See attached Exhibit H- Denial of Appeal dated 11/23/04).

3

16.    On or about December 1, 2004, The Defendants, contracted PhysioMetrics of 520 Fellowship Road, Suite C-306, Mt. Laurel, NJ to schedule an appointment with the Plaintiff for a Functional Capacity Evaluation on December 22, 2004 some two (2) years and eleven (11) months and thirteen (13) days after the initial claim filing in an attempt to further delay Plaintiff claim. (See Attached Exhibit I Functional Capacity Evaluation Appointment; dated 12/01/04)

## COUNT I Breach of Contract

17.    Plaintiff repeats, re-alleges, and re-avers paragraphs 1 through 16 as though specifically rewritten and incorporates said herein by reference.

18.    The Defendant based on the facts as set forth above owed the Plaintiff a duty to pay the benefits based on a claim of disability pursuant to its contractual agreement dated May 28, 1987.

19.    The Defendant breached that duty to pay the Plaintiff based on the initial denial of benefits on or about September 5, 2002, again as set forth above on reconsideration and further upon appeal and reconsideration.

20.    That the denial of the contractual benefits due to the Plaintiff by the Defendant are the direct and proximate cause of the Plaintiff's harm.

21.    That as a result of the Defendant's denial of benefits the Plaintiff has and continues to be damaged.

WHEREFORE, the Plaintiff prays that this Honorable Court:

1.    Grant Judgment to the Plaintiff against the Defendants;

2     That Defendant shall deliver to the Plaintiff any and all monies owed pursuant to the terms and conditions of the contract in issue;

3.    That the Defendant be further ordered to deliver onto the Plaintiff the monthly disability monies owed for future benefits pursuant to the terms and conditions of the policy provisions;

4

Defendants failure to waive the premiums paid by the Plaintiff and that the Defendant be further ordered to waive any and all additional premiums that become due in the future for the term and by the terms of the contract therein referenced;

4.    That based on the Defendant's fraudulent and deceptive business practices as presented in the foregoing, the Defendant be assessed up to treble damages together with Attorney fees of the Plaintiff plus costs and interest; and

5.    For any and all further relief that this Honorable Court finds met and just.

### COUNT III- Complainant v. the Prudential Insurance Company of America, Et. Al. For Violation of Mass. Gen. L. Ch. 93a and 176D

26.    Plaintiff repeats, re-alleges, and re-avers paragraphs 1 through 25 as though specifically rewritten and incorporates same herein by reference.

27.    Despite receiving the documentation and information as set forth above, the Defendant, failed to tender any benefits under the Disability due to sickness or injury portion of the policy or to make any offer of settlement and instead, requested additional unnecessary and irrelevant documentation.

28.    Since the subject personal injury accident, Plaintiff provided the Defendant, with extensive documentation and information about the accident, his injuries and his claim for loss of earning capacity, including making himself available for an examination by MPO Consulting, Mary Paine O'Malley, vocational consultant, and a Functional Capacity Evaluation on December 22, 2004.

29.    The information provided to the Defendant by the Plaintiff established that the Plaintiff was entitled to disability coverage for his injuries for lost earning capacity as well as Waiver of Premium Benefits under the policy issued by the Defendant.

6

30.     Despite receiving the documentation and information as set forth above, the Defendant, failed to tender any benefits under the disability coverage for his injuries portion of the policy or to waive the premium due by the Plaintiff or to make any offer of settlement and instead, requested additional unnecessary and irrelevant documentation.

31.     The Defendants, Prudential Insurance Company of America and Reassure America Life Insurance Company has:

1).   failed to affirm or deny coverage of claims within a reasonable time after proof of loss statements had been completed;

2).     failed to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, specifically including the Plaintiff's claim;

3).     failed to effectuate prompt, fair and equitable settlements of the Plaintiff's claim, despite the fact that liability had become reasonably clear; compelled the Plaintiff to institute litigation which will ultimately be recovered by the Plaintiff;

4).     refused to pay the Plaintiff's claim without conducting a reasonable investigation based on all available information;

5).     failed to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for its denial of the Plaintiff's claim and of the Defendant, subsequent unreasonable failure to pay benefits due or to make a settlement offer.

6).     failed to waive the premiums due by the Plaintiff to the Defendant pursuant to the terms and conditions of the contract herein in issue.

32.     The Defendants, Prudential Insurance Company of America and Reassure America Life Insurance Company's actions, as set forth above, were unfair and deceptive within the meaning of Mass. Gen. Laws Ch. 93A and Mass. Gen. Laws Ch. 176D Section 3 (9).

33.     The Defendants, Prudential Insurance Company of America and Reassure America Life Insurance Company's actions, as set forth above, were willful and knowing violations of Mass. Gen. Laws Ch. 93A, Section 2 and Mass. Gen. Laws Ch. 176D, Section 3. The Defendants, Prudential Insurance Company of America and  Reassure America Life Insurance, knew or had reason to know that its actions as set forth above violated Mass. Gen. Laws Ch. 93A, Section 2 and Mass. Gen. Laws Ch. 176D, Section 3.

7

34.    As a result of these unfair and deceptive acts and practices the Plaintiff sustained damages.

35.    More than thirty days prior to filing this Complaint, Plaintiff mailed Defendants, Prudential Insurance Company of America and Reassure America Life Insurance Company, (certified copy return receipt numbered, 7002 0860 0006 9637 2543 dated 1/23/03 and received by the Defendants 1/29/03) a written demand for relief, within the meaning of Mass. Gen. Laws Ch. 93A, Section 9, identifying the Plaintiff and reasonably describing the Defendants, Prudential Insurance Company of America and  Reassure America Life Insurance Company's unfair and deceptive acts and practices and the injuries and damages suffered by the Plaintiff. (A copy of this demand letter is attached to this Complaint and marked exhibit "J").

36.    The Defendants,  Prudential Insurance Company of America and Reassure America Life Insurance Company refused to tender a reasonable settlement offer in light of Plaintiff's injuries and damages. Defendant's refusal following receipt of the demand for relief to tender a reasonable settlement offer, in light of the Plaintiff's injuries and damages was made in bad faith with knowledge or reason to know that the acts and practices complained of violated Mass. Gen. Laws Ch. 93A, Section 2 and Mass. Gen. Laws Ch. 176D, Section 3.

37.    Prior to the date of filing this Complaint, the Plaintiff, had been given sufficient notice of Plaintiff's claim for Disability and waiver of premium benefits to allow the Defendant to conduct a reasonable investigation and attempt settlement.

WHEREFORE, the Plaintiff prays that this Honorable Court:

      1.    Grant Judgment to the Plaintiff against the Defendants;

      2    The Defendant to deliver to the Plaintiff any and all monies owed pursuant to the terms and conditions of the contract in issue;

      3.    Order further benefits monthly;

      4.    That the Defendant be ordered to reimburse the Plaintiff for the

8

monies paid to the Defendant as of the undersigned date, namely, $3,250.26 for the Defendants failure to waive the premiums paid by the Plaintiff and that the Defendant be further ordered to waive any and all additional premiums that become due in the future for the term and by the terms of the contract therein.;

4.    The Plaintiff, Michael D. Sullivan, demands judgment against the Defendants, Prudential Insurance Company of America and Reassure America Life Insurance Company, for double or treble damages, with interest, costs, and attorneys' fees, and

5.    Other such damages as this Court deems met and just.

Respectfully submitted,
Michael D. Sullivan, Plaintiff
By his Attorney,

Michael J. Malloy, Esq.
The Law Office of Michael J. Malloy
105 Washington Street, Suite 9
North Easton, MA 02356
508-230-7373
BBO # 653512

DATED:

9

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, S.S.                                    SUPERIOR COURT DEPT.
                                                 DOCKET NUMBER:

MICHAEL D. SULLIVAN )
    Plaintiff )
 )
 )
v. )
 )
 )
THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, )
REASSURE AMERICA LIFE )
INSURANCE COMPANY, et. al. )
    Defendants )
 )

**APPENDIX**

## Table of Contents

Exhibit A-Long Term Disability Contract, Policy Number H5 518 149.

Exhibit B- Clients Initial Statement dated 6/5/02.

Exhibit C-Initial denial of benefits to Plaintiff dated 9/5/02.

Exhibit D- Reconsideration of initial denial of benefits to Plaintiff dated 3/25/03.

Exhibit E- Reconsideration: Michael D. Sullivan dated 12/10/03.

Exhibit F- Occupational review report of MPO Consultant dated 4/27/04.

Exhibit G-Supplemental Report of Activities by Plaintiff and Supplemental Attending Physicians Statement of Dr. Albert Ackil, dated 6/28/04.

Exhibit H- Denial of Appeal dated 11/23/04.

Exhibit I-Functional Capacity Evaluation Appointment, dated 12/01/04.

Exhibit J-Pursuant to Massachusetts General Laws C.93A and 176D et. seq. via certified mail returned receipt requested No. 7002 0860 0006 9637 2543 to the Defendants.





The Prudential Insurance Company of America
a mutual life insurance company
Corporate Office, Newark, New Jersey

| Insured | MICHAEL D SULLIVAN | H5 518 149 | Policy Number |
| Premium Term | 12 MONTHS | MAY 28, 1987 | Contract Date |
| First Premium | $1,083.42 | MAY 28, 1987 | Effective Date |
| Agency | C-BROC-018 | | |

We will pay the benefits shown in this contract in the event of sickness or injury of the Insured. We make this promise subject to all the provisions of the contract.

**Right to Cancel Contract**—Not later than ten days after you get this contract, you may return it to us. All you have to do is take it or mail it to one of our offices or to the agent who sold it to you. We will cancel the contract from the start and give back your money promptly.

**First Period of Coverage**—We issue this contract on the basis of your application and the payment in advance of the first premium. A copy of your application is attached. The contract is a receipt for the first premium.

The coverage paid for by the first premium starts on the effective date of the contract. This coverage will cease at the end of the last day of the first premium term. This term begins on the contract date. The first premium, effective date, premium term and contract date are shown in the window of this page.

**Right to Continue this Contract to the Insured's Age 65 Without an Increase in Premiums**—While the Insured is less than 65 years old, this contract may be kept in force for premium terms after the first by the timely payment of premiums. We explain this under Premiums After the First Premium on Page 2. We will not increase the amount of the premiums which fall due before the Insured's 65th birthday. We show the amount of these premiums in the Schedule of Premiums.

**Right to Continue this Contract Between the Insured's Ages 65 and 72 – Premiums May Be Increased**—After the Insured reaches age 65 and before he or she reaches age 72, this contract may be kept in force if these conditions are met at the start of each new premium term.

1. The Insured is actively and regularly employed in a gainful occupation on a full-time basis away from his or her home.

2. Premiums are paid as explained under Premiums After the First Premium on Page 2.

We have the right to increase premiums due on and after the Insured's 65th birthday by changing our table of premium rates. We will make a change of this kind only on a class basis

If the Insured's employment stops for a reason other than total disability, the contract will end on the date the employment stops. We will refund the part of any premium paid for any time after the date the contract ends. This will not affect any claim which starts before that date.

If we accept a premium for a premium term which starts on or after the Insured's 72nd birthday, the contract will stay in force until the end of that term or, if earlier, the date the Insured's employment stops for a reason other than total disability. But this is subject to the Misstatement of Age provision.

We promise that we will not reduce benefits because of a change to a more hazardous occupation. Also, while the contract stays in force, we will not cancel it or add any restrictions to it.

Signed for Prudential.

_Isabelle L. Kirchner_
Secretary

_Joseph J. Melone_
President

SA DP—79A                    **Disability Income Contract**

## PREMIUM PAYMENT AND REINSTATEMENT

**Premiums After the First Premium**—Each premium is due on the first day of its premium term. Due dates fall on the same day of the month as the contract date. Premiums may be paid at our Home Office or to any of our authorized agents. We will give a signed receipt if we are asked to do so. Except as we state in Grace Period, the payment of any premium will not keep the contract in force beyond the end of the last day of the premium term to which the premium applies.

**Change in Frequency of Premium Payments**—You may ask us in writing to change the premium term to one, three, six or twelve months. If we agree, we will make the change and tell you what the new premiums are and when they are due. The more often premiums are due, the larger the total amount that will have to be paid for a year.

**Premium Refund**—We will make a refund if the Insured dies before the end of a term for which a premium has been paid. The refund will be the part of the premium paid that applies to the contract month in which death occurs and to any later period. We will make this refund when we have proof of death.

**Grace Period**—You have 31 days after the due date to pay any premium but the first one. This 31 day period is called the Grace Period. The contract will stay in force until the end of this period.

**Reinstatement**—If your contract ends because a premium has not been paid, you may be able to reinstate it. If we or any of our authorized agents accepts a premium payment and does not require an application for reinstatement, the contract will then be reinstated. If an application is required and a conditional receipt is given for the premium, the contract will be reinstated on the first to occur of:

1. the date we approve the application; and,

2. the 45th day after the date of the receipt, but only if we have not told you in writing by then that the application has been disapproved.

If the contract is reinstated, it will cover only loss or total disability which results from:

1. Injury which is sustained after the date of reinstatement;

2. Sickness which begins more than ten days after that date.

In all other ways your rights and ours will be the same as they were before the due date of the premium which was not paid on time. But this is subject to any provisions we endorse on or attach to the contract in connection with the reinstatement.

CONTRACT SCHEDULE

CONTRACT SCHEDULE

| | | | |
|---|---|---|---|
| INSURED | MICHAEL D SULLIVAN | H5 518 149 | POLICY NUMBER |
| PREMIUM TERM | 12 MONTHS | MAY 28, 1987 | CONTRACT DATE |
| FIRST PREMIUM | $1,083.42 | MAY 28, 1987 | EFFECTIVE DATE |
| AGENCY | C-BROC-018 | | |

##### ***** SCHEDULE OF PREMIUMS *****

BEFORE INSURED'S 65TH BIRTHDAY
  PREMIUMS AFTER THE FIRST PREMIUM ARE                     - $1,083.42 EACH
ON AND AFTER INSURED'S 65TH BIRTHDAY
  PREMIUMS ARE                                             - $1653.85 EACH*

    * BASED ON CURRENT RATES, WHICH MAY BE CHANGED-SEE FIRST PAGE OF
      THIS CONTRACT

##### ***** END OF SCHEDULE OF PREMIUMS *****

##### ***** SCHEDULE OF COVERAGE *****

MONTHLY INCOME BENEFIT (PART 1.)
  MONTHLY BENEFIT AMOUNT                                   - $2,810.
  ELIMINATION PERIOD                                       - 26 WEEKS
  MAXIMUM DURATION IF MONTHLY INCOME BENEFITS START:
    BEFORE 64TH BIRTHDAY                                   - TO AGE 65
    ON OR AFTER 64TH BIRTHDAY                              - 12 MONTHS

WAIVER OF PREMIUM BENEFIT (PART 2.)                        - INCLUDED

RECOVERY BENEFIT (PART 3.)                                 - INCLUDED

ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT (PART 4.)
  PRINCIPAL SUM                                            - NOT INCLUDED

OPTION TO INCREASE MONTHLY BENEFIT AMOUNT (PART 5.)        - NOT INCLUDED

LIFETIME EXTENSION OF MONTHLY BENEFIT AMOUNT (PART 6.)     - INCLUDED

##### ***** END OF SCHEDULE OF COVERAGE *****







The Prudential Insurance Company of America
a mutual life insurance company
Corporate Office, Newark, New Jersey

| | | |
|---|---|---|
| **Insured** | MICHAEL D SULLIVAN | H5 518 149 **Policy Number** |
| **Premium Term** | 12 MONTHS | MAY 28, 1987 **Contract Date** |
| **First Premium** | $1,083.42 | MAY 28, 1987 **Effective Date** |
| **Agency** | C-BROC-018 | |

We will pay the benefits shown in this contract in the event of sickness or injury of the Insured. We make this promise subject to all the provisions of the contract.

**Right to Cancel Contract**—Not later than ten days after you get this contract, you may return it to us. All you have to do is take it or mail it to one of our offices or to the agent who sold it to you. We will cancel the contract from the start and give back your money promptly.

**First Period of Coverage**—We issue this contract on the basis of your application and the payment in advance of the first premium. A copy of your application is attached. The contract is a receipt for the first premium.

The coverage paid for by the first premium starts on the effective date of the contract. This coverage will cease at the end of the last day of the first premium term. This term begins on the contract date. The first premium, effective date, premium term and contract date are shown in the window of this page.

**Right to Continue this Contract to the Insured's Age 65 Without an Increase in Premiums**—While the Insured is less than 65 years old, this contract may be kept in force for premium terms after the first by the timely payment of premiums. We explain this under Premiums After the First Premium on Page 2. We will not increase the amount of the premiums which fall due before the Insured's 65th birthday. We show the amount of these premiums in the Schedule of Premiums.

**Right to Continue this Contract Between the Insured's Ages 65 and 72—Premiums May Be Increased**—After the Insured reaches age 65 and before he or she reaches age 72, this contract may be kept in force if these conditions are met at the start of each new premium term.

1. The Insured is actively and regularly employed in a gainful occupation on a full-time basis away from his or her home.

2. Premiums are paid as explained under Premiums After the First Premium on Page 2.

We have the right to increase premiums due on and after the Insured's 65th birthday by changing our table of premium rates. We will make a change of this kind only on a class basis

If the Insured's employment stops for a reason other than total disability, the contract will end on the date the employment stops. We will refund the part of any premium paid for any time after the date the contract ends. This will not affect any claim which starts before that date.

If we accept a premium for a premium term which starts on or after the Insured's 72nd birthday, the contract will stay in force until the end of that term or, if earlier, the date the Insured's employment stops for a reason other than total disability. But this is subject to the Misstatement of Age provision.

We promise that we will not reduce benefits because of a change to a more hazardous occupation. Also, while the contract stays in force, we will not cancel it or add any restrictions to it.

Signed for Prudential.

_Isabelle L. Kirchner_
Secretary

_Joseph J. Melone_
President

SA DP—79A                    **Disability Income Contract**

# PREMIUM PAYMENT AND REINSTATEMENT

**Premiums After the First Premium**—Each premium is due on the first day of its premium term. Due dates fall on the same day of the month as the contract date. Premiums may be paid at our Home Office or to any of our authorized agents. We will give a signed receipt if we are asked to do so. Except as we state in Grace Period, the payment of any premium will not keep the contract in force beyond the end of the last day of the premium term to which the premium applies.

**Change in Frequency of Premium Payments**—You may ask us in writing to change the premium term to one, three, six or twelve months. If we agree, we will make the change and tell you what the new premiums are and when they are due. The more often premiums are due, the larger the total amount that will have to be paid for a year.

**Premium Refund**—We will make a refund if the Insured dies before the end of a term for which a premium has been paid. The refund will be the part of the premium paid that applies to the contract month in which death occurs and to any later period. We will make this refund when we have proof of death.

**Grace Period**—You have 31 days after the due date to pay any premium but the first one. This 31 day period is called the Grace Period. The contract will stay in force until the end of this period.

**Reinstatement**—If your contract ends because a premium has not been paid, you may be able to reinstate it. If we or any of our authorized agents accepts a premium payment and does not require an application for reinstatement, the contract will then be reinstated. If an application is required and a conditional receipt is given for the premium, the contract will be reinstated on the first to occur of:

1. the date we approve the application; and,

2. the 45th day after the date of the receipt, but only if we have not told you in writing by then that the application has been disapproved.

If the contract is reinstated, it will cover only loss or total disability which results from:

1. Injury which is sustained after the date of reinstatement;

2. Sickness which begins more than ten days after that date.

In all other ways your rights and ours will be the same as they were before the due date of the premium which was not paid on time. But this is subject to any provisions we endorse on or attach to the contract in connection with the reinstatement.



CONTRACT SCHEDULE

CONTRACT SCHEDULE

INSURED   MICHAEL D SULLIVAN          H5 518 149   POLICY NUMBER

PREMIUM TERM   12 MONTHS              MAY 28, 1987   CONTRACT DATE

FIRST PREMIUM   $1,083.42             MAY 28, 1987   EFFECTIVE DATE

AGENCY   C-BROC-018


***** SCHEDULE OF PREMIUMS *****

BEFORE INSURED'S 65TH BIRTHDAY
   PREMIUMS AFTER THE FIRST PREMIUM ARE          - $1,083.42 EACH
ON AND AFTER INSURED'S 65TH BIRTHDAY
   PREMIUMS ARE                                  - $1653.85 EACH*

   * BASED ON CURRENT RATES, WHICH MAY BE CHANGED-SEE FIRST PAGE OF
     THIS CONTRACT

***** END OF SCHEDULE OF PREMIUMS *****


***** SCHEDULE OF COVERAGE *****

MONTHLY INCOME BENEFIT (PART 1.)
   MONTHLY BENEFIT AMOUNT                         - $2,810.
   ELIMINATION PERIOD                             - 26 WEEKS
   MAXIMUM DURATION IF MONTHLY INCOME BENEFITS START:
      BEFORE 64TH BIRTHDAY                        - TO AGE 65
      ON OR AFTER 64TH BIRTHDAY                   - 12 MONTHS

WAIVER OF PREMIUM BENEFIT (PART 2.)               - INCLUDED

RECOVERY BENEFIT (PART 3.)                        - INCLUDED

ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT (PART 4.)
   PRINCIPAL SUM                                  - NOT INCLUDED

OPTION TO INCREASE MONTHLY BENEFIT AMOUNT (PART 5.)  - NOT INCLUDED

LIFETIME EXTENSION OF MONTHLY BENEFIT AMOUNT (PART 6.)  - INCLUDED

***** END OF SCHEDULE OF COVERAGE *****



PAGE 3 (DP-79)

# GUIDE TO CONTENTS

| | Page |
|---|---|
| Premium Payment and Reinstatement | 2 |
| Premiums After the First Premium; Change in Frequency of Premium Payments; Premium Refund; Grace Period; Reinstatement | |
| Contract Schedule | 3 |
| Schedule of Premiums; Schedule of Coverage | |
| Definitions | 5 |
| Voting Rights | 6 |
| Home Office Locations | 6 |
| Benefit Provisions | 7 |
| Monthly Income Benefits; Waiver of Premium Benefit; Recovery Benefit; Accidental Death and Dismemberment | |

| | Page |
|---|---|
| Benefit Provisions (Continued) | 7 |
| Benefit; Conditional Option to Increase Monthly Benefit Amount; Extended Payment of Monthly Benefit Amount | |
| Exceptions | 8A |
| General Provisions | 9 |
| Entire Contract, Changes; Incontestable as to Misstatements in the Application; Pre-Existing Conditions; Notice of Claim; Claim Forms; Proof of Claim; Time of Payment of Claims; Payment of Claims; Physical Examinations; Legal Actions; Misstatement of Age; Suspension During Military Service; Beneficiary; Ownership; Assignment; Statements; Dividends | |

Printed in U.S.A.

## ENDORSEMENTS
### (Only we can endorse this contract.)

**Voting Rights.—**We are a mutual life insurance company. Our principal office is in Newark, New Jersey, and we are incorporated in that State. By law, we have 24 directors. This includes 16 elected by our policyholders (four each year for four year terms), two of our officers, and six public directors named by New Jersey's Chief Justice.

The election is held on the first Tuesday in April from 10:00 A.M. to 2:00 P.M. in our office at the Secretary's address shown here. After this contract has been in force for one year, you may vote either in person or by mail. We will send you a ballot if you ask for one. Just write to our Secretary at Prudential Plaza, Newark, New Jersey 07101, at least 60 days before the election date. By law, your request must show your name, address, policy number and date of birth. You must be at least 18 years old to vote.

**Home Office Locations.—**When we use the phrase Home Office we mean any of these Prudential offices:

Corporate Office, Newark, N.J.

Central Atlantic Home Office, Fort Washington, Pa.
Eastern Home Office, South Plainfield, N.J.
Head Office, Canadian Operations, Toronto, Ont.
Mid-America Home Office, Chicago, Ill.
North Central Home Office, Minneapolis, Minn.

Northeastern Home Office, Boston, Mass.
South-Central Home Office, Jacksonville, Fla.
Southwestern Home Office, Houston, Tex.
Western Home Office, Los Angeles, Calif.

The Prudential Insurance Company of America,

By *Isabelle L. Kirchner*

Secretary

SA 82830—79

---

Printed in U S A

**Part 1. MONTHLY INCOME BENEFIT—**This benefit
will be payable if the Insured

## BENEFIT PROVISIONS

## BENEFIT PROVISIONS

**Part 1. MONTHLY INCOME BENEFIT**—This benefit will be payable if the Insured is totally disabled due to sickness or injury. Before we pay the benefit, he or she must be totally disabled for the term of the Elimination Period.

**Elimination Period**—We show this period in the Schedule of Coverage. It is the period at the start of total disability during which we do not pay benefits.

**Conditions for Benefit Payments**—The benefit will be payable if these three conditions are met.

1. The Insured becomes totally disabled while this contract is in force.

2. The Insured is under the regular care of a doctor.

3. The Insured remains totally disabled beyond the Elimination Period.

**Monthly Benefit Amount**—We pay the applicable Monthly Benefit Amount for each month that the Insured remains totally disabled after the Elimination Period. The amount is shown in the Schedule of Coverage. We pay one-thirtieth of the amount for each day of any period of total disability less than a full month. Payment will be made at regular intervals.

**Duration of Benefits**—We pay benefits for not longer than the Maximum Duration for each period of total disability. We show this duration in the Schedule of Coverage.

**Successive Periods of Total Disability**—After the end of a period of total disability for which we have paid benefits, a recurrence of total disability will be treated in one of these ways.

1. It will be a separate period of total disability if one of these two conditions applies.

    (a) The Insured performs all of the substantial duties of a gainful occupation on a full-time basis for at least six months in a row.

    (b) The Insured performs all such duties on a full-time basis for less than six months, but the two periods of disability are due to unrelated causes.

If the recurrence is a separate period, a new Elimination Period and Maximum Duration will apply to it.

2. If 1 above does not apply, the recurrence will be a continuation of the earlier period of total disability. Then, a new Elimination Period will not occur, and only one Maximum Duration will apply for the period of disability, including the continuation.

If there are more than two successive periods of total disability, each recurrence will be treated in one of the ways described above.

**Work Training Program**—During a period of total disability the Insured may take part in a program designed to help him or her to get back to work. We will not consider the program to be a gainful occupation if it is government sponsored or approved by us. We will not stop paying benefits because of such a program.

**Part 2. WAIVER OF PREMIUM BENEFIT**—Premiums which fall due while the Insured is totally disabled due to sickness or injury may be waived as described below.

**Conditions for Benefit**—Premiums will be waived if both of these conditions are met.

1. The Insured becomes totally disabled before age 65 while the contract is in force.

2. The Insured stays totally disabled for a period of at least 90 days in a row.

**Premiums Which are Waived**—We will waive each premium which falls due during a period of total disability and before the end of the Maximum Duration for such period. But we will not waive any premium which falls due on or after the Insured's 65th birthday. We will refund any premium which is paid and which is later waived.

**Effect of Waiver**—Any premium we waive will keep the contract in force for the same term as if it had been paid, even though the Insured's total disability ceases before the end of that term.

**Resumption of Premium Payments**—After we have waived one or more premiums, any premium which falls due and is not waived must be paid. It will be payable just as if no premiums had been waived.

*(Continued on Next Page)*

*(Continued)*

**Part 3. RECOVERY BENEFIT**—This benefit will be payable after a period of total disability ends if the Monthly Income Benefit has been payable for each day of the 12 months preceding the end of that period.

**Conditions for Benefit Payments**—Benefits will be payable only for days on which these conditions are met.

1. The Insured is not totally disabled.

2. The Insured is less than 65 years old and living.

3. The payment of a Recovery Benefit does not result in total benefit payments that exceed the limit for Monthly Income Benefits for Part 1. This means that Recovery Benefits plus the Monthly Income Benefits paid for the period of total disability cannot be more than the maximum amount allowed for Monthly Income Benefits under the contract.

**Benefit Amount**—We pay a monthly Recovery Benefit amount which is 50% of the Part 1 Monthly Benefit Amount that was payable just before the Insured ceased to be totally disabled. We pay one-thirtieth of this Recovery Benefit amount for each day of any period less than a full month. Payment will be made at regular intervals.

**Duration of Benefits**—We pay benefits for not longer than three months starting on the day after the period of total disability ends.

**Part 4. ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT**—(We provide this benefit unless we show the words Not Included in the Schedule of Coverage.) A benefit is payable for a loss described below which is the direct result, independent of all other causes, of injury sustained by the Insured while this contract is in force.

**Conditions for Benefit Payment**—A benefit will be payable if one of these conditions is met.

1. The loss occurs within 90 days after the date of the injury.

2. The loss occurs within one year after the date of the injury while the Monthly Income Benefit is payable as a result of the same injury.

**Benefit Amount**—We will pay the amount shown below for any listed loss. But the amount of the Principal Sum is

the most we will pay for all losses which result from an one accident.

| Loss of: | Amount Payable |
|---|---|
| Life; Both hands; Both feet; Sight of both eyes; One hand and one foot; One hand and sight of one eye; One foot and sight of one eye. | Principal Sum shown in the Schedule of Coverage |
| One hand; One foot; Sight of one eye. | One-half the Principal Sum shown in the Schedule of Coverage |

We pay twice the amount we would otherwise pay for a loss if it results from an accident which occurs while the Insured is riding in or upon a public conveyance provided by a common carrier for passenger service. We do this even if the total benefit amount payable is more than the Principal Sum.

**Part 5. OPTION TO INCREASE MONTHLY BENEFIT AMOUNT**—(We provide this benefit unless we show the words Not Included in the Schedule of Coverage.) You may increase the Part 1 Monthly Benefit Amount on each option date. The first option date is the third anniversary of the contract date. After that, an option date occurs every three years on the anniversary date. But each option date must occur before the Insured's 41st birthday.

**Amount of Increase**—The amount of any increase may be any multiple of $10 which is not more than 20% of the applicable Monthly Benefit Amount for Part 1 shown in the Schedule of Coverage. But the increase, plus the Insured's total disability coverage with us and any other insurers on the option date, may not result in more insurance than we would permit for a new contract.

**When Increase Applies**—The amount of an increase will apply to any period of total disability which starts after the option date for the increase. But it will not apply if such period is considered to be a continuation of one which started before the option date. We explain in the Monthly Income Benefit provisions how a period of disability will be a continuation of an earlier period.

*(Continued)*

Request and Pre.........        *(Continued)*

**(Continued)**

**Request and Premium Payment for Increase**—Your request for an increase in the Monthly Benefit Amount must be in writing and in a form which meets our needs. Your request and any premium due at the time of the option date must be received at our Home Office not more than 31 days after that date. The premium payment must include the extra premium for the amount of the increase. This extra premium is based on the Insured's age on such option date. But the premium for the increase will be waived if contract premiums are being waived at the time of the option date as provided in the Waiver of Premium Benefit. After the option date, premiums which fall due for the contract will include the premium for the increase.

**When Each Option Expires**—Your right to increase the Part 1 Monthly Benefit Amount as of any specific option date ends on the 31st day after that date. But this will not change your right to increase the Monthly Benefit Amount on any later option date.

**Part 6. LIFETIME EXTENSION OF MONTHLY BENEFIT AMOUNT**—(We provide this benefit unless we show the words Not Included in the Schedule of Coverage.) This benefit will apply if a period of total disability continues beyond the Maximum Duration for Monthly Income Benefits and if these three conditions are met.

1. The period of total disability began before the Insured's 50th birthday.

2. Monthly Income Benefits have been paid for the Maximum Duration.

3. The Insured stays totally disabled and under the regular care of a doctor.

**Benefit Amount**—We pay a monthly benefit amount for each month that the Insured remains totally disabled after the end of the Maximum Duration. The amount we pay is the same as the Part 1 Monthly Benefit Amount that was payable just before the Maximum Duration ended. We pay one-thirtieth of the amount for each day of any period less than a full month. Payment will be made at regular intervals.

**Duration of Benefit**—We pay benefits for as long as the Insured stays totally disabled without interruption.

## EXCEPTIONS

(A) We do not pay benefits under this contract for any loss described below. As used here, loss means total disability due to sickness or injury as well as any loss described in the Accidental Death and Dismemberment Benefit.

   1. Loss which is caused or contributed to by:

      (a) War, declared or undeclared. The word war includes resistance to armed aggression.

      (b) Pregnancy. But this exception does not apply to complications of pregnancy (see Definitions).

   2. Loss which is incurred, or which results, from injury which is sustained or sickness which begins while the Insured is on full-time active duty with the armed forces of any country. This exception does not apply if the active duty is for two months or less just for training. (See the Suspension During Military Service provision for your rights to premium refund and to reinstatement.)

(B) In addition to the losses described in (A) above, we do not pay benefits under the Accidental Death and Dismemberment Benefit for any loss which results from:

   1. Suicide or attempted suicide while sane or insane;

   2. Infirmity or disease of mind or body or treatment for it;

   3. Travel by, or descent from, any aircraft if the Insured had any duties or acted in any capacity other than as a passenger at any time during the flight. But we will ignore 3 if all these statements are true of the aircraft: (a) It has fixed wings and a permitted gross takeoff weight of at least 75,000 pounds. (b) It is operated by an air carrier which is certificated under the laws of the United States or Canada to carry passengers to or from places in those countries. (c) It is not being operated for any armed forces for training or other purposes. As used here, the word aircraft includes rocket craft or any other vehicle for flight in or beyond the earth's atmosphere.

Printed in U.S.A.

## GENERAL PROVISIONS

As used in these provisions loss means any loss described in the Accidental Death and Dismemberment Benefit.

**Entire Contract; Changes**—This policy, with any endorsements and papers attached, forms the entire contract. A change in this contract will be valid only when approved by a Prudential officer and made a part of the contract. An agent may not change the contract or waive any part of it.

**Incontestable as to Misstatements in the Application**—After this contract has been in force for two years during the lifetime of the Insured, we will not deny a claim or void the contract because of misstatements made in the application.

**Pre-Existing Conditions**—We will not reduce or deny a claim because a sickness or physical condition had existed before the effective date of coverage. But this does not apply if this contract excludes such a sickness or condition by name or description on the date of a loss or the date that total disability starts.

**Notice of Claim**—Written notice of claim must be given to us within 60 days after the date of a loss or the date that total disability starts. If notice cannot be given within 60 days, it must be given as soon as reasonably possible. The notice may be sent to our Home Office or given to one of our authorized agents. It should show the Insured's name and policy number.

**Claim Forms**—We will send you our claim forms when we have notice of claim. Proof of claim may then be given by using these forms. It may happen that you do not receive our forms within 15 days after the notice is sent. If so, proof of claim may then be submitted without waiting for the forms. This should be done within the time stated in Proof of Claim. This proof must cover the occurrence and nature of the loss or total disability for which claim is made.

**Proof of Claim**—Written proof of a loss or total disability must be given to our Home Office. This must be done no later than 120 days after the date of the loss or the end of the period for which we are liable. If proof cannot be given within 120 days, it must be given as soon as reasonably possible. But proof of claim may not be given later than one year after the time proof is otherwise required, except in the absence of legal capacity.

**Time of Payment of Claims**—After we receive due written proof of claim, any benefits payable under this contract at regular intervals will be paid monthly, and any balance of such benefits which remains unpaid when our liability ends will be paid immediately. Any benefits payable for a loss will be paid as soon as we receive due written proof of claim.

**Payment of Claims**—If the Insured dies, the benefit payable under this contract because of his or her death will be paid to the beneficiary. But this is subject to any provisions which apply to the payment and are in effect when the payment is made. If there is no named beneficiary at the time of payment and no other provision is in effect as to the payment, we will pay the benefit to you. We have the right to pay you or the named beneficiary any amount which is due for benefits which are payable at regular intervals and are unpaid when the Insured dies.

We will pay any other benefits to you.

If you are not able to give a valid release or if any benefits become payable to your estate, we have the right to pay up to $1,000 to any of your relatives whom we consider entitled to it. If a beneficiary is not able to give a valid release, we have the right to pay in the same way to any of his or her relatives. If we pay benefits in good faith to a relative, we will not have to pay such benefits again.

**Physical Examinations**—We have the right to require that the Insured be examined at our expense. We may do this when and as often as it is reasonable while the claim is pending.

**Legal Actions**—No legal action can be brought to recover on this contract before the end of 60 days after we have been given due written proof of claim. No such action can be brought more than three years after the time written proof of claim is required.

**Misstatement of Age**—If the stated age of the Insured is not the correct age, the amounts payable will be determined as shown below.

1. If coverage would be provided had the correct age been given, the amounts payable for claims will be the amounts that the premiums paid would have bought at the correct age.

2. If the misstated age causes us to accept premiums for a time when coverage would not otherwise be provided, our only liability for that time will be the refund of any premium paid.

*(Continued on Next Page)*

Page 9 (DP—79B)

**(Continued)**

**Suspension During Military Service**—If you ask us in writing, we will suspend this contract while the Insured is on full-time active duty with the armed forces of any country. We will then give back any premium paid which applies to the term of active duty for which coverage is not provided. But we will not suspend the contract if the active duty is for two months or less just for training.

If the contract is suspended, you may reinstate it after the date the term of active duty ends. This can be done if these conditions are met within 60 days after that date.

1. You ask us in writing to reinstate the contract. We will not need proof that the Insured is insurable.

2. We receive a premium payment for the term from the date full-time active duty ends until the next premium due date.

**Beneficiary**—The beneficiary under this contract is the person or persons named as beneficiary in the application. But the beneficiary may be changed. You alone have the right to make this change. The consent of the beneficiary is not required. Nor is it required for assignment of the contract or for any other changes in it.

Your request for change of beneficiary must be in writing and in a form which meets our needs. It will take effect only when we file it at our Home Office. This will be after you send the contract to us to be endorsed, if we ask you to do so. Then any previous beneficiary's interest will end

as of the date of the request. It will end then even if the Insured is not living when we file the request. Any beneficiary's interest is subject to the rights of any assignee of whom we know.

The interest of any beneficiary who dies before the Insured will become yours unless the contract or the latest filed request for change of beneficiary states otherwise.

**Ownership**—The owner of this contract is the applicant if other than the Insured. Otherwise the owner is the Insured. While the Insured is living the owner alone is entitled to: (a) any amount payable under the contract; and (b) the exercise of every right and privilege granted by the contract or by us.

**Assignment**—We will not be deemed to know of an assignment unless we receive it, or a copy of it, at our Home Office. We are not obliged to see that an assignment is valid or sufficient.

**Statements**—All of your statements in the application for coverage under this contract will be considered to be made to the best of your knowledge and belief. We will not use any statement, unless made in the application, to deny a claim or to void the contract.

**Dividends**—Your contract may share in our surplus to the extent and in the way that we may from time to time determine.

1. Name of person

Pruco Life Insurance Company of America — Printed in U.S.A.
A Sub... ...

~~Insurance Company of America~~
**Pruco Life Insurance Company**
A Subsidiary of The Prudential Insurance Company of America

No. _Disability_

**1. Name of person examined—first, initial, last (Print)**
Michael D. Sullivan

| | 2. Family record | Living (give age) | Dead Cause of death | Age | Year |
|---|---|---|---|---|---|
| | Father | | Heart | 39 | 1952 |
| | Mother | | Cancer | 76 | 1980 |
| | Brothers (3) | 44,43, 34 | | | |
| | Sisters 0 | | | | |

**3. Has the weight of the person examined changed more than 10 pounds in the last year?** Yes ☐ No ☒ (If "Yes", give details in 11.)

**4. When was a doctor last consulted for the person examined?**
Mo. _March_ Yr. _1987_ (Give details in 11.)

**5. Is the person examined now being treated or taking medicine for any condition or disease?** ........ Yes ☐ No ☒

**6. Has the person examined ever:**

| | Yes | No |
|---|---|---|
| a. had any surgery or been advised to have surgery and has not done so? | ☒ | ☐ |
| b. been in a hospital, sanitarium or other institution for observation, rest, diagnosis or treatment? | ☒ | ☐ |
| c. used or is now using valium or other tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methodone or other narcotics; amphetamines or other stimulants; or any other narcotics or controlled substances, except as legally prescribed by a doctor? | ☐ | ☒ |
| d. been treated or counseled for alcoholism or other drug dependency? | ☐ | ☒ |
| e. had life or health insurance declined, postponed, changed, rated-up or withdrawn? | ☐ | ☒ |
| f. had life or health insurance canceled or its renewal or reinstatement refused? | ☐ | ☒ |

**7. Has the person examined ever been treated by a doctor for or had any known sign of:**

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| a. high blood pressure? | ☐ | ☒ | d. asthma, emphysema or tuberculosis? | ☐ | ☒ |
| b. chest pain, pressure or discomfort? | ☐ | ☒ | e. tumor, cancer, leukemia, diabetes or syphilis? | ☐ | ☒ |
| c. heart murmur or rheumatic fever? | ☐ | ☒ | f. nervous trouble, convulsions, epilepsy or mental disorder? | ☐ | ☒ |

**8. Other than as shown above, has the person examined ever been treated by a doctor for or had any known sign of a disease or disorder of the:**

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| a. heart, arteries or veins? | ☐ | ☒ | e. kidney, bladder, genital organs or urinary tract? | ☐ | ☒ |
| b. lungs, chest or throat? | ☐ | ☒ | f. liver, gallbladder, stomach, intestines or rectum? | ☐ | ☒ |
| c. brain or nervous system? | ☐ | ☒ | g. blood, glands or skin? | ☐ | ☒ |
| d. spine, joints, skull or other bones? | ☒ | ☒ | h. ears, eyes, nose or sinuses? | ☐ | ☒ |

**9. Other than as shown above, in the past 5 years has the person examined:**

| | Yes | No |
|---|---|---|
| a. consulted or been attended or examined by any doctor or other practitioner? | ☒ | ☐ |
| b. had electrocardiograms, X-rays for diagnosis or treatment, or blood, urine, or other medical tests? | ☒ | ☐ |
| c. made claim for or received benefits, compensation, or a pension because of sickness or injury? | ☐ | ☒ |

**10. Does the person examined now have a known sign of any physical disorder, disease or defect not shown above?** Yes ☐ No ☒

**11. What are the full details of the answer to 4 and to each part of 3 and 5 through 10 to which is answered "Yes"?**

| Question No. | Illness, operation or other reason. Reason for any check-up, doctor's advice, treatment and medication. | Dates and duration of illness | Full names and addresses of doctors and hospitals |
|---|---|---|---|

(4.) Dr. Leuthers, Goddard Med Assoc, 1 Pearl St, Brockton Ma. For Annual P.E. had blood, urine, EKG + rectal exam. Nothing remarkable. Tenn. Vasectomy in childhood. Complication ^ recovered. 6b. Ford family - Sudden Death Hosp 15 years ago. Annual P.E. only. EKG Post Dr. Capelo.

To the best of my knowledge and belief the above statements are complete and true. It is understood that, if any of the above statements is a material misrepresentation, coverage could be invalidated as a result.

Date 5-28 19 87    Witness ROBERT E. ARENZ CPT    Signature Michael P. Sullivan

COMB 84379-86

**Prudential**   The Prudential
Insurance Company
of America

Number

*H 0551 7149 m*

Prudential is authorized to change the application for this contract, so that the contract is issued:

with question *12* of part 1 answered:

Company                         *Monarch*

Amount of Monthly Benefit $ *3 000*

Benefit Duration          i  *6 months*

with question *12* of part 1 answered:

Company                         *Phoenix*

Amount of Monthly Benefit $ *1603*

Benefit Duration          i  *6 months*

The undersigned agree(s) that this form is a part of the application and is to be put in the contract.

Date

*8·11 . 19 87*

Signature of Proposed Insured or Annuitant

*K  Michael J Sullivan*

Signature of Applicant (If other than proposed Insured or Annuitant)

Witness to signature(s)

*John R Sullivan*

(If applicant is a firm or corporation, insert name of company)

By

This copy is to stay in the Contract.

MB 10164 — 79

(Signature and the title of officer signing for firm or corporation)

Printed in U.S.A.

| 1a. Proposed Insured's name—first, initial, last (Print) | 1b. Sex | 2a. Date of birth | | | 2b. Age | 2c. Place of birth |
|---|---|---|---|---|---|---|
| MICHAEL D. SULLIVAN | ☒ M ☐ F | Mo. 8 | Day 3 | Yr. 56 | 40 | MA. |

| 3. | ☐ Single | ☒ Married | ☐ Widowed | ☐ Separated | ☐ Divorced |
|---|---|---|---|---|---|

**4.** Home address  No. 40 SPOONER ST.  Street  City N. EASTON MA.  State  Zip 02356

**DISABILITY INSURANCE SECTION**

| 5a. Occupations FINANCE DIRECTOR | 5b. For how long? 2 WKS | 5c. Duties (in detail) DIRECTOR OF FINANCES |
|---|---|---|

**6.** Plan  S+A to age 65

**7. a.** Monthly Income Benefit
   (1) First six months benefits $ — 0 —
   (2) After six months benefits $ 2810.00
**b.** Elimination period for disability benefit 26 weeks

**8.** Occupation Class ☒ 4A ☐ 3A ☐ 2A ☐ A

**9. a.** Monthly earned income from all occupations
   $ 7000.00
**b.** Is any part of earned income continued during disability other than as shown in 12? . . . Yes ☐ No ☒
   If "Yes",       % for       months.

**10.** Accidental death and dismemberment $

**11.** Beneficiary (if accidental death benefit included)

| Name | Relationship |
|---|---|

**12.** What disability benefit plans (other than Social Security) do you now have, or have pending, from Health, Life, Group Insurance, State or other disability plans? . . . . . . . . ☐ None

| Company | Amount of monthly benefit | Benefit duration |
|---|---|---|
| | | |
| | | |
| | | |

**13.** Is a medical examination to be made on the proposed Insured? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Yes ☒ No ☐

**14.** If 13 is "Yes", is it agreed that no insurance will take effect until any required medical examination is made even though 24 shows that an amount has been paid? . . . . . . . . . . . . . . . . . . . . . . . . . . . . Yes ☒ No ☐

**HEALTH SECTION**

**15.** Plan

**16.** Amount of Daily Hospital Benefit $

**17.** Optional Maternity Benefit? . . . . . . . . . . . . . . Yes ☐ No ☐

**18.** If dependents are to be covered, give:

| Name | Relationship Spouse | Date of birth Mo. | Day | Yr. | Age |
|---|---|---|---|---|---|
| a. | | | | | |
| b. | | | | | |
| c. | | | | | |
| d. | | | | | |
| e. | | | | | |
| f. | | | | | |
| g. | | | | | |
| h. | | | | | |

**20. a.** What other coverage for health care or hospital indemnity does any person named in 1a or 18 have now or have pending in this or any company or organization? . . . . . . . . . ☐ None

| Company | Type of coverage | Daily hosp. benefit | Deductible |
|---|---|---|---|
| | | | |

**19.** Is spouse to be covered employed? . . . . . . Yes ☐ No ☐
If "Yes", state occupation, duties, employer and address.

**b.** Is any person named in 1a or 18 now eligible or to become eligible in the next 6 months for a Group-type plan not identified in the answer to 20a? . . . . . . . . Yes ☐ No ☐
If "Yes", identify person and give details.

**21.** Will this insurance replace or change any existing insurance in any company on any person named in 1a or 18?  Yes ☐ No ☒
If "Yes", give their names, name of company, plan, amount and policy number(s).

**22.** Within the past year has any person proposed for coverage participated in auto or boat racing, motorcycle racing or contests, sky diving, rodeos, scuba diving or hang-gliding? If "Yes", give details.  Yes ☐ No ☒

**23.** Premiums payable ☒ Ann. ☐ Semi-Ann. ☐ Quar. ☐ Mon. ☐ Pru-Matic ☐ Pay. Budg.  **24.** Amount paid $ 1073.42

**25.** State any special dating or other request.

SA 14 83

Continuation of Part 1 of Application

Disability Insurance—Always complete 26 thru 33 when applying on a non-medical basis

| | |
|---|---|
| 26. Height and weight of: a. Proposed Insured Ht. _61_ Wt._204_ b. Spouse Ht._____ Wt._____ | |

Has the weight changed more than 10 pounds in the past year? Yes ☐ No ☒ If "Yes", give details in 33.

27. Has the proposed Insured or spouse ever smoked?    a. Proposed Insured   Yes ☐ No ☒    b. Spouse Yes ☐ No ☐
If "Yes", give date(s) last smoked: Cigarettes    Cigars    Pipe
Proposed Insured    Mo.____ Yr.____    Mo.____ Yr.____    Mo.____ Yr.____
Spouse    Mo.____ Yr.____    Mo.____ Yr.____    Mo.____ Yr.____

28. When was a doctor last consulted by:   a. Proposed Insured? Mo. _3_ Yr._87_ b. Spouse? Mo._____ Yr._____

29. Is any person to be covered now being treated or taking medicine for any condition or disease? . . . . . . . . Yes ☐ No ☒

30. In the past 10 years, has any person to be covered ever:

| | | Yes | No |
|---|---|---|---|
| a. | had any surgery or been advised to have surgery and has not done so? . . . . . . . . . . . . . . . . . . . . . | ☐ | ☒ |
| b. | regularly used or is any such person now using, barbiturates or amphetamines, marijuana or other hallucinatory drugs, or heroin, opiates or other narcotics, except as prescribed by a doctor? . . . . . . . . . . . . | ☐ | ☒ |
| c. | been treated or counseled for alcoholism? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ | ☒ |
| d. | had life or health insurance declined, postponed, changed, rated-up or withdrawn? . . . . . . . . . . . . . . | ☐ | ☒ |
| e. | had life or health insurance canceled, or its renewal or reinstatement refused? . . . . . . . . . . . . . . . . . | ☐ | ☒ |

31. Other than as shown above, in the past 5 years has any person to be covered:

| | | Yes | No |
|---|---|---|---|
| a. | consulted or been attended or examined by any doctor or other practitioner? . . . . . . . . . . . . . . . . . . . | ☐ | ☒ |
| b. | been in a hospital, sanitarium or other institution for observation, rest, diagnosis or treatment? . . . . . . . . | ☐ | ☒ |
| c. | had electrocardiograms, X-rays for diagnosis or treatment, or blood, urine, or other medical tests? . . . . . . | ☐ | ☒ |
| d. | made claim for or received benefits, compensation, or a pension because of sickness or injury? . . . . . . . . | ☐ | ☒ |

32. Does any person to be covered now have a known sign of any physical disorder, disease or defect not shown above? Yes ☐ No ☒

33. What are the full details of the answer to 28 and to each part of 26 and 29 thru 32 which is answered "Yes"?

| Name & Question No. | Illness or other reason | Dates and duration of illness | Full names and addresses of doctors and hospitals |
|---|---|---|---|
| 28 A. Regular annual physical - no problems | | | Dr. Lubeck Colony Med. Assoc. Carol St. Brockton Ma |

The proposed Insured declares that, to the best of his or her knowledge and belief, the above statements are complete and true. If the Company gives a Limited Insurance Agreement, SA 34031-83, of the same date as this Part 1, coverage will start as shown in that form.

IT IS UNDERSTOOD THAT NO BENEFITS WILL BE PAID UNDER THE LIMITED INSURANCE FOR ANY BODILY OR MENTAL DISORDERS FOR WHICH ADVICE OR TREATMENT WAS GIVEN BY A DOCTOR WITHIN THE TWELVE MONTH PERIOD JUST BEFORE THE DATE THE LIMITED INSURANCE STARTS.

If the Company does not give a Limited Insurance Agreement, then no coverage will start unless: (1) a contract is issued; (2) it is accepted; (3) the full first premium is paid; and (4) the statements in Parts 1 and 2 continue to be complete and true as of the date of delivery. If all these take place, coverage will start on the effective date in the contract. No agent can make or change a contract or waive any of the Company's rights or needs.

OWNERSHIP: Unless otherwise asked for above, the owner of the contract will be (1) the applicant if other than the proposed Insured, otherwise (2) the proposed Insured.

Dated at Brockton, Ma. on 5-18, 1987    Signature of Proposed Insured X Michael D. Sullivan
(City/State)
Witness    Signature of Applicant (If other than proposed Insured)

(Only we can endorse this contract.)

Policy #
H 5518149

1-800-828-0153

Needham, MA

781-449-9100
Field office

**Reassure America**
**Life Insurance Company**

Individual Disability Income Claims
P.O. Box 749014
Dallas, Texas 75374-9014
(800) 743-0122

## CLAIMANT'S INITIAL STATEMENT

Claim for (check those applicable)    ☒ Total Disability    ☐ Overhead Expense    ☐ Residual Disability
Policy No.(s) H 5518149    ☐ Income Replacement    ☐ Partial Disability    ☐ Cancer
                                                    ☐ Medical                 ☐ Other_____

| Your Name and Address | Your Employer |
|---|---|
| Name: Michael D. Sullivan | Name: N.A. |
| Street, Apt #, City, State, Zip: 40 Spooner Street N. Easton MA 02356 | Street, Suite #, City, State, Zip: |
| Phone # 508-238-8225 | Phone # |
| Date of Birth 8-3-46 | Your Job Title |
| Social Security No. 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 | Supervisor's Name |
| Height, Weight, Current Age 6'1" 230 Pounds Age = 55 | Type of Employment: ☐ Salaried ☐ Hourly ☐ Self-employed ☐ Independent Contractor ☐ Partner in Partnership ☒ Unemployed ☐ Terminated ☐ Partner ☐ Sole Proprietor ☐ S Corp ☐ C Corp ☐ Retired |

### Description of Condition Causing Disability

If your condition is due to an accident complete questions A – F, then skip to J
A. If accident, date occurred 1/9/02    How and where did accident occur (explain fully): Slipped and fell on Wet Spot on Kitchen Floor At Home.
B. Were there any witnesses? Please list: Yes. - Florence Sullivan
C. Was an accident report completed: Yes ☐ No ☒ If yes, please attach a copy of the accident report. If you do not have a copy of the report, please specify the date and approximate time of the accident and the name of the authority who took the accident report:

D. Was the accident work related? Yes ☐ No ☒
E. Date symptoms first appeared: 1/9/02    Date of first treatment: 1/2/02
F. Please describe your injuries: Extreme Pain In Lower Back. Sharp Pains down Right Leg.

If your condition is due to a sickness, complete questions beginning with question G
G. Describe the nature and onset of your condition:    N/A

H. When did your symptoms first appear?_____    Date of first treatment:_____
I. When and how did your symptoms first effect your daily activities:_____

J. Is your condition work-related? Yes ☐ No ☒
   If Yes, please provide the name and address of your Worker's Compensation carrier, claim number, and policy number if known:

K. Have you ever had a similar condition?    Yes ☐    No ☐    If Yes, please provide details:_____

1

DLS Initial Claim Package

## Work Activity

Date last worked: _____
(mm/dd/yy)                            *N.A.*

Date able to resume partial duties:    On _____
(mm/dd/yy)

Date able to resume full duties:    On _____
(mm/dd/yy)

## List All Hospitalizations for this or any other condition

| HOSPITAL | ADDRESS | CONDITION/TREATMENT  Date admitted/date discharged |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

## List all physicians who have treated you for this or any other Condition

| Condition/Date of Onset | Treating Physician/Dates of Treatment | Address |
|---|---|---|
| Seen 1/2/02 & 5/28/02 | Albert Ackland MD 1/2/02 / 5/28/02 | 83° Oak St. Brockton MA |
| Seen 1/3o|-2 | Shields MRI Center | 365 Westgate Dr. Brockton M |
| Seen 2/14/02 - 2/28/02 | Fitness Forum PT (Physcal therapy) | 110 Liberty St. Brockton MA 02301 |

## Medications

| Drug/Dosage/Frequency | Prescribing Physician name and address | How long have you been taking this? |
|---|---|---|
| N.A. |  |  |
|  |  |  |

Please provide the name, address, and phone number of your pharmacy:  CVS \ South Easton, MA  508-238-348.

If your occupation is a medical or dental service provider, are you currently or have you ever self-prescribed medications?
Yes ☐  No ☐  If Yes, please provide details.  N/A

## Current Daily Activity

1. Describe how you currently spend your time and the daily activities that you engage in.  How is a typical day spent?  Please be specific.

Morning  Read Newspaper - try to do exercises suggested by physical therap

Afternoon  Watch Some tv. - Read.

Evening  Very Little. Watch Some t.v. \ Read

2.  Please describe your activities prior to your claim.

Morning  Walk 2-3 Miles  or in Bad weather Ride Stationary Bicycle

Afternoon  Go to Library - Play Golf; tennis

Evening  Attend Civic Meetings Such as town of Easton Selectman ; Knight of Columbus
and Serve on Civic Committee

3. Have you been doing any work from home or have you been to your place of business since your disability began?  If so, please provide dates and description of the activities:
None

## The Following Is Required By Federal Law

Did your employer pay any portion of the premium for this disability insurance?  Yes ☐  No ☐  If Yes, what percentage?

| Other Disability Coverage in Force | | | | | |
|---|---|---|---|---|---|
| INSURANCE CO. Name and phone # | POLICY NUMBER | DATE ISSUED | BENEFIT PERIOD | BENEFIT AMOUNT | TYPE OF INSURANCE |
| *None* | | | | | |
| | | | | | |
| | | | | | |

Do you expect to, or are you receiving any other Benefit?     Yes ☐ No ☒
Short Term Disability Amount_____     Yes ☐ No ☒
Long Term Disability Amount_____     Yes ☐ No ☒
Other _____     Yes ☐ No ☒

Are you receiving or have you applied for Social Security Disability Benefits? If Yes, please attach a copy of your award. If No, please attach a copy of your denial. Please provide date applied:_____     Yes ☐ No ☒

Are you receiving or have you applied for Worker's Comp Benefits? Please provide date applied:_____     Yes ☐ No ☒

Are you receiving or have you applied for State Disability Benefits? Please provide date applied:_____     Yes ☐ No ☒

Are you receiving or have you applied for any other type of Social Benefit? Please provide date applied:_____     Yes ☐ No ☒

Have you or your attorney filed a lawsuit against any third party in connection with this illness or injury? If Yes, please provide details.     Yes ☐ No ☒

Have you retained the services of an attorney to represent you against any third party relative to this illness or injury? If Yes, please provide details.     Yes ☐ No ☒

Does an attorney currently represent you for your Reassure America claim? If so, please provide the name and address:     Yes ☐ No ☒

| Other Insurance Information | | |
|---|---|---|
| Health Insurance Carrier Name/address/phone number (please feel free to attach a copy of your card)   Tufts Health Plan | Policy or Group Number   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-02 | Effective Date   1/1/02 |
| Malpractice Carrier Name/address, if applicable (please attach a copy of your declaration of coverage page)   N.A. | Policy or Group Number | Effective Date |

### Detailed Occupational Information

What was your Occupation(s) at the onset of your claim? (please attach a current resume or CV, detailed job description and copy of your employment agreement, if available): _Unemployed_____

Net monthly income (gross income less business expenses) at time condition began $ _-_ 0 ✓ If hourly, hourly rate:_____
Please provide percentage of ownership or stock held if applicable: _N.A.___
Normal work schedule immediately prior to claim: Number of days work: _-0-_ Number of hours per week: _-0-_
How many years have you worked in your primary occupation? _____
Do you have any secondary employment or business ownership interest? Yes ☐ No ☒ If Yes, how often do you participate in the other employment? Number of hours per week? _____ Number of days per week? _____ How much income is generated monthly? _____ Annually? _____
Name and address of secondary employer and nature of business: _N.A._____

Did you reduce your work hours at any time in the past 36 months? Yes ☐ No ☒ If Yes, please explain: _____

Please include copies of your personal income tax returns including W-2's, all schedules and attachments for the last five tax years. Also include copies of your two most recent pay stubs.

_Will be forwarded under Separate Cover._

_Many Pages._

List all of your occupational duties in descending order of importance and indicate approximate number of hours spent at each:

DLS Initial Claim Package

| Duties | Percentage of time | Hours per week |
|---|---|---|
| *N.A* | | |

Please relate how your restrictions and limitations effect your ability to perform your occupational duties: _____

If you are back to work partially, please describe your typical day now: _____

Is your work: Mostly indoors ☐    Mostly outdoors ☐ Equally in and out ☐    Seasonal or are there cycles of business activity ☐

If so, please provide details:_____

If your occupation normally requires travel other than between residence and principle place of business, describe the usual frequency, mode of transportation, trip distance and purpose: _____

**Physical Requirement of Occupation**

Sitting _____ hours per day          Lifting/carrying _____ hours per day
Standing _____ hours per day      Handling/fingering _____ hours per day
Walking _____ hours per day        Speaking _____ hours per day

Maximum weight lifted or carried?                    10 lbs ☐  25 lbs ☐  50 lbs ☐  100 lbs ☐
Maximum weight most frequently lifted or carried?     10 lbs ☐  25 lbs ☐  50 lbs ☐  100 lbs ☐

When you recover, is your job still available to you?  If not, why not: *N.A.*

Are there any other factors, apart from your condition, that would impact your ability to return to work?  If so, what?_____

Could your job be modified to allow you to return to work with your condition?  Please provide details. *N.A.*

While you are out of work, who is performing your job duties? *N.A.*

Are you performing any job duties at home?  If so, what duties? *N.A.*

Did/do you spend time on the Internet at: Work ☐    Home ☐    None   ☐ If so, for what purpose? _____

Do you have a professional Website?  Yes ☐  No ☒  If Yes, please provide the Web address_____

Do you utilize on-line stock trading?  If Yes, provide details including percentage of time spent doing on-line trading prior to and since your illness or injury:__ *N.A*

| Education / Experience | | |
|---|---|---|
| Primary / High School:          1  2  3  4  5  6  7  8  9  10  11  (12) GED | | |
| Trade School Years:                       Skill Trade: | | |
| College: 1  2  3 (4)          Major / Minor:  *Accounting* | | |
| Post Graduate Work: (1) 2  3  4     Area(s) of study:  *Business*          Degree:  *MBA* | | |
| Other Continuing Education courses (keyboarding, software, classes, etc.): | | |

Military Experience: *U.S.A. Reserve*     Years served/Rank: *4-68 — 7/74     E-4*

Educational training while in Military: *Mortar Platoon*

Does your occupation require a license or other special privilege?  Yes ☐  No ☒  If so, has your license or privilege now or ever been canceled, revoked, suspended, limited, or under review of prosecution by the licensing body granting your license?

Yes ☐  No ☒ If so, please provide details: _____

State License(s): _____          License(s)/Certificate #: _____

List other employment prior to your current employment.  Please include the employer's name, your job title and duties performed

*Knight of Columbus Insurance     Sold Insurance*
                                                            *Life*

4                                                                        DLS Initial Claim Package

I hereby certify to the best of my knowledge and belief the above information is true, correct, and complete. I hereby authorize any physician, hospital, medical practitioner, clinic, mental health care provider, substance abuse treatment provider, pharmacy, health claim index, insurance company, reinsurance company, malpractice carrier, government agency, Social Security Administration, Internal Revenue Service, group policy holder, contract holder or benefit plan administrator, employer, former employer, State or Federal Licensing Boards, or other person organization to release to the Reassure America Life Insurance Company or its representative, any and all information relative to my health and medical conditions (including any illness, injury, psychiatric conditions, drug or alcohol use, or disorders of the immune system including Acquired Immune Deficiency Syndrome (AIDS)), and to release copies of all records with respect to my mental or physical condition, diagnoses, treatments consultations, medical history, prescriptions or benefits. I ALSO AUTHORIZE the release of all information concerning my occupation, work history, earnings, finances, or benefits which may be in the possession of any employer, insurance company, financial institution, accountant, consumer reporting agency, or any other agency, person or institution having such information.

Upon the presentation of the original or photocopy of this signed authorization I request the Social Security Administration to release information or records about me to Reassure America directly, or through its agent SS Consultants Inc., or through its other agents. This information is to be released in order to properly adjudicate my claim or continue my eligibility for benefits. Please release detailed earnings for the last 10 years and/or summary records of total earnings and/or information from master benefit records regarding award, denial or continuing benefits.

In addition, I AUTHORIZE Reassure America Life Insurance Company or its representative to share claim information with my medical care provider.

I UNDERSTAND that information obtained by use of this AUTHORIZATION will be used by REASSURE AMERICA LIFE INSURANCE COMPANY to determine eligibility for benefits under an existing policy.

I KNOW that I may request a copy of the Authorization.

I AGREE that a photostatic copy or facsimile transmission of this Authorization shall be as valid as the original.

**I AGREE this Authorization shall be valid for 90 days from the date the form is signed.**

DATE: ___6/5/_____, 20 02   SIGNED: _____
                                                    Claimant

**NOTE: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."**

Upon presentation of the original or photocopy of this signed authorization, I request the Social Security Administration to release to Reassure America Life Insurance Company any and all information regarding any claim filed for benefits under any program with the Administration. I further authorize the release of information regarding Social Security Disability award, earnings information, Workers Compensation, and if requested, any compensation regarding the status of my disability claim including date of my entitlement and any period when benefits were approved or denied. I understand that this authorization will be valid for 6 months from the date it was signed.

DATE: ___6/5_____, 20 02   SIGNED: _____
                                                    Claimant

_____8/3/46_____                    _____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_____
      Date of Birth                              Social Security Number

5                                                        DLS Initial Claim Package

**Reassure America**
**Life Insurance Company**

P.O. Box 749014
Dallas, Texas 75374-9014
Telephone: (800) 743-0122

This authorization should be included with the attending physician portion of the claim form to ensure prompt receipt of your medical records. Please sign and date before forwarding to your physician.

## AUTHORIZATION FOR THE RELEASE OF INFORMATION FOR CLAIMS

I AUTHORIZE my physician to release to Reassure America Life Insurance Company or its legal representatives, copies of my medical records.

6/5/02
Date

*Michael D. Sullivan*
Signature of Insured

40 Spooner Street
North Easton, MA 02356
Residence Address of Insured

DLS Initial Claim Package

6

P.O. Box 790015
Dallas, Texas 75374-9014
Telephone: (800) 743-0122

**Reassure America**
**Life Insurance Company**

# INITIAL ATTENDING PHYSICIAN'S STATEMENT
### Policy No. _45518149_

Please complete both sides of this form and promptly return it to Reassure America Life Insurance Company.
Any cost incurred in the completion of this form is the responsibility of the Insured.

| NAME OF PATIENT MICHAEL D. Sullivan | DATE OF BIRTH 08/03/46 | HEIGHT / WEIGHT 6'1" 230 |
|---|---|---|

## HISTORY OF CONDITION (Please print or type)

A. Date symptoms first appeared? 1/9/03

B. Referring physician's name, address and telephone number: Albert Acciel N

C. Has the patient ever had the same or similar condition?: Yes ☐ No ☑
   If Yes, please provide details including diagnosis and dates of treatment:

D. Have you ever treated this patient for any other condition?   Yes ☐ No ☑
   If Yes, please provide details including diagnosis and dates of treatment:

E. Describe the patient's initial reason for seeking treatment. Specify how and when the symptoms first appeared and the progression
   of symptoms to current level. L & R leg pain

F. List any additional treatment interventions, recommendations or referrals to other physicians, rehabilitation, day treatment
   programs, 12-step programs, community support groups and/or hospitalizations: Pt rehab   unt

## DIAGNOSTIC & TREATMENT

A. Primary Diagnosis (include complications): Lube Strain cord
   Radpory

B. Subjective Symptoms: L bl RLE pnt nml

C. Secondary Diagnosis (include complications):

D. Subjective Symptoms:

E. How have these subjective symptoms been verified? PE
   Have any collateral contacts been made? If so, who was contacted and when? Please provide details.

F. Objective Findings (Please attached copies of any testing or clinical findings.): +S&R  + Pt ILS

G. In your opinion, do the *objective* findings support the level of subjective limitations reported by your patient? Yes ☑ No ☐
   Please explain your answer V = + 92   22 1 - 12   1 7 / 12

H. Date of initial visit: _____  Additional dates of treatment since last report: _____

DLS Initial Claim Package

I. Date of next follow up visit:_____

J. Has the patient been hospitalized?  Yes □  No □  If Yes, please provide the name and address of hospital and dates confined:

_____

K. Please describe in detail the treatment plan for the insured including therapy, medications, frequency of visits, timeframe for implementation, etc.. Please attach a copy of the treatment plan.  *P.T*

_____

L. Please list current medications and dosages being prescribed:  *N 3M 1V*

M. Has this treatment plan been discussed with your patient?  Yes □  No □  If no, please explain: _____

_____

N. Does this treatment plan include a focus on returning your patient to his occupation?  Yes □  No □  If no, please explain:

_____

O. Compliance with treatment:  ☑ Excellent □  Good □  Fair □  Poor □  Noncompliant

P. Has the patient been discharged from your care?  Yes □  No □  If yes, please provide a date and reason for discharge.

_____

Q. Are there any other physicians or practitioners currently involved with this patient's treatment?  If so, please list the names, addresses, and specialty:_____ *R Warner  Newsey* _____

---

## Impairments, Limitations & Restrictions

A. Please describe your patient's mental/emotional impairments, if any: _____

_____    _____

B. Please describe your patient's physical impairments:  *has not left 2 old no*
_____  *prely Sulf Stay bend*

C. Please describe your patient's mental/emotional restrictions and limitations: ____ _____

_____

D. Please describe your patient's physical restrictions and limitations: _____

_____

E. Describe your understanding of the duties of your patient's occupation.  *Health care coorind*

F.  Have you restricted your patient's occupational activities in any way?  Yes □  No □
    If yes, please outline each restriction in detail:
    a) _____  Restriction began  *1-9-2* ___  Anticipated duration _____
    b) _____  Restriction began _____  Anticipated duration _____
    c) _____  Restriction began _____  Anticipated duration _____
    d) _____  Restriction began _____  Anticipated duration _____

G.  Have you restricted your patient's activities of daily living in any way?  Yes □  No □
    If yes, please outline each restriction in detail:
    a) _____  Restriction began _____  Anticipated duration _____
    b) _____  Restriction began _____  Anticipated duration _____
    c) _____  Restriction began _____  Anticipated duration _____

DLS Initial Claim Package

d) _____ Restriction began _____ Anticipated duration _____

H. Since the patient is submitting a claim for disability income benefits, what is your understanding about the patient's level of Vocational functioning prior to ceasing employment or reducing work hours? *[handwritten]*
_____

I. What, if any, nonmedical factors contribute to the insured's current employment or vocational status?
*[handwritten: N/]*
_____

J. If you have any additional information that would assist in our review and understanding of this case, please provide this information. _____
_____

K. Do you believe the patient is competent to endorse checks and direct the use of the proceeds thereof?  Yes ☑  No ☐

---

## PSYCHOLOGICAL SYMPTOMS – Please complete this section if the primary or secondary diagnosis involves a psychological or psychiatric condition, or if the patient is suffering from symptoms that are psychological in nature.

A. DSM-IV Multiaxial Diagnosis   *[handwritten: N/A]*

    Axis I _____    Axis II _____
    Axis III _____    Axis IV _____
    Axis V: Current GAF _____    Highest Past Year _____    Baseline _____

B. Subjective Symptoms: _____

C. Secondary Diagnosis (include complications): _____
_____

D. Subjective Symptoms: _____  _____  _____

E. How have these subjective symptoms been verified? _____
_____

    Have any collateral contacts been made? If so, who was contacted and when? Please provide details.
_____
_____

F. Objective Findings (Please attach copies of any testing or clinical findings)
_____

G. In your opinion, do the *objective* findings support the level of subjective limitations reported by your patient? Yes ☐  No ☐ Please explain your answer _____

H. Currently, what are the behavioral consequences of the patient's condition? Include the duration and severity of functional impairments and stress factors, as well as your understanding of your patient's activities of daily living.
_____
_____
_____
_____
_____
_____

I. Complete following checklist:  add explanations, if necessary, in the space provided following checklist.

9                                                                    DLS Initial Claim Package

Degree of Impairment (Please rate using scale of 0 – none, 1 – slight, 2 – moderate, 3 – significant, 4 – severe)

| | |
|---|---|
| Interpersonal relations | 0 |
| Daily Activities: <u>Occupational</u> (Please list in space below) | 0 |
| | 0 |
| Daily Activities: <u>Social</u> (Please list in space below) | 0 |
| Ability to think and reason | |
| Understand and carry out instructions | 0 |
| Sustain work performance | 0 |
| Attention span | 0 |
| Concentration | 0 |
| Past memory disturbance | 0 |
| Present memory disturbance | 0 |
| Judgement | 0 |
| | 3 |
| Thought content | 0 |
| Visual hallucinations | 0 |
| Auditory hallucinations | 0 |
| Suicidal ideation/intent | 0 |
| Homicidal ideation/intent | 3 |

Remarks: _____

_____

_____

J.  Affect (Please describe below: i.e., Appropriate, Inappropriate; full or restricted range; Labile, stable, flat)

_____

K.  Do you feel that the patient's condition has been precipitated by a situation at their place of employment? If "yes", please Provide details of the employment situation. ___ _____

L.  Are the patient's problems related to alcohol or drug abuse?  Yes ☐  No ☑  If "yes", please provide details.

_____

M.  Has this treatment plan been discussed with the patient?  Yes ☐  No ☐  If "yes", please provide details.

_____

N.  Has the patient ever had a psychiatric hospitalization? Yes ☐  No ☑
If "Yes", please provide the name(s) and addresses(es) of hospital(s) and date(s) of admission and discharge. ___

O.  Specify any other factors which may have precipitated this condition and which may effect prognosis for recovery.  (e.g. family history, affects of physical illness, psychological history, educational history, inability to tolerate medications, legal or licensing difficulties, financial difficulties, etc.). _____

_____

DLS Initial Claim Package

**CARDIAC – Please complete if applicable**

A. When was the last treadmill test? _____

B. What were the results of the test? _____

C. When was the last myocardial perfusion imaging? _____

D. What were the results of that test? _____

E. METS (circle one) 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

F. Blood Pressure (last date) Systolic _____ Diastolic _____ Date taken _____

G. When was the last echocardiogram? _____ What was the interpretation of that study? _____

H. Has the patient been referred for Cardiac Rehabilitation? Yes ☐  No ☐  If yes, please provide the name of Rehab center and date of referral. _____

I. LVEF _____  _____

J. Have any irregular heart beats been noticed? _____

K. What are the current medications? Please include the date prescribed, dosage and frequency. _____
_____

L. What are the coronary risk factors? _____

Please include copies of all medical records/notes since your last update was provided with this claim form. If there is a customary charge for these copies, please include your bill along with your Tax ID number; and we will be happy to mail you a check. If records have already been sent, please disregard.

Are you completing insurance forms or providing medical information to any other company(ies)? Yes ☐  No ☐
If Yes, please indicate the company and type of insurance (medical, disability, waiver of premium, etc.):

| _____ | _____ |
| Company | Type of insurance |
| _____ | _____ |
| Company | Type of insurance |
| _____ | _____ |
| Company | Type of insurance |

The above information is true and accurate to the best of my knowledge.

_____ _Albert Achji'L_ _____
Physician's Name and Address (please print)

_____ _5 ed ~_ _Qell Oll_ _____ _5 8 3 1 c 7 5_ ____ _New_ ____
Date          Physician's Signature          Telephone Number          Physician's Specialty
(Original Signature, no stamps please)

DLS Initial Claim Package

**Reassure America**
**Life Insurance Company**

Individual Disability Income Claims
P.O. Box 749014
Dallas, Texas 75374-9014
(800) 743-0122

Return To: _H5518149_    _N.A_

## EMPLOYER'S OR ADMINISTRATOR'S STATEMENT

**Please attach a copy of the employee's job description, if available.**

Please attach copies of the last three performance reviews, if possible.

| | |
|---|---|
| Print Employee Name | Date of Birth |
| Social Security Number | Occupational Title |
| Original Date of Hire (Month/Day/Year) | Date Employed in Current Job (Month/Day/Year) |
| Type of Employment    Salary ▢ Hourly ▢  Independent Contractor ▢  Self-Employed ▢  Partner in Partnership ▢ Terminated ▢  Partner ▢  Sole Proprietor ▢  S Corp ▢ C Corp ▢  Retired ▢ | Rate of Pay $_____    Frequency of Pay   Hourly ▢ Weekly ▢ Bi-Monthly ▢ Monthly ▢  Other (specify)_____ |

1. Prior positions held with your company_____

2. Nature of Employer's business_____

3. Number of hours worked in normal week_____

4. Date employee stopped work (Month/Day/Year)_____    Reason_____

5. Date employee returned to work - Full Time (Month/Day/Year)_____    Part Time (Month/Day/Year)_____

6. If employee returned to work part time, how many hours per week is he/she working?_____

7. Has the job been modified to accommodate employee? Yes ▢ No ▢ If yes, please explain_____

   _____

8. Did employee return to work at their own occupation? Yes ▢ No ▢ If no, please explain_____

   _____

9. If your employee has not returned to work, is their job still available? Yes ▢ No ▢   If no, please explain_____

   _____

10. Expected date of return if employee has not returned_____

11. If your employee cannot return to their former occupation, would the company provide an alternate position within their

    capabilities? Yes ▢ No ▢ If no, please explain_____

    _____

12. Does this position, or any other position, performed by the employee allow for telecommuting? Yes ▢ No ▢ Please explain

    _____

13. Does your company, or would your company, participate in a jobsite or ergonomic evaluation? Yes ▢ No ▢ If no, please

    explain_____

14. Does your company have Group Disability Insurance? Yes ▢ No ▢ If yes, please provide the name, address, and phone number

    of your Group Insurance Company:_____

    _____

DLS Initial Claim Package

15. Date employee's group coverage became effective _____

16. Is your employee eligible for Group Disability Benefits?  Yes ☐  No ☐  If yes, has your employee applied?  Yes ☐  No ☐  If no, please explain_____

17. If your employee has applied for Group Benefits, please advise date of application (Month/Day/Year)_____

18. Is your employee eligible for Workers Compensation Benefits?  Yes ☐  No ☐  If yes, please provide the name, address, and phone number of your Workers Compensation insurance company:_____

_____

If no, please explain_____

19. If a job description has not been attached, please list all of the occupational duties in descending order of importance and indicate approximate number of hours spent at each per week:

| Duties | % of Time | Hours/Week |
|---|---|---|
| | | |
| | | |
| | | |

20. Is the work:  Mostly Indoors ☐  Mostly Outdoors ☐  Equally In and Out ☐  Seasonal, or are there cycles of business activity ☐
Please provide details of the above_____

21. If the occupation requires travel other than between residence and principal place of business, describe the usual frequency, mode of transportation, trip distance, and purpose _____

22. Please advise of any educational requirements needed to perform this job, e.g., University or College Degree, certificates (either on the job or from formal schooling), training, etc._____

23. Additional comments on occupational requirements:_____

_____
_____
_____

24. Are you willing to make adaptations to these duties as may be required by the American Disabilities Act?  Yes ☐  No ☐   How has disability interfered with the performance of this occupation?_____

_____
_____

25. In terms of an eight-hour workday, claimant's occupation requires:

| | Not At All | Up to 2 Hrs | 2 to 6 Hrs | Over 6 Hrs |
|---|---|---|---|---|
| Bend/stoop | ☐ | ☐ | ☐ | ☐ |
| Reach above shoulder level | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Kneel | ☐ | ☐ | ☐ | ☐ |
| Balance | ☐ | ☐ | ☐ | ☐ |
| Fine Motor Skills | ☐ | ☐ | ☐ | ☐ |

13

DLS Initial Claim Package

| | | | | |
|---|---|---|---|---|
| Speech – Expressing or exchanging ideas orally | ☐ | ☐ | ☐ | ☐ |
| Hearing – Recognizing sounds | ☐ | ☐ | ☐ | ☐ |
| Sight – Sharpness of near vision | ☐ | ☐ | ☐ | ☐ |
| Sharpness of far vision | ☐ | ☐ | ☐ | ☐ |
| Capacity to handle stress | ☐ | ☐ | ☐ | ☐ |
| Production sales quotas | ☐ | ☐ | ☐ | ☐ |
| Time deadlines | ☐ | ☐ | ☐ | ☐ |
| Lift   Usual number of _____ lbs | ☐ | ☐ | ☐ | ☐ |
| Maximum number of _____ lbs | | | | |
| Carry Usual number of _____ lbs | ☐ | ☐ | ☐ | ☐ |
| Maximum number of _____ lbs | | | | |

Other occupational requirements (please specify):

| | | | | |
|---|---|---|---|---|
| 1. _____ | ☐ | ☐ | ☐ | ☐ |
| 2. _____ | ☐ | ☐ | ☐ | ☐ |
| 3. _____ | ☐ | ☐ | ☐ | ☐ |
| 4. _____ | ☐ | ☐ | ☐ | ☐ |

Sit        _____hours at a time  _____hours total in a day
Stand  _____hours at a time  _____hours total in a day
Walk   _____hours at a time  _____hours total in a day
Drive   _____hours at a time  _____hours total in a day

| Name of Company | Address of Company |
|---|---|
| Phone Number of Company | Name of Contact Person if different than person completing this form |

I HEREBY DECLARE THAT ALL STATEMENTS GIVEN ON PAGES 1 THROUGH 3 HEREIN ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

_____          _____
Signature and Title of Official Company Representative                            Date

DLS Initial Claim Package

**B. Authorization:** After reading, please sign and date the authorization to obtain and release information.

**C. Attending Physician's Statement:** This form should be completed by the physician who is *primarily* responsible for your care. Please be sure all dates of treatment are indicated in this section and that your physician completes each question, then signs and dates this form.

**D.** Please provide copies of your personal and business income tax returns (if applicable) including W-2's, all schedules and attachments for the last five years. Also, please include copies of your two most recent pay stubs.

We have enclosed a self-addressed return envelopes to assist you in forwarding these completed forms.

In the meantime, should you have any problems or questions regarding the completion of these forms, please do not hesitate to contact us for assistance at (800) 743-0122, ext. 4030.

Sincerely,

Pamela Jacques
Claims Specialist

NOTE: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

P O Box 749014     Dallas, Texas 75374-9014     (800) 743-0122

# Reassure America
## Life Insurance Company

September 5, 2002

MICHAEL SULLIVAN
40 SPOONER ST.
N. EASTON, MA  02356

Re: Policy No. H5518149

Dear Mr. Sullivan:

On behalf of The Prudential Insurance Company of America, we are writing in regard to your Prudential Individual Disability Income Policy.

We have reviewed your claim for total disability benefits.  According to the information available to date, you are claiming total disability due to lumbar radiculopathy which you suggest began January 21, 2002 to the present date.  You also state that you were semi-retired and did not provide any information to support a specific occupation.  Based on our review, it appears that you are not eligible for disability income benefits.  Please allow me to explain our determination.

Your policy defines "total disability" as:

> **"total disability" means the complete inability of the Insured to perform any and every duty pertaining to the Insured's occupation until benefits for total disability have been payable under the policy during any period of total disability for 60 months or for the period for which such benefits are payable, if less;**

In applying the above definition to evaluate a claim for "total disability", it is evident an occupation should be supported prior to a period of "total disability".  However, there have been instances when claims have been payable in conjunction with the activities of a "retired person".  When evaluating a disability claim of this nature, please be aware that the conditions for eligibility are based on the normal activities of daily living; i.e., eating, sleeping, bathing, etc.  Therefore, the likelihood of being eligible for benefits as a "retired person", would in all probability be reduced if compared with being employed in an occupation with occupational duties.

As you are aware, your policy has a 26-week elimination period, which means you would have to remain totally disabled beyond this period to become eligible for benefits.

On June 14, 2002, we received a Claimant's Initial Statement completed by you which indicated that you slipped and fell on a wet spot on your kitchen floor while at home on January 9, 2002.  You indicated that you were first treated on January 21, 2002 due to extreme pain in lower back, sharp pain down right leg.  We received, on June 14, 2002, an Initial Attending Physician's Statement completed by Dr. Ackil, which

# Reassure America
## Life Insurance Company

March 25, 2003

MICHAEL J. MALLOY
ATTORNEY AT LAW
1469 WASHINGTON STREET
CANTON, MA 02021

Re: Your Client/Our Insured: Michael Sullivan
Policy No.     H90261002

Dear Mr. Malloy:

On behalf of The Prudential Insurance Company of America, we are writing in regard to the Prudential Individual Disability Income Policy.

We are corresponding with you to address the concerns outlined in your undated letter that was received at Reassure America on January 30, 2003. We previously denied Mr. Sullivan's disability claim on the premise that the symptoms associated with his impairment were not severe enough to prevent him from performing his activities of daily living for a continuous period of six months. After careful review of the information you have provided, we must abide by our original determination. Please allow me to explain.

The definition of "total disability" and "elimination period" as outlined in the Prudential contact states:

**Total disability:**

> **Total disability means the complete inability off the Insured to perform any and every duty pertaining to the Insured's occupation until benefits for total disability have been payable under the policy during any period of total disability for 60 months or for the period for which such benefits are payable, if less;**

**Elimination Period:**

> **Elimination period means the applicable number of weeks, specified in the Schedule of Benefits of the Policy Schedule, at the beginning of each period of total disability due to sickness or injury.**

The Schedule of Benefits that were issued to Mr. Sullivan on May 28, 1987 reflect a monthly income benefit of $2,810.00. This is payable on a monthly basis after satisfaction of a 26-week elimination period and to the insured's 65th birthday. However, this is contingent upon whether he satisfies the definition of "total disability", as outlined above.

On March 26, 2002, we received a "notice of claim" from Mr. Sullivan. On March 29, 2002, an initial telephone conversation was conducted with Mr. Sullivan to discuss his claim circumstances. During that



Michael Sullivan
September 5, 2002
Page 2

documents your restrictions and limitations as unable to lift over 20lbs, no prolonged sitting, standing, bending.

As we advised you in our letter dated June 18, 2002, we requested additional medical documentation from Dr. Ackil and Fitness Forum as to determine the severity of your impairment. The information from Dr. Ackil received on July 15, 2002 indicates that you were treated on two occasions, February 21, 2002 and May 28, 2002. The February 21, 2002 note indicates that you did not have the epidural injection; however, you were attending physical therapy and doing reasonably well. You still had some leg pain but actually had improved. You were to return to their office once physical therapy was completed. The May 28, 2002 treatment note indicates continued low back pain and paresthesias especially in the right lower extremity. It was suggested that you obtain a neurosurgical opinion concerning the spinal stenosis.

Subsequently, we have a letter from Dr. Weller, who is the neurosurgeon, dated July 9, 2002 addressed to Dr. Ackil. The letter documented his impression of your medical evaluation. He suggested to continue with conservative medical treatment and if symptoms continued, he suggests possible surgical intervention. It is our understanding that surgery is currently pending.

As I previously explained, we are currently assessing your claim as a "retired" person. You have not provided us with any documentation to support that you were involved in an occupation prior to the date you suggest total disability commenced. Should you provide us with this information, we would be more than happy to reassess our evaluation.

Therefore, taking this into account, in review of the medical records, it does not appear that the restrictions and limitations imposed by your physician would impair you from performing the normal activities of daily living, i.e., eating, bathing, dressing, sleeping for a continuous period of 26 weeks. In other words, you would have to be unable to perform these activities for 26 weeks in a row.

Again, should you provide us documentation, which supports your involvement in an occupation, we would be more than happy to reassess our decision.

Additionally, in the event you do proceed with surgery, and the recovery period from the surgery deems you totally disabled beyond the 26-week elimination period, we will be more than willing to reassess our determination.

Nothing in this letter should be construed as a waiver of any right or defenses under the policy or by law. This determination has been made in good faith and without prejudice pursuant to the terms and conditions of the contract.

Should you have additional new and objective information that would furnish a basis for our further review for possible reconsideration, please forward it to my attention within the next 30 days. If you have any questions, please call me at 1-800-743-0122, ext. 4030.

Sincerely,


Pamela Jacques
Claims Specialist, DI

MICHAEL J. MALLOY
ATTORNEY AT LAW
1469 WASHINGTON STREET
CANTON, MA  02021
PAGE 2

conversation Mr. Sullivan indicated that he was semi-retired.  When asked what occupation he was engaged in, he indicated that he did "books for his household".  Based on this information, It did not appear, Mr. Sullivan was employed at the time of his impairment.

On June 14, 2002 we received Mr. Sullivan's initial Claimant's Statement and initial Attending Physician's Statement.  This information referenced a period of "total disability" commencing January 9, 2002, due to multilevel spinal stenosis.  We were advised that these symptoms occurred as a result of a fall in his home.  On page 2 of the Claimant's Initial Statement, it asks about "current daily activities".  Under this caption, Mr. Sullivan provided us information regarding how a typical day is spent currently and to describe his activities prior to claim.  The activities prior to claim were described as

- ◆  Morning: walk 2-3 miles or in bad weather ride stationery bicycle;
- ◆  Afternoon: go to library, play golf, tennis;
- ◆  Evening: attend civic meetings such as Town of Easton selection; Knights of Columbus and serve on civic committee.

On Page 3, under the section Detailed Occupational Information, Mr. Sullivan indicated he was "unemployed".  There was no indication to believe Mr. Sullivan was employed in any capacity at the time of his impairment.

Although the policy provision for "total disability" clearly relates to a policyholder having an occupation, in order to give Mr. Sullivan every consideration, the claim was assessed on his inability to perform the normal activities of daily living; i.e., eating, sleeping, bathing, dressing.

In review of the medical records and the Attending Physician's Statement completed by his treating physician, it appears his current restrictions and limitations were 1). No lifting over 20lbs, 2). No prolonged bending, sitting or standing.  Based on the restrictions and limitations given by his treating physician, it did not appear these restrictions and limitations would have prevented him from performing the normal activities of daily living for a continuous period of 26 weeks.  As Mr. Sullivan did not satisfy the elimination period, the claim was denied.

We have reviewed the documentation received on January 29, 2003, which includes financial documentation for the tax years 1996 through 2001.  You indicate that pursuant to IRS code 475(f), Mr. Sullivan would have been in violation had he advised us of his employment.  It is documented, that on or about February 2001 he applied for status as a Day Trader; however, was not approved until on or about July 26, 2002.  Therefore, it appears you are alleging he was engaged in the activities of a Day Trader at the time of his impairment.  Therefore, if he was actively engaged in this activity and had subsequently filed an application with the IRS, it is unclear why this information could not have been divulged during our initial telephone interview.

According to the 2001 tax record, which should reflect an accurate report of his income and his activities relating to Day Trading, the following information was noted:

The W-2 income totaling $78,008.90 appears to be income earned by Mrs. Sullivan.  On Line 12, which references business income, the total shows a loss of $1,699.00.  There is also a capital loss in the amount of $3,000.00.  According to the Schedule C, which is the Profit and Loss from the business it reflects "0" under Part I income.  Under Part II, Expenses, it shows  $1,699.00.  The expenses are:

MICHAEL J. MALLOY
ATTORNEY AT LAW
1469 WASHINGTON STREET
CANTON, MA  02021
PAGE 3


- ◆ Margin Interest
- ◆ Office Expense
- ◆ Telephone

The Schedule D reflects activity with regard to the buying and selling with what appears to be 10 different stocks.

Based on the expenses documented on the Schedule C and the information documented on the Schedule D, it appears the activities associated with the business are minimal and performed in his home at the computer and/or telephone. There does not appear to be any physical activities associated with this business.

In determining eligibility, we apply the definition of total disability outlined on page one of this letter. As such, we take into consideration the occupation one is engaged in at the time of claim. Thus, we carefully considered all the duties Mr. Sullivan was required to perform in the activities of a Day Trader along with the level of his impairment. It would be reasonable to conclude that the duties associated with a Day Trader would consist primarily of sitting and using the telephone. As the work is performed from Mr. Sullivan's home, it would appear that he could work at his own pace, taking rest periods as his medical condition warrants. He would not be required to perform activities that include prolonged bending, sitting or standing. Nor would he be required to lift over 20lbs. There is currently no new medical documentation to review.

We must abide by our original determination and deny eligibility for benefits on the basis that his impairment would not have prevented him from performing his activities of a Day Trader beyond the 26-week elimination period.

Nothing in this letter should be construed as a waiver of any right or defenses under the policy or by law. This determination has been made in good faith and without prejudice pursuant to the terms and conditions of the contract.

Should you have additional new and objective information that would furnish a basis for our further review for possible reconsideration, please forward it to my attending within the next 30 days. If you have any questions, please call me at 1-800-411-1098, ext. 8530.

Sincerely,

Pamela Jacques
Claims Specialist, DI

*Albert A. Ackil, M.D.*

*Neurology – Electrodiagnosis*

**830 Oak Street, Suite 128E**
**Brockton, MA 02301**
**(508) 583-1295**

August 28, 2003

RE: Michael Sullivan
DOB: 8/3/46

This patient returned for followup today. He is really n t
doing that well. He is continuing to be quite symptomatic.
He has pain and paresthesias involving the right buttock
radiating to the lateral aspect of the calf to the foot
with numbness, paresthesias and pain. Sitting or walking
for extended periods of time causes worsening of his
symptoms. He has some difficulty sleeping at night.

He has been seen by Dr. Weller who suggested possible
surgical intervention if he did not respond to conservati e
treatment.

The patient is still quite symptomatic. His recent MRI sc n
showed no improvement. There continues to be the same
findings concerning DDD, nerve root compression, etc. It
is my impression that the patient has persistent lumbar
radiculopathy. He has had MRI scans and he has had
physical therapy, a course of conservative management,
anti-inflammatories, etc. and he is still quite
symptomatic. I think that surgical intervention has to b
readdressed and reconsidered and he is being referred bac
to Dr. Weller for consideration for this. If he is not a
candidate for surgery, he would be a candidate for epidur l
injections.

It is my impression that the patient is totally disabled
for 1/9/200? through continuing based on the physical
examination, the persistence of his radicular signs as we l
as MRI scans. I would not recommend that the patient lif
greater than 10 pounds and do no prolonged sitting,
standing, bending, climbing, etc. He cannot walk without

RE: Michael Sullivan
August 26, 2003
Page 2

any significant pain. He has difficulty sitting, standing
and bending for any extended periods of time. He should
not be crawling, etc. It is my impression that the
prognosis here is guarded and the length of disability is
indefinite and may be permanent depending upon his response
to therapy. It is my impression that he is totally
disabled at this time from his past occupation or any other
occupation, even on a part time basis. It is my impression
that he has inability to perform any of the duties
pertaining to his previous occupation from the onset to the
present and continuing beyond. He is also totally disabled
from any other occupation, even on a part time and limited
basis.

*Albert A. Ackil* MD

Albert A. Ackil, M.D.

AAA/ch
This is a transcribed dictation of the voice of Dr. Ackil.
Copy-Mr. Michael Sullivan
        Attorney Michael J. Malloy

**BROCKTON REGIONAL MRI CENTER**

265 Westgate Drive

Brockton, MA 02301

BROCKTON REGIONAL MRI CENTER

VISIT NUMBER           : 1-0037946-007

PATIENT NAME           : SULLIVAN; MICHAEL D

MEDICAL RECORD NUMBER : 1-006284

DATE OF BIRTH          : 08/03/1946

DATE OF EXAM           : 07/24/03

REFERRING PHYSICIAN    : ACKIL; ALBERT A
                         72 WASHINGTON STREET
                         TAUNTON, MA 02780

FILM PREFERENCE        : FAX ONLY, 508-880-0887, CISTERNO VERTIGO PTS

MRI EXAM               : MRI LUMBAR

CLINICAL HISTORY       : LUMBAR RADICULOPATHY, BILATERAL.

MRI TECHNIQUE          : IMAGING WAS PERFORMED ON A GE PROFILE 0.2T
OPEN MRI SYSTEM. THE FOLLOWING SEQUENCES WERE PERFORMED: SAGITTAL
T2-WEIGHTED, SAGITTAL T1-WEIGHTED, AXIAL T1-WEIGHTED, AXIAL
T2-WEIGHTED.

FINDINGS               : The examination is compared with previous exam
of January 2002. Congenital canal narrowing is again demonstrates
lumbar region. The lumbar vertebral bodies are intact. The conus
terminates at the T12 level and is unremarkable. Degenerative
spondylosis is seen at all lumbar levels with relative sparing of the
L3-L4 and L4-L5 discs.

There is significant degenerative interspace narrowing at the L2-L3
level which is not significantly changed. There is mild concentric
annular bulging with moderate posterior facet hypertrophy resulting in
mild stable central canal stenosis.

At L3-L4 the disc interspace is better preserved, there is mild
concentric bulging and mild canal stenosis due to posterior facet
hypertrophy. There are small intra foraminal protrusions bilaterally
with mild foraminal narrowing at both levels.

At L4-L5 annulus has unchanged mild concentric bulging with mild

```
VISIT NUMBER        : 1-0037946-007
PATIENT NAME        : SULLIVAN; MICHAEL D
PAGE NUMBER         : 2 OF 2
```

central canal stenosis with mild bilateral hypertrophic foraminal
narrowing.

At L5-S1 there is a stable shallow right posterolateral protrusion,
which combined with posterior facet hypertrophy, greater on the right,
results in moderate right lateral stenosis. There is moderate right
lateral recess stenosis due to the hypertrophic right-sided facet,
stable. The neural foramina are patent.

CONCLUSION             : 1. STABLE LUMBAR SPONDYLOSIS AND MULTILEVEL
MILD CENTRAL CANAL STENOSIS DUE TO CONGENITAL CANAL NARROWING AND
POSTERIOR HYPERTROPHIC CHANGE.

2. STABLE MODERATE RIGHT LATERAL STENOSIS, PREDOMINANTLY DUE TO
HYPERTROPHIC CHANGE, AT L5-S1 WITH A SUPERIMPOSED MINIMAL, SHALLOW
RIGHT POSTEROLATERAL PROTRUSION, ALSO STABLE.

PHYSICIAN              : DAVID M NOVICK, MD
                         (Signature on file)

07/25/03

MICHAEL SULLIVAN
DOB: 08/03/46
MR# 1911875
9-23-03

Mr. Sullivan presents to the office today in follow-up for lumbar radiculopathy. He was last seen on 7/9/02. He reports that his pain is worsening. He describes low back pain and right leg pain radiating from his right buttock into his lateral thigh, into his lateral calf, and into the first, second and third toes. He reports pain and paraesthesias. He also has a new symptom of bilateral leg cramping with walking. He did not undergo the epidural steroid injection as Dr. Weller had advised. He reports that he has undergone them in the past without relief. He underwent physical therapy in March of 2002 without relief and stopped secondary to the pain.

Current medications include, Advil three to four times per day, and Aleve prn.

On physical examination, motor testing of the lower extremities reveals give-way weakness throughout. Reflexes are 2+ at the knees and absent at the ankles bilaterally.

Dr. Weller examined the patient and reviewed the MRI scan, which was performed on 7/24/03 and demonstrates moderate to severe L2-3, 3-4, 4-5, L5-S1 lumbar spinal stenosis.

Mr. Sullivan presents with symptomatic lumbar stenosis with right radicular pain and neurogenic claudication. Mr. Sullivan would likely benefit from L2-L5 laminectomies. Dr. Weller explained the risks, benefits, and treatment alternatives with him. The patient would like to consider this and will notify us of his decision.

Marianne Cardello
Marianne Cardello, APRN, BC


Simcha J. Weller, M.D.

MC:df
MMedical

Cc:    William Siegel, M.D., Bridgewater Goddard Park Medical Associates,
       110 Liberty Street, Brockton, MA  02301
       Albert Ackil, M.D., 830 Oak Street, Suite 128E, Brockton, MA  02301
       Michael Sullivan,

*Albert A. Achtl, M.D.*

*Neurology - Electrodiagnostic*

78 Washington Street

Taunton, Massachusetts 02780

Telephone (508) 880-5880

Fax (508) 880-0887

## COVER SHEET

**Facsimile Transmittal**

To: *Attorney Malloy*    Fax: 781 · 828 5716

From:    Date: 9-19-03

Re:    Pages:

CC:

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Notes:

Note:  The information contained in this facsimile may be privileged and confidential and protected from disclosure.  If the reader of this facsimile is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this facsimile is strictly prohibited.  If you have received this facsimile in error, please notify the sender immediately by telephone at 508-880-5880 and destroy this

*Michael J. Malloy*
*Attorney at Law*

*1469 Washington Street*
*Canton, Massachusetts 02021*
*Telephone: 781-828-3103*
*Fax: 781-828-5710*
*Email: Lawyrmlly@aol.com*

Reassure America Life Insurance Company
c/o Pamela Jacques, Claims Specialist, DI
Reconsideration/Appeal
P. O. Box 749014
Dallas, Texas 75374-9014

December 10, 2003

**RE: Reconsideration: Michael D. Sullivan**
**Policy No.: H5518149**

Dear reconsideration analyst,

I hereby request reconsideration of the denial of benefits to my client, Michael D. Sullivan in regard to the above-captioned policy. In that regard I have enclosed the following:

Newly ascertained evidence attached herein of Dr. Albert A. Ackil, Neurologist dated August 28, 2003 and Dr. Simcha J. Weller, Neurological Surgeon, Beth Israel Deaconess Hospital dated September 23, 2003 with referenced supporting MRI conclusions and findings from the Brockton Regional MRI Center dated July 24, 2003.

First, Ms. Jacques initial evaluation denied my client benefits in part because he stated in his initial application that he was unemployed. The reason for that statement was that at the time of submission of his initial application Mr. Sullivan had a pending application with the IRS as a Day Trader that had not been approved. Accordingly, he understood, for whatever reason, that to hold himself out as a Day Trader, without first being approved by the IRS, would jeopardize his application. After additional evidence was provided to Ms. Jacques of his employment as a Day Trader she acquiesced in her letter dated March 25, 2003 upon reevaluation of the newly presented evidence that my client, Michael D. Sullivan was gainfully employed as a Day Trader and as such was capable of preforming his duties on a limited basis without restriction. To the later part of that statement, (i.e. "capable of preforming his duties on a limited basis without restriction.") we take exception.

According to your definition of "total disability" prudential contract states:
**Total disability:**

> **Total disability means the complete inability of the Assured to preform any and every duty pertaining to the Insured's occupation until benefits for total disability have been payable under the policy during any period of total disability for (60) months or for the period for which such benefits are payable, if less;**

Based on the aforementioned definition I direct your attention to the Dr. Albert A. Ackil,

(Sullivan's primary physician) in this case. Dr.Ackil demonstrates quite extensively the objective and subjective findings, limitations, and future prognosis of Mr. Sullivan. He [Dr.Ackil] denotes the excessive restrictions presented by Mr. Sullivan in regard to exercising his past occupation and/or any dissimilar occupation on a full-time or limited part-time basis.

Dr. Simcha J. Weller concurred with Dr. Albert A. Ackil's findings & determinations and further suggests that Mr. Sullivan's only option at this point is to live with the continued debilitating conditions or elect for a highly intrusive laminectomy surgery that is undetermined at best as to any significant improvements verses the adverse risks associated with the surgery.

In response to Ms. Jacques assessment of Trading actively by Mr. Sullivan she notes 10 Trades during 2002 that are reflected on his joint tax return of 2001. In reality, there were nine (9) trades consisting of: two (2) consecutive trades in January on 1-24-02, two (2) in February, on 2-15 & 2-25, one (1) in April, 4-11-02, and four (4) consecutive trades on 4-11-02. Of these nine (9) trades only seven (7) trades were made post injury. To consider seven (7) intermittent trades, months apart, to be judged as engaging in active trading would be unrealistic at best, even on a part-time basis. Additionally, these were not commercial market trades in furtherance of his business practice. These trades in question were strictly personal in nature, deminimus and were conducted specifically as a private matter. To equate these sporadic trades to conclude that the physical duties associated with a Day Trader were satisfied was unrealistic, unreasonable, and fatuous.

Again, I refer to the objective and subjective findings of Dr. Ackil and Dr. Simcha J. Weller who concurred with Dr. Albert A. Ackil's findings & determinations and described Mr. Sullivan's severe limitation quite poignantly.

Wherefore, taking into account, the totality of the newly submitted evidence and the clearly defined disabling conditions that Mr. Sullivan has suffered since the outset of his injuries we respectfully request that your reconsideration results in the retroactive approval of his request for disability coverage pursuant to his above-captioned policy provisions.

Thank you for your anticipated cooperation in this matter.

Very truly yours,

Michael J. Malloy, Esq.

cc: M.D.S.
C.P,Esq.
File

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

# MPO Consulting
### Mary Paine O'Malley, MA, CRC.CCM

125 Lorraine Metcalf Drive
Wrentham, MA 02093

Phone: 508-384-6003
Fax: 508-384-9815
Email: mpo@kersur.net

April 27, 2004

Pamela Jacques
Reassure America
12770 Merit Drive, Suite 600
Dallas TX 75251

Re: Michael Sullivan
Policy #: H5518149

## OCCUPATONAL REVIEW

Michael Sullivan is a 57 year old Day Trader who experienced an interruption of work on 1/9/02 subsequent to a fall in his kitchen. His current diagnosis is lumbar radiculopathy with moderate to severe lumbar stenosis.

The purpose of this review was to complete an occupational analysis of the occupation, Day Trader. As part of this analysis, this consultant met with Mr. Sullivan and his attorney, Michael Malloy, at his home on 2/11/04. Additional resources of information include the Securities Exchange Commission, National Association of Securities Dealers, Security Traders Association, Electronic Traders Association, www.TraderStatus.com, www.wjs.com (Wall Street Journal), www.newsobserver.com, www.investorwords.com, Bright Trading, www.stocktrading.com , www.DayTraders.com, www.investorhome.com the Department of Labor's Dictionary of Occupational Titles, Occupational Outlook Handbook, and the O*NET on line, Lifesteps Vocational Software, the and additional resources regarding day trading. .

## *INSURED INTERVIEW*

On 2/11/04, I met with Mr. Sullivan and his attorney, Michael Malloy, for approximately 1.5 hours. I was not informed that Attorney Malloy would be present prior to the meeting. Both Mr. Sullivan and Attorney Malloy were cooperative and pleasant during the course of the meeting. I explained that the purpose of the meeting was to gather additional information regarding Mr. Sullivan's occupation and to observe his home office space. As part of the interview, I also obtained information regarding Mr. Sullivan's current status, functional capacity and activities.

Prior to initiating the interview, Attorney Malloy referenced Mr. Sullivan's status as a licensed Day Trader with the IRS. He reiterated that Mr. Sullivan reported that he was

"unemployed" on his application for disability benefits noting that he was required by the IRS to be considered "unemployed" until his application for Day Trader status was approved. I noted that this information was provided in the referral packet, but we did not discuss this in great detail.

## _Medical Status/Functional Capacity_

Mr. Sullivan relayed that he continues to experience chronic pain and discomfort in his lower back. He has pins and needles in his feet all the time. He continues to be followed by Dr. Ackil, attending physician, and Dr. Weller, surgeon. He stated that he is still considering surgical intervention as suggested by Dr. Weller. He stated that he is not involved in formal physical therapy as this was deemed to be too painful and not beneficial. He does do some light stretching exercises at home. He will apply ice and heat occasionally. He does not take prescribed medications for his pain. He does take over the counter medication, Advil or Aleve, on a daily basis. He noted that the weather, especially the cold, impacts his pain and discomfort significantly. Mr. Sullivan reported that he uses a cane for ambulation and stair climbing, noting that he is very unsteady on the stairs. During the course of our meeting, Mr. Sullivan got up to stretch and or walk around several times.

In terms of functional capacity, Mr. Sullivan reported the following:

| | |
|---|---|
| Sit | 5-10 minutes, then needs to get up or lay down |
| Stand | 5-10 minutes |
| Walk | 5-10 minutes, no prolonged walking |
| Climb Stairs | very difficult, has fallen 3-4 times |
| Driving | 5-10 minutes, then needs to stop and stretch |
| Crawling | unable to do |
| Bending | Very difficult, uses support bar in shower, extended shoe horn for Shoes, can't tie shoes |

Mr. Sullivan stated that he currently spends most of his time living in the basement. He stated that he moved to the basement to sleep at night initially because he was keeping his wife awake at night. He reported that he has trouble showering (although the support bar in shower helps) and dressing (especially putting on shoes). He basically stays in the basement all day and reads, watches television and takes a nap. He will generally warm up a prepared meal for his lunch.

Mr. Sullivan brought me down to the basement which is the lower level of a split level home. When you enter the front door, there is a landing and you can either walk up 5-6 stairs to the main living area (kitchen, living room, dining room, bedrooms, bathroom and home office) or walk down 5-6 stairs to the basement. The basement was set up with two recliner chairs, a television and a couch. Mr. Sullivan descended the stairs very slowly holding the railing and using his cane. Mr. Sullivan demonstrated how he reclines in the chair with his legs elevated noting that is his most comfortable position. In addition to the recliners, there is an old couch, without seat cushions, which had a folded sleeping

bag, sheet and pillow on it. Mr. Sullivan reported that he sleeps on the couch every night. He then ascended the stairs in the same slow fashion using his cane.

*Occupational Duties*

Mr. Sullivan reported that he was working as a Day Trader starting in the year 2000. He has only performed Day Trader activity from his home. He has never worked from a trading room. He was trading only his own money and did not have any customers. He does not hold any professional licenses (i.e. Series 7, Series 6, etc.) other than the Day Trader license from the IRS. He stated that he was trading securities on the NYSD, NASD, American Exchange and the Boston Exchange. He did not trade on the Foreign Market. He primarily bought and sold securities/stocks held with the S & P. Companies included EMC, Corning, GE, HCA (Hospital Corporation of America), Gillette, IBM, Calloway Golf, Frenysius, Mattel, etc. He stated that he worked with 6-10 stocks/securities noting that the literature reports that the average Day Trader works with 4-7. Mr. Sullivan reported that he worked approximately 50 to 60 hours per week with 25 to 30 of those hours spent in his home office. This included after hours trading. The remainder of the time was spent conducting research regarding stocks. He would go to the local public library and/or the library at Stonehill College to conduct research. He would also meet or speak with CFO's, attend stockholder meetings, annual investor meetings/ conferences, trade shows on new products, etc. He subscribed to the Wall Street Journal and Money magazine; otherwise, he used all the resources at the library. He stated that he was trying to keep costs down. He noted that when at the library he would use the Internet to watch the market and would call his broker on his cell phone to make a transaction. He always tried to sell at market price. He always called his broker to make a sale as he wanted immediate confirmation that the transaction had been processed. He stated that he did not always close his trades at the end of the day (clear his tray). After our meeting, I contacted Mr. Sullivan to request what broker he used. On 2/25/04, Mr. Sullivan left a voice mail message informing me that he used *Stock Cross* in Boston as his broker.

Mr. Sullivan reported the following trading activity:

| Year | Trades | Monetary Value in Transactions |
|------|--------|-------------------------------|
| 2000 | 80 | $2,800,000 |
| 2001 | 40 | $1,150,000 |
| 2002 | 5 | $20,000 |
| 2003 | 0 | $0 |

Mr. Sullivan had calculated that there were approximately 249 possible trading days per year (365-104 Saturdays/Sundays-12 holidays=249 days). Based on this calculation, he reported that in 2000 he was making a trade approximately every 2 to 3 days. Using the same calculation, in 2001 he was making a trade approximately every 5 to 6 days. He stated that he had not made any trades in the year 2003.

I requested a copy of his 2002 tax returns. Both Mr. Sullivan and Attorney Malloy stated that they had already forwarded his tax returns to Pamela Jacques. I stated that I was asked to obtain a copy. I offered to take the tax returns to a copy service and return them immediately. Mr. Sullivan stated that he would have to find the original and Attorney Malloy stated the would take care of it and forward directly to Pamela Jacques. Mr. Sullivan stated that he has not completed his 2003 tax returns.

## Home Office Space

Mr. Sullivan showed me his home office space which is the third bedroom on the main floor of the home. It is down the hall from the kitchen and across the hall from the bathroom. The office had a "U" shaped desk configuration with the desktop PC in the middle. His desk top was completely clear of any work or personal product. I asked Mr. Sullivan to sit in the desk chair which he did momentarily then stated he needed to get up. The chair is an executive office chair that is not ergonomically correct. It offers little lumbar support and/or arm support. The height of the chair is not adjustable. The monitor height was not optimal for Mr. Sullivan. He did not have a head set and noted that he used his cell phone to make calls. Mr. Sullivan reported that he had basic internet connection on his home telephone line through Juno for $10.00 per month. When questioned about the speed of the Internet access, he stated that it was not an issue for him. Again, he did not make his own trade transactions. He would contact his broker via his cell phone and await confirmation over the telephone that the trade was successfully executed. Mr. Sullivan reported that he did not attempt any significant changes to his office to continue working.

## Return to Work Plans

I questioned Mr. Sullivan about his thoughts about returning to work. He stated that he has significant difficulty sitting, doing research at the library, etc. I noted that ergonomic interventions could be implemented that could make his home office more comfortable including an ergonomic chair, appropriate desk and monitor height, etc. I also stated that he could use subscriptions to services for information from his home rather than going to the libraries which he reported did not offer a comfortable work environment. Mr. Sullivan responded that he also has trouble focusing and concentrating on his work due to his pain and discomfort. He stated that when conducting research he would frequently lose his concentration. For example, he would use Value Line to look up companies' Pension Funds, Debt, etc. and he would lose his concentration when trying to complete this activity at the library. Mr. Sullivan stated that he would love to be doing something noting that he misses doing the day trading. He also noted that he is taking everything day to day noting that surgery is still an alternative.

## Work Experience

As part of the vocational interview, I asked Mr. Sullivan to provide me with information regarding his work experience. He reported that he began working as a Day Trader in 2000. Prior to that his work experience included the following:

| 1998-1999 | *Financial Planner/Insurance Sales Agent* |
|---|---|
| | Knights of Columbus |
| | Sold insurance, IRA's, Annuities, etc. to Knights of Columbus member only |
| 1997 | *Financial Analyst* |
| | Hospital Corporation of America |
| | He completed financial analysis, acquisitions, etc. |
| | HCA filed for bankruptcy |
| 1995-1996 | *National Director of Reimbursements/Regulatory Affairs* |
| | National Medical Care |
| 1994-1995 | *Chief Financial Officer* |
| | International Health-Home Dialysis |
| 1989-1994 | *Vice President/Treasurer* |
| | Goddard Memorial Hospital/Good Samaritan |
| | He also taught Health Administration classes at Stonehill College for three years and would have students work in hospital setting. |

Prior to this, Mr. Sullivan reported that he was a *Certified Public Accountant (CPA)* with Peat Mark and Mitchell in Boston MA. He stated that he worked on dead issues, bond issues and ratings. From 1975 until 1980 he also spent a lot of time on Wall Street with an Analyst regarding bond issues and ratings.

## OCCUPATIONAL REVIEW

### Definition of a Day Trader

The definition of a Day Trader is *a very active stock trader who holds positions for a very short period of time and makes several trades each day. Day traders are individuals who are trying to make a career out of buying and selling stocks very quickly often making dozens of trades in a single day and generally closing all positions at the end of each day.*

A Day Trader is a person engaged in the business of buying and selling securities of their own account. A Day Trader does not buy and sell securities (stocks) for customers/clients. They use their own money to buy and sell stocks. To meet the definition of a trader, you must seek to profit from daily movements in the prices of securities; carry on the activity with continuity and regularity; and your activity must be substantial. Day Traders are in and out of the market many times during the course of one trading session and often do not hold a position in any stocks overnight. This approach generates a lot of commissions and portfolio turnover and denies the day trader the ability to participate in the long-term creation of wealth through compounded growth.

Many day traders make dozens of trades every market day hoping to capture profits that arise from small intraday price fluctuations. This activity requires a lot of time using a computer.

Momentum of the stock market impacts certain trades. A day trader should never trade unlisted or thinly traded (low volume) stocks. These stocks have poor liquidity and hence a higher price volatility. This may make it harder for a day trader to exit the position quickly at a fair price. Day traders should trade on high volume, well known stocks.

Of note, there have been many studies that concluded that most day traders do lose money, but there are also successful day traders. The data implies that most day traders probably do lose money and industry commentators suggest that day traders using software at home are much less successful than those trading at professional day trading firms.

A Pattern Day Trader is an SEC designation applying to *any individual who buys and sells a particular security in the same trading day at least four times in a five day period, and for whom same-day trades make up at least 6% of the trader's activity during that period.* The pattern day trader must maintain a minimum equity of $25,000 on any day that there are day trades. Please see attached definitions for Day Trader and Pattern Day Trader (Appendix A).

*Work Environment*

Day Traders can work in a brokerage firm where they rent space in a trading room which includes high technology computers and high speed internet connection as well as other services. They also pay a fee to the brokerage firm to execute the trade such as .15 cents for every 1000 shares. Day Traders can also work from a home based office where they would have access to information from the Internet and Internet based services. The technology needed for a home based office setting is outlined below.

Brokerage firms bring buyers and sellers together. In these firms, investors place their buy and sell orders for a particular security or commodity by telephone, online by computer, or through a broker. The firm fills the order in one of three ways. The firm will send the order electronically to the company's floor broker at the exchange and the floor broker will then post the order and execute the trade by finding a seller or buyer who offers the best price for the client. Secondly, if a security is sold through a dealer network, such as NASDAQ, the broker can access a computer network that lists the prices for which dealers in that particular security are willing to buy or sell it. If a price that the client agrees with is found, then a purchase or sale is made. Large investors and brokerage firms also can buy and sell securities and commodities on "electronic communications networks," or ECNs—powerful computers that automatically list, match, and execute trades, eliminating the middleman. ECNs commonly are used for stocks that trade frequently and in large numbers.

Securities Traders and Day Traders must constantly keep an eye on market activity and stay in touch with other traders and brokers to know what prices are being offered.

## Education/Professional Licenses

Securities (stock) Brokers/Dealers working for a brokerage firm typically have special licenses such as a Series 7 because they are purchasing or selling securities for a brokerage firm to execute client orders. Most people in the industry are required to be licensed by the National Association of Securities Dealers (NASD) before they can sell securities or recommend specific investments. To be licensed, brokers and assistants must pass an examination that tests their knowledge of investments. Various licenses are available for different investment products; however, the one most brokers and broker's assistants receive is the "Series 7" license, which requires a passing score on the General Securities Registered Representative Examination administered by the NASD. Since 1995, the NASD also has required all registered persons with licenses to undergo a continuing education program approximately every 3 years in order to retain their licenses. Classes consist of computer-based training in regulatory matters and training on new investment products.

A Day Trader is not required to have a special license or professional designation primarily because a Day Trader is trading his/her own money. They do not have customers or clients for which they are making trades or providing a professional service. Several Internet sites offer training programs for Day Traders such as DayTradersUSA, DayTraders.com, Day Trading Institute and Bright Trading.

As noted above, Mr. Sullivan reported that he has a Day Trader's License from the IRS. This is for income tax reporting purposes only and is not a professional license such as the Series 7 license.

There are three classifications of taxpayers who trade in securities or commodities (futures): investor, trader and dealer. Only the dealer's earnings are subject to self-employment, social security or Medicare taxes. A dealer is defined as a person who realizes a profit when a customer buys a security at a price in excess of the dealer's price. An investor is defined as a person who purchases securities for capital appreciation and income with little or no regard for short-term fluctuations in price.

## Physical Demands

The occupational description was obtained from occupational resources published by the Department of Labor including the Dictionary of Occupational Titles (DOT), the O*NET Dictionary of Occupational Titles and the Occupational Outlook Handbook. The Department of Labor published the O*NET DOT to update and replace the DOT. The DOT has formed the basis for much of the occupational information used by employers, career counselors, job seekers, educational and training institutions, researchers and others. LifeSteps occupational/vocational software was utilized to view the Dictionary of Occupational Titles and Demand Characteristics for this occupation.

| Spend time using hands | 45 |
|---|---|
| Spend time standing | 30 |
| Spend time walking/running | 30 |
| Spend time making repetitive motions | 25 |
| Trunk Strength | 25 |
| Handling and Moving Objects | 25 |
| Arm-Hand Steadiness | 20 |
| Manual Dexterity | 20 |
| Wrist-finger Speed | 20 |
| Far vision | 15 |
| Spend time bending/twisting body | 15 |
| Performing general physical activity | 13 |
| Finger Dexterity | 10 |
| Multilimb Coordination | 10 |
| Spend time kneeling, crouching, stooping | 10 |
| Static Strength | 5 |
| Explosive Strength | 5 |
| Dynamic Flexibility | 5 |
| Night Vision | 5 |
| Depth Perception | 5 |
| Gross Body Equilibrium | 5 |
| Gross Body Coordination | 5 |
| Stamina | 5 |

## *Equipment and Services*

Equipment and services typically required for serious day traders include a computer and monitor (500MHZ with 128 MB is adequate, but the higher the processing speed the better). The computer screen should be 17 inches at minimum. The computer should be equipped with a network card. On line connection speed is very important for an active day trader. They need fast order executions, confirmations of trades and delivery of news and other market data. For the active Day Trader, a cable modem connection or DSL phone connection at minimum is highly recommended. The T-1 line is the fastest connection to a market maker.

In order to successfully day trade, a day trader must have access to real time market data. Relying on stale information will result in poor trades. Access to timely information and fast execution of trades is essential to trade successfully. The types of data that a day trader should have access to include stock quotes and tickers, market averages and indices, market news stories, charting, price and news alerts and NASDAQ Level II screens. A good Level II screen will let a trader bring up other real time data. Traders can chart the recent price action in a stock and graph the momentum and relative strength of the buying or selling pressure. Numerous firms can supply the day trader with real-time online market data. The prices for this data varies based on the supplier and the quality of data. Please see attached listing of service providers. **(Appendix D)**

The Department of Labor has classified jobs according to Demand Characteristics. A Vocational Assessment Report for *Securities Trader (DOT code 162-167-038)* has been generated through LifeSteps vocational software program. This information outlines the aptitudes, general educational development, specific vocational preparation, strength, physical demands, environmental conditions, temperaments and worker functions for each occupation. Please see attached Vocational Assessment Report. **(Appendix B)**

The physical demands of a Day Trader are most similar to the occupation of Securities Trader. This is a sedentary occupation which is described by the Department of Labor as:

*Lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as small tools, dockets and ledgers. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.*

Nineteen <u>Physical Demands</u> are used to assess an occupation by the DOT. This occupation involves occasional reaching and handling and frequent fingering, talking, hearing and near acuity.

Research reflects that the opportunity to change postural positions from sitting to standing/walking is available during working/trading hours depending on the amount of trading activity being performed. One research contact stated that he traded every 15 seconds on some days based on trade positions, news, trends for the day, etc. . When trading at this level, this contact reported that it would be difficult to get up and move away from the computer/work desk because each second counted. He also reported that the day trader's primary times for trading are 9:30 to 11:00 a.m. and 2:00 p.m. until 4:00 p.m. eastern standard time. He stated that the volume of trades are rather slow from 11:00 am until 2:00 pm and that Day Traders are primarily only in the market when there is volume.

The O*NET has characterized occupations in several categories that include <u>Knowledge</u>, <u>Skills</u>, <u>Work Activities</u>, <u>Abilities</u>, <u>Interests</u>, <u>Work Values</u> and <u>Work Context</u>. They also outlined descriptive elements, which describe the importance of the activity and/or the ability level needed to perform effectively in an occupation. Please see attached report. **(Appendix C)**

The descriptive elements related to the physical demands of the occupation are listed below with the following importance ratings (scale of 0-least important to 100-most important):

| Descriptive Element | Rating |
|---|---|
| Speaking | 92 |
| Spend time sitting | 85 |
| Near Vision | 70 |

There are two basic types of online order execution services available to day traders. The first is offered by Internet based online brokers which is the most commonly used type of online trading. The second type of service is online systems that link the customer directly to the relevant exchange through a modem or dedicated phone line. These systems are referred to as Direct Access Trading (EDAT). An EDAT system will enable the day trader to have direct contact with the floor of the New York Stock Exchange, the market makers on the NASDAQ and Electronic Communication Network (ECN's). The EDAT system permits a trader to place an order directly into the system resulting in much quicker order executions and confirmations that is generally expected with Internet discount brokers.

Again, a brokerage firm/trading room will provide a day trader with the most up to date technology in order to execute trades in the most accurate and timely manner. The ideal situation for a home based office would be to have the above outlined equipment and technology.

### *Current Trends*

Research contacts reported that day trading activity has decreased since 2001. The peak years of trading were described to be from 1998 until 2001. Trading was fairly strong for a little while after the market crash then in 2001 the day traders' market slowed down significantly.

## *CONCLUSIONS*

As noted above, the definition of a Day Trader is a very active stock trader who holds positions for a very short period of time and makes several trades each day. A Day Trader is only trading on his own account using his/her own money. A Day Trader does not have clients/customers and does not require a professional license. Mr. Sullivan reported that he completed a maximum of 80 trades in the year 2000 which is equivalent to one trade every two to three days. As noted above, Day Traders typically complete several trades every day and usually close all trades each day. One research contact reported that trades can be made every fifteen seconds depending on the market conditions. This was described as the extremely active side of day trading. Mr. Sullivan's trading activity was considered to be on the extremely inactive side of day trading and close to investor status activity based on the number of trades he completed.

Overall, the physical demands of a Day Trader are sedentary with the opportunity to change positions as needed during the workday. Even when in a very active period of trading, a Day Trader, in most circumstances, could stand up in his/her work area while continuing to view the computer screen. Telephone headsets could also be utilized when talking on the telephone; however, most transactions are typically completed electronically.

In reviewing Mr. Sullivan's activity as a Day Trader, he reported that he spent approximately 50% of his time in his office and 50% of his time conducting research at the local library, a local college and in meeting with CEO's etc. Mr. Sullivan did not implement any changes to his work environment. Potential ergonomic changes that could be beneficial include an ergonomically correct chair with lumbar, neck and arm supports, appropriate desk and monitor height. Simple modifications to allow for standing and walking while continuing to perform research and monitor the market include the use of a telephone headset as well as placing the keyboard at a standing level using a stand or bookcase to provide a sit/stand option. In addition, Mr. Sullivan could upgrade his Internet service to allow for the fastest retrieval of information as well as subscribe to various information/data services rather than travel to the local library and college where the environment can not be easily modified.

If you have any questions or comments, please contact me at 508-384-6003.

Respectfully submitted,

Mary P. O'Malley, MA, CRC, CCM
Vocational Consultant

Enclosures
Appendix A
Appendix B
Appendix C
Appendix D
Appendix E (miscellaneous information)

*Michael J. Malloy*
*Attorney at Law*

*1469 Washington Street*
*Canton, Massachusetts 02021*
*Telephone: 781-828-3103*
*Fax: 781-828-5710*
*Email: Lawyrmlly@aol.com*

Reassure America Life Insurance Company
c/o Pamela Jacques, Claims Specialist, DI
Reconsideration/Appeal
12770 Merit Drive, Suite 600
Dallas, Texas 75251

July 7, 2004

**RE: Reconsideration: Michael D. Sullivan**
**Policy No.: H5518149**

Dear Ms. Jacques,

    I have received information from my client, Mr. Sullivan indicating that he was seen by his doctor on, June 24, 2004. Enclosed are the Supplemental Report of Activities , Supplemental Attending Physician's Report and Signed HIPPA Authorization Release Form.
    Please review and contact me with the final determination on your companies position.

Thank you for your anticipated cooperation.

Very truly yours,

Michael J. Malloy, Esq.

cc: M.D.S.
File

Reassure America Medical Disability Income Claims
12770 Merit Drive, Suite 600
Dallas, TX 75251
(800) 411-1098

# Reassure America
## Life Insurance Company

Return To:  PJ

## SUPPLEMENTAL REPORT OF ACTIVITIES

**(To avoid delay please answer all questions)**
This form is to be completed without expense to the Company and returned by _Michael D Sullivan_

List all policy numbers with Reassure America: **H 551 8149**

| | |
|---|---|
| Insured's Full Name: Michael D. Sullivan | Home Phone: ( ) 508-238-8325 |
| Insured's Address: 45 Spooner Street    N. Easton MA | Business or Work Phone: ( ) |
| Nature and Cause of Current Restrictions:    02356 | Social Security Number: 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 |
| Date of Birth: 8-3-46 | Height / Weight: 6'1"  220 |

1. Describe how you spend your time and the activities you engage in at present. How is a typical day spent? (Please be specific.)
AM- Read Newspapers Am. Intermittently, Light TV, light lunch Stretching Exercises occasionally
PM- Rest Some Reading.

2. Have you been doing any work from home or at your place of business, or have you visited your place of business since the date of your last report? ☒ Yes ☐ No  If Yes, give dates _ Home private trades _ If Yes, describe your activities.
2-3 trade per year + unable to continue due to Pain labor etc

3. Have you received medical attention since your last report? ☒ Yes ☐ No If Yes, show:
   a. Name of doctors Albert Derik MD.
   Address 830 Oak St Suite 103E
   Brockton MA 02301
   b. Dates of treatment 6/03/__ 7/8/03 8/30/03 6/24/04

4. Were you treated in a hospital since your last report?
   ☐ Yes ☒ No
   Admitted_____ Discharged_____
   Hospital Name_____
   Address_____

Shields MRI  1/24/03  Simon Wolf MD Nov 03 &
7-23 03

5. Since your last report:
   a. Have you applied for Social Security benefits? ☐ Yes ☒ No Date applied _____
   b. Have you been approved for Social Security disability benefits? ☐ Yes ☒ No Date approved _____
   c. Have you been denied Social Security disability benefits? ☐ Yes ☒ No Date denied _____
   d. Have you appealed a denial of Social Security disability benefits? ☐ Yes ☒ No Date appealed _____
   e. If approved, give entitlement date and amount: N/A.

   Please attach copy of approval/denial and attach copies of all Social Security communications if not previously supplied.

   f. If there have been any changes since your previous report, please provide details: _____

   If no changes have occurred, please indicate: ☐ No changes since last report.

## OTHER INSURANCE BENEFITS YOU ARE RECEIVING

| INSURANCE COMPANY | POLICY NUMBER | DATE ISSUED | BENEFIT PERIOD | BENEFIT AMOUNT |
|---|---|---|---|---|
| Saving Bank Life Ins | waiver | of Premium | due to Disability | |
| Knight of Columbus Life Ins | in quiet | of Premium | due to Disability | |

DLS Supp Form w/ APS

6. Have you returned to any type of work?   ☐ Yes ☑ No

   a. If Yes, what date did you begin to perform these duties?  Date: _N.A._

   b. What is your job title and describe the duties you perform? _N.A_

7. Please describe how your medical condition has improved since your last report:

   Condition has not Improved Sins Last Report

8. Please describe how your medical condition continues to interfere with the performance of your occupation.  Describe any restrictions and limitations, including specific examples of how your condition restricts or impairs your ability to work at your occupation. No lifting, Standing, Climbing, Kneeling, Standing bending, Walking or otherwise for any duration of time with

When do you expect to return to work?  In your occupation at the time of claim? _Not Determined, At this time_

   In a different occupation? _Not Determined, At this time._

Are there nonmedical factors delaying your return to work?  If so, what are these factors?

   No,

DLS Supp Form w/ APS

I understand that My Providers may not refuse to provide treatment or payment for health care services if I refuse to sign this Authorization. I further understand that if I refuse to sign this Authorization, Reassure America Life Insurance Company may not be able to make any benefit payments under my insurance policy. I acknowledge that I have received a copy of this Authorization.

_Michael P. Mueller_        _7/7/04_
Signature of Insured/Patient or Personal Representative      Date

Description of Representative's Legal Authority or Relationship to Patient

# CLAIM FRAUD WARNING STATEMENTS

## Fraud Warning for Residents of All States Not Specified Below
For your protection, the laws of several states require the following statement to appear:
Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

## Fraud Warning for California Residents
For your protection California law requires the following notice to appear on this form:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

## Fraud Warning for Florida Residents
Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

## Fraud Warning for Kentucky Residents
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

## Fraud Warning for New Jersey Residents
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

## Fraud Warning for New Mexico Residents
Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

## Fraud Warning for New York Residents
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

## Fraud Warning for Pennsylvania Residents
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

## Fraud Warning for Tennessee Residents
It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

     DLS Supp Form w/ APS

## Authorization for Release of Personal Information to
## Reassure America Life Insurance Company
### This authorization complies with the HIPAA Privacy Rule.

Michael D. Sullivan                              08/03/46

Name of insured/patient (please print)          Date of birth

I authorize any health plan, physician, health care professional, hospital, clinic, laboratory, pharmacy, medical facility, medical practitioner, substance abuse treatment provider or other health care provider that has provided payment, treatment or services to me or on my behalf within the past 10 years ("My Providers") to disclose the entire medical record and any other protected health information concerning me to the Reassure America Life Insurance Company and its agents, employees and representatives. This includes information on the diagnosis, treatment or prognosis of any physical or mental condition, including Human Immunodeficiency Virus (HIV) infection, sexually transmitted diseases, mental illness, and use of alcohol, drugs and tobacco, but excludes psychotherapy notes.

By my signature below, I acknowledge that any agreements I have made with My Providers to restrict my protected health information do not apply to this Authorization. I further instruct My Providers to release and disclose my entire medical record without restriction as requested under this Authorization.

I also authorize any insurance or reinsuring company, the Medical Information Bureau, employer, health claim index, malpractice carrier, government agency, Internal Revenue Service, Social Security Administration, group policyholder, contract holder, benefit plan administrator, former employer, State of Federal Licensing Board, or any other organization, institution, person, consumer reporting agency or insurance support organization that has my personal (medical and non-medical) information to release such information, including the entire medical record without restriction if requested, to Reassure America Life Insurance Company and its agents, employees and representatives.

Upon presentation of the original or photocopy of this signed Authorization, I request the Social Security Administration to release information or records about me to Reassure America Life Insurance Company directly, or through it's agent, SS Consultants, Inc., or through its other agents. This information is to be released in order to properly adjudicate my claim or continue my eligibility for benefits. Please release detailed earnings for the last 10 years and/or summary records of total earnings and/or information from master benefit records regarding award, denial or continuing benefits.

Protected health information and other personal information is to be disclosed under this Authorization so that Reassure America Life Insurance Company may 1) administer claims and determine or fulfill responsibility for coverage and provision of benefits; 2) obtain reinsurance; and 3) conduct other legally permissible activities that relate to any coverage I have with Reassure America Life Insurance Company.

This Authorization shall remain in force for the duration of the claim with regard to a claim under my insurance policy. A copy of this Authorization is as valid as the original.

I understand that I have the right to revoke this Authorization in writing, at any time, by sending a written request for revocation to Reassure America Life Insurance Company at 12770 Merit Drive, Suite 600, Dallas, Texas 75251. I understand that a revocation is not effective to the extent that Reassure America Life Insurance Company or any of My Providers has relied on this Authorization or to the extent that Reassure America Life Insurance Company has a legal right to contest a claim under an insurance policy or to contest the policy itself. I understand that any information that is disclosed pursuant to this Authorization may be re-disclosed and no longer covered by federal rules governing privacy and confidentiality of health information.

DLS Supp Form w/ APS

# Reassure America
## Life Insurance Company

Individual Disability Income Claims
12770 Merit Drive, Suite 600
Dallas, TX 75251
(800) 411-1098

Return To:  PJ _____

# SUPPLEMENTAL ATTENDING PHYSICIAN'S STATEMENT

Policy No _____

Please complete both sides of this form and promptly return it to Reassure America Life Insurance Company.
Any cost incurred in the completion of this form is the responsibility of the Insured.

| NAME OF PATIENT MICHAEL D. Sullivan | DATE OF BIRTH 8/3/46 |
|---|---|

## HISTORY OF MEDICAL CONDITION (Please print or type)

A. Date symptoms first appeared? __1/9/02__

B. Referring physician's name and address: __Albert A Acril MD.__
___830 Oak St   Suite 128E   Brockton, MA 02301___

C. Has the patient ever had the same or similar condition? Yes ☐  No ☑

   If Yes, please provide details including diagnosis and dates of treatment:
   _____
   _____

D. Have you ever treated this patient for any other condition? Yes ☐  No ☑

   If Yes, please provide details including diagnosis and dates of treatment: _____
   _____

E. Describe the patient's initial reason for seeking treatment. Specify how and when the symptoms first appeared and the progression of symptoms to current level. __Low Back Pain__
   _____

F. Since your last report, list any additional treatment interventions, recommendations or referrals to other physicians, rehabilitation, day treatment programs, 12-step programs, community support groups and/or hospitalizations: _____

## DIAGNOSIS & TREATMENT

A. Primary Diagnosis (include complications and ICD9/10 codes): __Lumbar  Stenosis , Lumbar__
   __Radiculopathy__

B. DSM-IV Multiaxial Diagnosis

   Axis I _____     Axis II _____

   Axis III _____     Axis IV _____

   Axis V: Current GAF _____     Highest Past Year _____  Baseline _____

C. Subjective Symptoms: __Low back Pain.   Pain i numbness. RLE.__

D. Secondary Diagnosis (include complications): _____
   _____

E. Subjective Symptoms: _____

F. How have these subjective symptoms been verified? _____

   Have any collateral contacts been made? If so, who was contacted and when? Please provide details.

G. Objective Findings (Please attach copies of any testing or clinical findings) _____

H. In your opinion, do the *objective* findings support the level of subjective limitations reported by your patient? Yes ☐  No ☐
   Please explain your answer _____

I. Date of initial visit: ___1/24/02___    Additional dates of treatment since last report: _7/8/03  9/03/03, 9/15/03_
                                                                                                6/24/04

J. Date of next follow up visit: _____

K. Has the patient been hospitalized? Yes ☐  No ☒  If Yes, please provide the name and address of hospital and dates confined: _____
   _____

L. Please describe in detail the treatment plan for the insured including therapy, medications, frequency of visits, timeframe for
   implementation, etc.. Please attach a copy of the treatment plan if it has changed since your last report. _____
   _____

M. Please list current medications and dosages being prescribed: _____

N. Has this treatment plan been discussed with your patient? Yes ☐  No ☐  If, no please explain _____

O. Does this treatment plan include a focus on returning your patient to his occupation? Yes ☐  No ☐  If, no please explain: _____
   _____

P. Compliance with treatment: ☒ Excellent ☐ Good ☐ Fair ☐ Poor ☐ Noncompliant

Q. Has the patient been discharged from your care? Yes ☐  No ☒    If yes, please provide a date and reason for discharge. _____

R. Are there any other physicians or practitioners currently involved with this patient's treatment? If so, please list the names,
   addresses, and specialty. ___Simcha V Weller MD  Clief-Neurosurger  Beth Isra/___
   ___Shield MRI  -  MRI Services___                                         Hospital

## IMPAIRMENTS, LIMITATIONS & RESTRICTIONS

A. Please describe your patient's mental/emotional impairments, if any: _____

B. Please describe your patient's physical impairments. _not  to lift greater than  20lbs. no prolonged_
   _Sitting. standing or bending_

C. Please describe your patient's mental/emotional restrictions and limitations. _____
   _____
   _____

D. Please describe your patient's physical restrictions and limitations. _____
   _____
   _____

E. Describe your understanding of the duties of your patient's occupation. _Health  Care  Consultant_

F. Have you restricted your patient's occupational activities in any way? Yes ☒  No ☐
   If yes, please outline each restriction in detail:

   a) _Pt  totally  disabled_____ Restriction began _1-9-02_ Anticipated duration_____

   b)_____ Restriction began _____ Anticipated duration_____

   c) _____ Restriction began _____ Anticipated duration_____

   d)_____ Restriction began _____ Anticipated duration_____

G. Have you restricted your patient's activities of daily living in any way? Yes ☐  No ☐
   If yes, please outline each restriction in detail:

a) _____ Restriction began _____ Anticipated duration_____

b)_____ Restriction began _____ Anticipated duration_____

c) _____ Restriction began _____ Anticipated duration_____

d)_____ Restriction began _____ Anticipated duration_____

H. Since the patient is submitting a claim for disability income benefits, what is your understanding about the patient's level of
   vocational functioning prior to ceasing employment or reducing work hours? Pt. Totally disabled.

I. What, if any, nonmedical factors contribute to the insured's current employment or vocational status?
   _____
   _____

J. If you have any additional information that would assist in our review and understanding of this case, please provide this
   information. _____

K. Do you believe the patient is competent to endorse checks and direct the use of the proceeds thereof? Yes ☑ No ☐

---

## Cardiac -- Please complete if applicable

A. When was the last treadmill test?_____

B. What were the results of the test?_____          N.A.

C. When was the last myocardial perfusion imaging?_____

D. What were the result of that test?_____

E. METS (circle one) 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

F. Blood Pressure (last date) Systolic_____Diastolic_____ Date taken _____

G. When was the last echocardiogram?_____ What was the interpretation of that study?_____

H. Has the patient been referred for Cardiac Rehabilitation? Yes ☐ No ☐ If yes, please provide the name of Rehab center and
   date of referral._____

I. LVEF _____

J. Have any irregular heart beats been noticed?_____

K. What are the current medications? Please include the date prescribed, dosage and frequency. _____
   _____

L. What are the coronary risk factors?_____

# SIGNATURE REQUIRED
## (SEE REVERSE SIDE)

Please include copies of all medical records/notes since your last update was provided with this claim form. If there is a charge for these copies, please include your bill along with your tax ID number; and we will be happy to mail you a check. If records have already been sent, please disregard.

Are you completing insurance forms or providing medical information to any other company(ies)? Yes ☒ No ☐
If Yes, please indicate the company and type of insurance (medical, disability, waiver of premium, etc.).

Knights of Columbus Insurance               Life Insurance          Waiver of Premium
_____            _____      _____
Company                                     Type of insurance

MA Savings Bank Life Insurance              Life Insurance          Waiver of Premium
_____            _____      _____
Company                                     Type of insurance

_____            _____      _____
Company                                     Type of insurance

I hereby certify to the best of my knowledge and belief the above information is true, correct and complete.

Albert A. Ackil  MD.   830 Oak St, Suite 13BE  Brockton, MA
_____   02301.
Physician's Name and Address (please print)

6/28/04        Alwllex            Neurology        508 583-1295
_____      _____   _____   _____
Date           Physician's Signature   Physician's Specialty   Telephone Number

DLS Supp Form w/ APS

# Reassure America
Life Insurance Company

November 23, 2004

Michael J. Malloy
Attorney At Law
1469 Washington St.
Canton, MA 02021

Re: Your Client/Our Insured: Michael D. Sullivan
     Policy No.: H5518149

Dear Mr. Malloy:

On behalf of The Prudential Insurance Company of America, we are writing in regard to your client's Prudential Individual Disability Income policy.

The appeal panel members reviewed Mr. Sullivan's claim file and recently met to discuss our findings. At this time, it was determined that the analyst's decision to terminate benefits appears correct according to the policy language. However, due to the possible concerns regarding the documented restrictions and limitations, we are prepared to proceed with an Independent Medical Evaluation to further clarify his limitations. You will be contacted concerning these arrangements.

The definition of "total disability" and "elimination period" as outlined in the Prudential contact states:

Total disability:
> Total disability means the complete inability off the Insured to perform any and every duty pertaining to the Insured's occupation until benefits for total disability have been payable under the policy during any period of total disability for 60 months or for the period for which such benefits are payable, if less;

Elimination Period:
> Elimination period means the applicable number of weeks, specified in the Schedule of Benefits of the Policy Schedule, at the beginning of each period of total disability due to sickness or injury.

Mr. Sullivan's policy was issued on May 28, 1987, providing a monthly income benefit of $2,810.00. This is payable on a monthly basis after satisfaction of a 26-week elimination period and to the insured's 65th birthday. However, this is contingent upon whether he satisfies the definition of "total disability", as outlined above.

On March 26, 2002, we received a "notice of claim" from Mr. Sullivan. On March 29, 2002, an initial telephone conversation was conducted with Mr. Sullivan to discuss his claim circumstances. During that conversation Mr. Sullivan indicated that he was semi-retired. When asked what occupation he was engaged in, he indicated that he did "books for his household". Based on this information, it did not appear that Mr. Sullivan was employed at the time of his impairment.

November 19, 2004
Michael Sullivan – H5518149
Page Three

The W-2 income totaling $78,008.90 appears to be income earned by Mrs. Sullivan. On Line 12, which references business income, the total shows a loss of $1,699.00. There is also a capital loss in the amount of $3,000.00. According to the Schedule C, which is the Profit and Loss from the business it reflects "0" under Part I income. Under Part II, Expenses, it shows $1,699.00. The expenses are:

♦ Margin Interest
♦ Office Expense
♦ Telephone

The Schedule D reflects activity with regard to the buying and selling with what appears to be 10 different stocks.

Based on the expenses documented on the Schedule C and the information documented on the Schedule D, it appeared the activities associated with the business were minimal and performed in Mr. Sullivan's home at the computer and/or telephone. There does not appear to be any physical activities associated with this business.

The definition of total disability, as defined in the policy, and Mr. Sullivan's reported occupation of a Day Trader was taken into consideration along with the level of his impairment. As a Day Trader, he would not be required to perform activities that include prolonged bending, sitting or standing. Nor would he be required to lift over 20 pounds at that time. Again, Mr. Sullivan did not meet the elimination period and benefits were denied as noted in our correspondence March 25, 2003.

On December 10, 2003, you wrote to us requesting reconsideration of the denial of benefits to Mr. Sullivan. You provided additional medical documentation including an MRI dated July 24, 2003, and office notes from Dr. Ackil dated August 28, 2003, and Marianne Cardello, APRN, BC, dated September 23, 2003. The medical information was forwarded to our Orthopedic Medical Consultant who concluded that the records support that the claimant would continue to be limited to work at no greater than a sedentary level.

The appeal panel initially met to discuss Mr. Sullivan's claim on January 7, 2004. After the initial review, we requested that the analyst obtain additional information regarding the physical demands of a Security Trader/Day Trader and the amount of activity Mr. Sullivan's trading warranted. We also asked that a consulting CPA review IRS Code 475(f), and respond to Mr. Sullivan's claim of his inability to provide information regarding his trading in the early part of his claim.

The CPA stated that this section of the Internal Revenue Code essentially discusses how a trader can make an accounting election so that the trading income can be treated in a more favorable manner on Form 4797 as opposed to Schedule D. He also added that it does not mean that the claimant could have been a trader at an earlier date and listed that on our forms as his "occupation". He also added that should you have any additional information that would support your argument; he would be more than willing to look into it further.

12770 Merit Drive Suite 600    ◆    Dallas, Texas 75251    ◆    (800) 411-1098

November 19, 2004
Michael Sullivan – H5518149
Page Two

On June 14, 2002 we received Mr. Sullivan's initial Claimant's Statement and initial Attending Physician's Statement. This information referenced a period of "total disability" commencing January 9, 2002, due to multilevel spinal stenosis. We were advised that these symptoms occurred as a result of a fall in his home. He described his injuries as extreme pain in lower back and sharp pains down right leg.

On page 2 of the Claimant's Initial Statement, Mr. Sullivan provided us information regarding how a typical day is spent currently and described his activities prior to claim. He wrote:

Prior to claim
• Morning: walk 2-3 miles or in bad weather ride stationery bicycle;
• Afternoon: go to library, play golf, tennis;
• Evening: attend civic meetings such as Town of Easton selection; Knights of Columbus and serve on civic committee.

Currently:
• Morning: read newspaper – try to do exercises suggested by Physical Therapist
• Afternoon: watch some TV – read
• Evening: very little – watch some TV - read

On Page 3, under the section Detailed Occupational Information, Mr. Sullivan indicated he was "unemployed".

In review of the medical records and the Attending Physician's Statement completed by his treating physician, it appeared his current restrictions and limitations were 1). No lifting over 20lbs, 2). No prolonged bending, sitting or standing. Based on the restrictions and limitations given by his treating physician, it did not appear these restrictions and limitations would have deemed Mr. Sullivan totally disabled as defined in the policy. Further, Mr. Sullivan's condition did not appear to disable him for a continuous 26 weeks and as such the elimination period was not satisfied. As Mr. Sullivan did not fulfill the definition of total disability, the claim was denied, September 5, 2002.

Additional documentation was received on January 29, 2003, which included financial documentation for the tax years 1996 through 2001. We were advised that Mr. Sullivan would have been in violation pursuant to IRS code 475(f), had he advised us of his employment. It is documented, that on or about February 2001 he applied for status as a Day Trader; however, was not approved until on or about July 26, 2002. It was unclear why this information was not provided to us during the initial telephone interview between Ms. Jacques and Mr. Sullivan.

According to the 2001 tax record, which should reflect an accurate report of his income and his activities relating to Day Trading, the following information was noted:

November 19, 2004
Michael Sullivan – H5518149
Page Four

On February 11, 2004, you and Mr. Sullivan met with Mary O'Malley, MA, CRC, CCM, Vocational Consultant, for the purpose of an occupational analysis. It is our understanding that a copy of Ms. O'Malley's report was supplied to you in July 2004. In summary, the report defined a Day Trader as a very active stock trader who holds positions for a very short period of time and makes several trades each day. A Day Trader is only trading on his own account using his/her own money. A Day Trader does not have clients/customers and does not require a professional license. Mr. Sullivan reported that he completed a maximum of 80 trades in the year 2000 which is equivalent to one trade every two to three days. If our understanding of this information is incorrect, please advise.

Overall, the physical demands of a Day Trader are sedentary with the opportunity to change positions as needed during the workday. Even when in a very active period of trading, a Day Trader, in most circumstances, could stand up in his/her work area while continuing to view the computer screen. Telephone headsets could also be utilized when talking on the telephone; however, most transactions are typically completed electronically. Our vocational consultant did point out some ergonomic changes that could be beneficial to Mr. Sullivan.

Based on the policy definition of Total Disability, Mr. Sullivan's self-reported occupational duties, the duties of a Day Trader as researched by the vocational consultant, Mr. Sullivan's restrictions and limitations, and the verification of Mr. Sullivan's trading activities, the appeal panel upholds the analyst's decision regarding Mr. Sullivan's claim.

However, as stated at the beginning of this letter, we will proceed with an Independent Medical Evaluation to further discern the limitations and restrictions and their impact on his ability to perform his stated activities as a Day Trader.

Nothing in this letter should be construed as a waiver of any right or defenses under the policy or by law. This determination has been made in good faith and without prejudice pursuant to the terms and conditions of the contract.

Should you have any questions, please call me at 1-800-411-1098, ext. 8526.

Sincerely,

Anna Culley/dy

Anna Culley, ALHC
Director of Disability Claims

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Reassure America Life Ins.
C/o Pamela Jacques
P.O. Box 749014
Dallas, Texas 75374-9014

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Paula_                    ☐ Agent
                             ☐ Addressee

B. Received by (Printed Name)    JAN 29 2003

D. Is delivery address different from item 1?  ☐ Yes.
   If YES, enter delivery address below:        ☐ No

JAN 2 9 2003

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☒ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7002 0860 0006 8637 2543

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-1035

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

# O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ 5.40 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 9.45 |

NORTH EASTON MA 02356

Sent To: Reassure Life Ins Co
Street, Apt. No.; or PO Box No. P.O. Box 749014
City, State, ZIP+4 Dallas, Texas 75374

7002 0860 0006 8637 2543

PS Form 3800, April 2002        See Reverse for Instructions



COMMONWEALTH OF MASSACHUSETTS
DIVISION OF INSURANCE
ONE SOUTH STATION
BOSTON, MASS 02110

$ 03.13⁰
DEC 17 2004
02 1A
0004371541
MAILED FROM ZIP CODE 02110
UNITED STATES POSTAGE

Reassure America Life Insurance Company
1275 Sandusky Road
Jacksonville, Ill 62650



| CIVIL ACTION COVER SHEET | DOCKET NO.(S) · | Trial Court of Massachusetts Superior Court Department County: |
|---|---|---|

**PLAINTIFF(S)**
Michael O. Sullivan

**DEFENDANT(S)** Prudential Life Insurance Comp. of America and ReAssure America Life Insurance Company

**ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE**
Attorney Michael J. Malloy
105 Washington St, Suite 9
North Easton, MA 02356

**ATTORNEY (If Known)**

### Original code and track designation

Place an x in one box only:
- ☐ 1. F01 Original Complaint
- ☐ 2. F02 Removal to Sup.Ct. C.231,s.104
- ☐ 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- ☐ 4. F04 District Court Appeal c. 231, s. 97 & 104 (after trial) (X)
- ☐ 5. F05 Reactivated after rescript; relief from judgement/Order (Mass.R.Civ.P. 60) (X)
- ☐ 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) TRACK | IS THIS A JURY CASE? |
|---|---|---|
| A-99 | Long Term Disability (F) | (X) YES    ( ) NO |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A.  Documented medical expenses to date:
1. Total hospital expenses — $
2. Total Doctor expenses — $
3. Total chiropractic expenses — $
4. Total physical therapy expenses — $
5. Total other expenses (describe) — $

Subtotal $

B.  Documented lost wages and compensation to date $
C.  Documented property damages to date $
D.  Reasonably anticipated future medical and hospital expenses $
E.  Reasonably anticipated lost wages $
F.  Other documented items of damages (describe) $

G.  Brief description of plaintiff's injury, including nature and extent of injury (describe)

TOTAL $
$

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

Plaintiff contracted with Defendants to pay Long Term Disability benefits at $2,810.00 per month and waive yearly premiums of $1,083.24 per year. Defendant refused to pay resulting in Damages to Plaintiff.    TOTAL  $ 86,145.26 + interest cost

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

+ Attorney's Fees

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record    Michael J. Malloy, Esq.    DATE: 12-9-04

AOTC-6 mtc005-11/99
s.o.s.c. 1-2000

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Michael D. Sullivan

**(b)** County of Residence of First Listed Plaintiff **Bristol**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Michael J. Malloy, 105 Washington St., Suite 9, No. Easton, MA  02356  508-230-7313

## DEFENDANTS The Prudential Insurance Company of America and Reassure America Life Insurance Company

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)
Edward S. Rooney, Jr., Eckert Seamans Cherin & Mellott, LLC, 1 International Place, Boston, MA 02110    617-342-6800

05 10030 GAO

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Diversity - 28 U.S.C. Secs. 1332
Brief description of cause:
Claim for disability insurance benefits

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):     JUDGE _____     DOCKET NUMBER _____

DATE  1/6/05

SIGNATURE OF ATTORNEY OF RECORD   E. S. Rooney Jr.

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Michael D. Sullivan v. The Prudential Insurance Company of America

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ☐  I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐  II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

   ☒  III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
            380, 385, 450, 891.

   ☐  IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
            690, 810, 861-865, 870, 871, 875, 900.

   ☐  V.   150, 152, 153.

   05 CV 10030 GAO

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

   YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☒    NO ☐

   A. If yes, in which division do all of the non-governmental parties reside?

   Eastern Division ☒    Central Division ☐    Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

   YES ☐    NO ☒

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Edward S. Rooney, Esq.

ADDRESS Eckert Seamans Cherin & Mellott, LLC, 1 International Pl., 18th Flr., Boston, MA 02110

TELEPHONE NO. 617-342-6863

(Coversheetlocal.wpd - 10/17/02)