UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL D. SULLIVAN, Plaintiff | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05 CV 10030 GAO |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA and REASSURE AMERICA LIFE INSURANCE COMPANY, Defendants | ) ) ) ) ) ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In this action, plaintiff Michael D. Sullivan ("Sullivan") seeks to recover disability insurance benefits under the terms of an individual disability insurance policy issued to Sullivan by defendant Prudential Insurance Company of America and subsequently assumed by defendant Reassure America Life Insurance Company ("Reassure"). Sullivan claims that he slipped and fell on January 9, 2002, injuring his back, and became totally disabled under the terms of his policy. Since that time, he claims that he has been unable to do any of the substantial duties of his regular occupation as a trader of securities. Following his injury, Sullivan submitted a claim for benefits to Reassure and Reassure denied the claim on the ground that he was not totally disabled under the terms of the policy. Sullivan appealed this denial to a 3-person appeal panel at Reassure, which affirmed the denial. Sullivan then filed this lawsuit.

Defendants' motion for summary judgment is based on the following two related grounds:  1)  During the time that Sullivan's claim was pending before Reassure, he  failed to submit due written proof, as required by the policy, that he was totally disabled under the terms of the policy, i. e. complete inability to do all of the substantial duties of his regular occupation as a trader of securities; and 2)  After this action was commenced, Sullivan produced his investment account statements from Fidelity Investments which showed conclusively that from 2002 to 2006 he was in fact engaging in all of the regular duties of his occupation as a trader of securities. There are no genuine issues of material fact in dispute on either of these grounds and therefore summary judgment should be entered for the defendants.

## STATEMENT OF UNDISPUTED FACTS

Defendants incorporate herein by reference the Statement Of Undisputed Facts, prepared in accordance with Fed. R. Civ. P. 56 and Local Rule 56.1, and set forth in their Motion for Summary Judgment.  Factual references in the following argument are to the underlying sources contained in the Appendix ("App.") and page references are to the Bates-numbered pages of the Appendix, which appear in the upper right-hand corner of each page.

## ARGUMENT

**1.    Sullivan's Policy Requires That He Provide Due Proof of His Complete Inability to do All of the Substantial Duties of His Regular Occupation.**

Sullivan's disability policy provides a monthly income benefit of $2,810.00 in the event that he becomes totally disabled due to sickness or injury. Policy at App. 112, 116.  The term "total disability" is defined in the Policy as follows:

**Total Disability –**

1.    For any time that monthly income benefits are payable up to 60 months; total disability means the complete inability of the Insured to do all of the substantial duties of his or her regular occupation.

2

2.      After benefits have been payable for more than 60 months; total disability means the complete inability of the Insured to do all the substantial duties of any gainful occupation for which he or she is reasonably fitted by education, training or experience.

Policy at App. 114. The monthly benefit becomes payable after plaintiff remains totally disabled for the entire 26-week term of the policy's "Elimination Period." Policy at App. 116. In order to begin receiving the monthly benefit, Sullivan had to provide Reassure with due written proof of his total disability, that is, his complete inability to do all of the substantial duties of his regular occupation as a trader of securities. Policy at App. 120, "Proof of Claim." This policy provision requiring due proof of the insured's disability is a standard requirement in most all individual disability policies. *See, Manzi v. Provident Mut. Life Ins. Co.,* 335 Mass. 71,77, 138 N. E. 2d 581, 585 (1956). *Arabia v. John Hancock Mut. Life Ins. Co.,* 301 Mass. 397, 401, 17 N. E. 2d 202, 204 (1938). Sullivan's right to receive disability benefits is contingent upon his satisfying this contractual obligation and providing Reassure with due proof of his total disability. *Belbas v. New York Life Ins. Co.,* 300 Mass. 471, 473, 15 N. E. 2d 806, 807 (1938). As discussed in the argument below, Sullivan has failed to provide Reassure with this required due proof of disability.

**2.      Sullivan Has Failed to Satisfy the Due Proof Requirement of the Policy**

   **A.      Sullivan's Regular Occupation Was That of "Security Trader."**

Sullivan's claim was pending before Reassure for two and one-half years. Much of the focus of his claim during this time period was determining what Sullivan's occupation was at the time his claimed disability arose. By background, training and experience, Sullivan was an accountant with a masters degree in business administration who worked as an administrator and financial manager in the health care industry for almost 30 years. Sullivan Dep. at App. 092 - 094. In 1998 and 1999, Sullivan worked as a financial planner and insurance salesman for the Knights of Columbus, a fraternal organization based in Hartford, Connecticut. Sullivan Dep. at App. 094-096. He stopped working for the Knights of Columbus at the end of 1999 and did not work outside of the home after that time. When Sullivan initially notified

Reassure of his claim for benefits due to his slip and fall accident on January 9, 2002, it was unclear as to precisely what his occupation was during the preceding two years of 2000 and 2001.

In his initial telephone contact with a Reassure representative in March, 2002, Sullivan said he was "semi-retired," and when asked what he did for work, he said that "he does the books for his household." Claim File at App. 476. In his initial claim statement to Reassure dated June 5, 2002, Sullivan described his employment at that time, as well as at the time he became disabled, as "unemployed." Complaint – Ex. B at App. 026, "Detailed Occupational Information." He said that he had no monthly income and that he worked "zero hours" during the time immediately prior to his claim. *Id.* Sullivan certified on the claim form that this information was "true, correct and complete." Complaint – Ex. B at App. 028. In light of this information, Reassure considered Sullivan's occupation to be that of a "retired person" with no specific occupational duties. His claim was thus denied, on September 5, 2002, because Reassure concluded that Sullivan could perform the normal activities of daily living, i.e., eating, sleeping, bathing, etc. Complaint and Answer – par. 7 at App. 002, 083 and Complaint - Ex. C at App. 040-041.

About five months after this denial, in late January, 2003, Reassure received an undated letter from Sullivan's present attorney Michael Malloy. Complaint and Answer – par. 9 at App. 002, 083; Claim File at App. 474-75. In his letter, Attorney Malloy said that Reassure's denial of benefits was wrong because it was based on Sullivan being an "unemployed" person. Attorney Malloy maintained that Sullivan was actually working at the time of his disability as a day trader in securities pursuant to IRS Code § 475(f). Attorney Malloy said that the reason why Sullivan stated in his original claim statement that he was unemployed was "because to do otherwise would have been in direct violation to IRS Code § 475(f)." Attorney Malloy explained that Sullivan had applied to the IRS in February, 2001 for status as a "day trader," and it was not until July 26, 2002 that his application was approved. Claim File at App. 474.

Reassure considered the information that Attorney Malloy had provided, but in a letter to Attorney Malloy dated March 25, 2003, again denied the claim on the ground that Sullivan's back condition did not prevent him from performing the activities of a day trader, which Reassure had identified as "sitting and using the telephone" at his home, where Sullivan "could work at his own pace, taking rest periods as his medical condition warrants," and where he "would not be required to perform activities that include prolonged bending, sitting or standing." Complaint and Answer – par. 10 at App. 002-03, 083 and Complaint - Ex. D at App. 042-44.

About nine months later, in December, 2003, Attorney Malloy wrote to Reassure again and asked for reconsideration of the denial of Sullivan's benefits. Complaint and Answer – par. 11 at App. 003, 083 and Complaint - Ex. E at App. 045-46. In his letter dated December 10, 2003, Attorney Malloy again argued that Sullivan was not unemployed at the time of his disability, but was really a day trader, and he provided Reassure with medical reports from Dr. Albert Ackil dated August 28, 2003 and from Dr. Simcha Weller dated September 23, 2003. Complaint-Ex. E at App. 047-051.

In January, 2004, in response to Attorney Malloy's request, Reassure convened a three-person appeal panel to reconsider Sullivan's claim. Claim File at App. 464-65. Over the next eleven months, the Reassure appeal panel investigated Sullivan's claim and obtained the following information:

A.    After referring Sullivan's updated medical records to Dr. Mark Doyne, an independent orthopedic surgeon, on January 5, 2004 Reassure received Dr. Doyne's report that "The records support that [claimant] would continue to be limited to work at no greater than a sedentary level, changing positions frequently." Claim File at App. 772-73.

B.    After requesting information from an outside accounting consultant with respect to Internal Revenue Code § 475(f), on January 13, 2004 the outside consultant provided Reassure with the requested information and summarized § 475(f) as follows: "This section of the Internal Revenue Code essentially discusses how a trader can make an accounting election

so that the trading income can be treated in a more favorable manner on Form 4797 as opposed to Schedule D." Claim File at App. 459-61.

       C.     After requesting a vocational consultant to do an occupational review, Reassure received a written report from vocational consultant Mary O'Malley. Complaint and Answer – par. 12 at App. 003, 084 and Complaint – Ex. F at App. 055-65. The vocational report stated that on February 11, 2004, Ms. O'Malley met with Sullivan and attorney Malloy at Sullivan's home for 1.5 hours for the purpose of obtaining additional information regarding Sullivan's occupation and to observe his home office work environment. Complaint and Answer – par. 12 at App. 003, 083 and Complaint - Ex. F at App. 055. On April 27, 2004 Ms. O'Malley provided Reassure with an 11-page report entitled "Occupational Review." Complaint and Answer – Ex. F at App. 055-65 (Appendices A – E not included). One of her many conclusions was the following: "Overall, the physical demands of a Day Trader are sedentary with the opportunity to change positions as needed during the workday. Even when in a very active period of trading, a Day Trader, in most circumstances, could stand up in his/her work area while continuing to view the computer screen." Complaint – Ex. F at App. 064.

       D.     Reassure received and reviewed additional reports and records sent by attorney Malloy on July 7, 2004, including a Supplemental Attending Physician's Statement from Dr. Ackil dated June 28, 2004. Complaint and Answer – par. 14 at App. 003, 084 and Complaint - Ex. G at App. 066-74.

       E.     After receiving Dr. Ackil's Supplemental Attending Physician's Statement from attorney Malloy, Reassure referred it to Dr. Doyne for an updated opinion. On November 17, 2004, Dr. Doyne opined that: "The above L&R's [Limitations & Restrictions] are consistent with the ability to perform at least sedentary work, changing positions frequently. This is unchanged from the conclusions in my previous review of 1/5/04." Claim File at App. 457-58.

After collecting and considering all of the foregoing information, Reassure again denied Sullivan's claim. By letter dated November 23, 2004, Reassure advised attorney Malloy that the appeal panel had reviewed Sullivan's complete claim file, including all the information that he had provided, and had concluded that the decision to deny him benefits was correct and in accordance with the policy language. Complaint and Answer – par. 15 at App. 003, 084 and Complaint- Ex. H at App. 075-78; Claim File at App. 456A-456D. In a four-page letter, Reassure's Director of Disability Claims advised attorney Malloy of the information that the appeal panel considered and summarized its conclusion as follows: "Based on the policy definition of Total Disability, Mr. Sullivan's self-reported occupational duties, the duties of a Day Trader as researched by the vocational consultant, Mr. Sullivan's restrictions and limitations, and the verification of Mr. Sullivan's trading activities, the appeal panel upholds the analyst's decision regarding Mr. Sullivan's claim." Complaint – Ex. H at App. 078; Claim File at App. 456D.

**B.** **Sullivan Represented to the IRS That He Was a "Security Trader."**

Attorney Malloy provided Reassure with copies of Sullivan's federal income tax returns for 2000 and 2001 and copies of Sullivan's federal tax returns were produced during discovery. The 2000 federal return was signed by Sullivan "under the penalties of perjury" on March 26, 2001, and the 2001 return was similarly signed on March 11, 2002. Sullivan Dep.– Ex. 9, Forms 1040 at App. 208, 221, "Sign Here". In each return, Sullivan listed his occupation as "Security Trader," and not day trader. *Id.* On subsequent returns for the years 2002, 2003 and 2004, after Sullivan's application for so-called "day trader" status had been approved by the Internal Revenue Service, Sullivan continued to list his occupation as "Security Trader." Sullivan Dep. – Ex. 9, Forms 1040 at App. 240, 254, 264, "Sign Here". Thus, during the same period of time that Sullivan was consistently representing to the IRS "under the penalties of perjury" that his occupation was that of "Security Trader," he was representing to Reassure that his occupation was initially "unemployed" and later was changed to "day trader." This inconsistency obviously begs the question of why Sullivan represented

7

to the IRS, the very entity to which he had applied for so-called day trader status under § 475(f), that his occupation was "security trader", but couldn't make that same representation to Reassure. If nothing else, this inconsistency created confusion and prolonged the processing of his claim.

The distinction between a day trader and a security trader is primarily one of volume and turnover with respect to the securities being traded. As Mary O'Malley reported in her "Occupational Review," they are both doing the same thing, i.e. "the buying and selling of securities for their own account." Complaint – Ex. F at App. 059. However, a day trader is a special type of securities trader, i.e., "a very active stock trader who holds positions for a very short period of time and makes several trades each day.... Day Traders are in and out of the market many times during the course of one trading session and often do not hold a position in any stocks overnight." *Id.* Sullivan does not fit the description of a day trader, although he apparently was a security trader, as he was not an active, daily trader of securities. In discovery, Sullivan produced his account statements and transaction vouchers from StockCross, where he did his stock trading. Sullivan Dep. at App. 103-04, Ex. 10 at App. 272-92. These statements and vouchers, as well as Sullivan's federal tax returns for 2000 and 2001 show that Sullivan did not trade stocks on an active, daily basis, but rather on a weekly (2000) or bi-weekly (2001) basis. Sullivan Dep. 214 – 218 at App. 105-06; Ex. 9 – Schedule D-Capital Gains and Losses for 2000 and 2001 at App. 212-14, 225-28; and Ex. 10 – Statements for 2000 and 2001 at App. 275-76, 282 "Proceeds from Broker and Barter Exchange Transactions" and "Purchases." Thus, based on Sullivan's own records and tax returns, it is clear that Sullivan did not fit the specialized type of stock trader that is referred to as a day trader, but did fit the more general description of being a security trader, which is precisely how Sullivan described himself to the IRS on all of his tax returns.

C.    **Sullivan's Election Under IRC § 475(f) – Mark-to-Market Election**

A word needs to be said about the contention made by Attorney Malloy in his undated letter that Reassure received on January 30, 2003 that the reason why Sullivan had originally

said he was unemployed at the time he became disabled was that Sullivan's application to the

IRS under § 475 (f) for day trader status had not yet been approved. Unfortunately, this

information was confusing and totally incorrect. Sullivan's so-called "application" was really

just a voluntary election on Sullivan's part on the accounting method he would use when

reporting his securities trading gains and losses. His "application" consisted of a single-page,

handwritten sheet of paper which stated the following:

> Subject: Section 475(f) Mark to Market Election for the tax year 2001.
>
> This letter will serve as notice of my election as described on page D-3
> of the 2000 IRS 1040 instructions. As such, I will report all gains and
> losses with my trading business as ordinary income for my 2001 tax return.

Sullivan Dep. – Ex. 9, 2001 tax return at App. 218; Claim File at App. 453A-453B. Nothing

at all is said in this application about "day trader" status. It is simply a "notice" of Sullivan's

"election" to report the gains and losses from his stock trading business as ordinary income on

his 2001 tax return, rather than reporting them as capital gains and losses on Schedule D-

Capital Gains and Losses on Form 1040 as he had done in the past. This is simply an

accounting election which is referred to as the mark-to-market method of accounting. This is

what Reassure learned when it asked its outside consultant for information about the reference

to § 475 (f) in Attorney Malloy's letter. Claim File at App. 458A. The consultant provided

the requested information, which included an explanation of the difference between an investor

and a trader and the pros and cons of reporting trading gains and losses as capital gains and

losses on Schedule D or as ordinary gains and losses on IRS Form 4797. Claim File at App.

459-61. However, as the information provided to Reassure makes clear, this accounting

election does not define your occupation. In fact, it's just the opposite, the taxpayer must

determine whether he is an investor or a trader and then decide which of the two tax

accounting elections is better for him. As Sullivan stated on all of his tax returns, he always

considered his occupation to be that of "Security Trader."

**D.    Day-to-Day Duties and Activities of a Security Trader**

Having established that Sullivan's occupation in January, 2002 when he claims to have fallen and hurt his back was that of a general "security trader" rather than the more specialized designation of "day trader", the next issue that Reassure needed to consider was what were the day-to-day activities involved in being a security trader.  Reassure retained vocational consultant Mary O'Malley to do this by meeting with Sullivan and seeing his at-home work environment and how he generally carries out his activities as a day trader/security trader. She did this on February 11, 2004 when she met with Sullivan and Attorney Malloy for 1.5 hours at Sullivan's home in North Easton, Massachusetts and provided Reassure with a written report on April 27, 2004. Complaint – Ex. F at App. 055-65; Sullivan Dep.-Ex. 6 at App. 175-85.  Although her report focuses more on the status of day trader than security trader, she notes in her report that "The physical demands of a Day Trader are most similar to the occupation of Securities Trader.  This is a sedentary occupation which is described by the Department of Labor as:

> *Lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as small tools, dockets and ledgers.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met."*

Sullivan Dep. – Ex. 6 at App. 183.  Ms. O'Malley also notes that important activities or abilities needed to perform effectively as a securities trader, per the O*NET,[1] are "speaking, spend time sitting and near vision." *Id.*  Ms. O'Malley concluded that "Overall, the physical demands of a Day Trader are sedentary with the opportunity to change positions as needed during the workday.  Even when in a very active period of trading, a Day Trader, in most circumstances, could stand up in his/her work area while continuing to view the computer screen.  Telephone headsets could be utilized when talking on the telephone." *Id.* at App. 184.

---

[1] As Ms. O'Malley explains in her report, the O*NET is an on-line information resource put out by the Department of Labor to update and replace the Dictionary of Occupational Titles (DOT) that the Department of Labor had published for many years. Report p. 7.

Ms. O'Malley noted that Sullivan had not implemented any changes in his home work environment and that certain basic ergonomic changes in this environment could be beneficial, such as an ergonomically correct chair with lumbar, neck and arm supports, an appropriate desk, a telephone headset and placing the computer keyboard at a standing level in order to provide a sit/stand option while working. *Id.* at App. 185.

> **E.    Sullivan's Medical Records Do Not Support His Claim of Total Disability**

Having established that Sullivan's occupation was that of a security trader, and knowing what the essential duties and activities that are involved in securities trading, the next step is considering what proof did Sullivan submit to support his claim of total disability. Sullivan's attending physician throughout the claim period and beyond has been Dr. Albert Ackil of Brockton, Massachusetts. Dr. Ackil's letterhead states that he practices in the areas of neurology and electrodiagnosis. Complaint – Ex. E at App. 047; Claim File at App. 468. Accompanying Sullivan's initial claim statement in June, 2002 was an undated "Initial Attending Physician's Statement" from Dr. Ackil. Complaint – Ex. B at App. 030-34. Much of the handwritten information provided by Dr. Ackil on the statement, concerning history, diagnosis and treatment, is unreadable. *Id.* at App. 030-32. However, on pages 9-10 of the form (App. 032-33), Dr. Ackil responded to questions about the mental or psychological impairment that Sullivan may be suffering as a result of his slip and fall and he responded with a zero, meaning "none", to each of the areas listed, including such activities as interpersonal relations, occupational daily activities, ability to think and reason, understand and carry out instructions, sustain work performance and maintain attention span and concentration. *Id.* at App. 032-33. Thus, from the very beginning, Dr. Ackil was of the opinion that Sullivan had absolutely no impairment to any of his mental faculties.

Through the course of discovery, Dr. Ackil's records of his treatment of Sullivan were obtained. Sullivan Dep. – Ex. 2 at App. 127-57. Following the slip and fall on January 9, 2002, Sullivan did not see Dr. Ackil until January 21, 2002. Dr. Ackil's report of that date makes no mention of Sullivan's accident on January 9, 2002, but simply states that Sullivan's

low back pain had become much worse than it had been when Dr. Ackil last saw Sullivan in November, 1997. *Id.* at App. 148.

Dr. Ackil next saw Sullivan on February 21, 2002 and his report states "He said he is doing physical therapy and doing reasonably well. He still has some leg pain but actually he has improved.... He is doing well." There is no mention in the report of the accident. *Id.* at App. 145.

Dr. Ackil's report of the next visit on May 28, 2002 says that Sullivan was "still having low back pain with pain and paresthesias especially in the right lower extremity," but otherwise his condition was unchanged from the previous visit of 2/21/02, when Sullivan was "doing well." *Id.* at App. 144. Dr. Ackil's next report of September 3, 2002 reported on Sullivan's seeing Dr. Simcha Weller, but otherwise his condition was "unchanged from last visit of 5/28/2002." *Id.* at App. 141.

Sullivan did not see Dr. Ackil again until 10 months later on July 9, 2003, which was many months after Reassure had denied Sullivan's claim and after Attorney Malloy had entered his appearance on behalf of Sullivan. In the July 9, 2003 report, Dr. Ackil, for the first time, opines that it is his impression that Sullivan "is totally disabled for any type of work at this time through (sic) continuing." *Id.* at App. 139. Dr. Ackil goes on to say that "his condition is such that he cannot do his past occupation or any other occupation even on a part-time basis," *Id.* at 140, although nowhere in any of his reports does he say what Sullivan's past occupation was or what other occupation he might be qualified for. Dr. Ackil then gets more specific and says "He cannot lift greater than 10 pounds. He cannot sit, stand, bend or climb for any period of time without significant exacerbation of his symptoms." *Id.*

In a similarly worded report dated August 28, 2003, a copy of which was sent to Attorney Malloy, Dr. Ackil modified and actually toned down several of the strongly-worded comments that he had made in his July 9, 2003 office report.[2] Sullivan Dep.- Ex. 2 at App.

---

[2] Attorney Malloy forwarded the August 28, 2003 report to Reassure, but not the July 9, 2003 report, with his letter of December 10, 2003. Complaint-Ex. E at App. 045-46; Claim File at App. 466-67. In his cover letter, Attorney

135-36 and  Claim File at App. 468-69. The comments that he backed-off on related to the
daily activities that he thought Sullivan could, or could not, engage in, such as the following:
"Sitting or walking for *extended* periods of time [as opposed to his prior statement of "any
period of time"] causes worsening of his symptoms.... I *would not recommend* that the patient
lift greater than 10 pounds [as opposed to his prior statement that "he cannot lift greater than
10 pounds] and do no *prolonged* sitting, standing, bending, climbing, etc. [as opposed to his
prior statement that he could not do these activities "for any period of time"]. He *has
difficulty* sitting, standing, and bending for any *extended* periods of time [as opposed to his
prior statement that he "cannot" do these activities "for any period of time"]." Dr. Ackil also
expanded on some of Sullivan's limitations, which are largely irrelevant, by noting that
Sullivan "has some difficulty sleeping at night" and that "He should not be crawling, etc."
Given the close proximity in time of these two reports in 2003, it is difficult to say for sure
where Dr. Ackil stood exactly on the extent of Sullivan's limitations.  However, only the
August 28, 2003 report was sent to Reassure and the opinions of Dr. Ackil in this report were
what Reassure had to consider in determining Sullivan's disability status at the time.  Clearly,
Dr. Ackil's statement of Sullivan's limitations and restrictions are not sufficient to qualify
Sullivan for benefits under his policy as these stated limitations and restrictions do not prevent
Sullivan from performing the job responsibilities of a sedentary job such as a security trader.
Simply comparing Dr. Ackil's stated limitations with the occupational activities of a security
trader noted by Mary O'Malley in her report shows that Sullivan could in fact perform as a
security trader even assuming he had the limitations noted by Dr. Ackil.  As a security trader,
Sullivan does not have to do any lifting of anything over 10 pounds, and given that he could
easily change his postural position from sitting to standing/walking throughout the work day at
his home, he would not have to do any prolonged sitting, standing or walking for extended
periods of time.

---

Malloy argues that "Dr. Ackil denotes  the excessive restrictions presented by Mr. Sullivan in regard to exercising
his past occupation and/or any dissimilar (*sic*) occupation on a full-time or limited part-time basis." *Id.* at App. 046.

Sullivan's next visit to Dr. Ackil was again 10 months later, on June 24, 2004. Sullivan Dep. – Ex. 2 at App. 134. On June 28, 2004, Dr. Ackil signed off on a "Supplemental Attending Physician's Statement" to Reassure, which Reassure received on July 12, 2004. Complaint-Ex. G at App. 067-74; Sullivan Dep. – Ex. 7 at App. 187-94. At this time, approximately one year later, Dr. Ackil's opinion on Sullivan's impairments, limitations and restrictions had not changed much, but had actually improved somewhat, as he described these impairments as: "Not to lift greater than 20 lbs. [an increase from the previous maximum lift of 10 pounds]. No prolonged sitting, standing or bending." App. at 191- "Impairments, Limitations & Restrictions."

This supplemental statement from Dr. Ackil is noteworthy for another reason. On page 6 of the statement (App. 191) Dr. Ackil states, in response to a question about "the duties of your patient's occupation," that Sullivan's occupation was "Health care consultant." This statement is obviously wrong, as the preceding discussion shows, as Sullivan had not worked as a health care consultant since 1998. Assuming that this was Dr. Ackil's understanding of Sullivan's occupation throughout the time that he was treating him following his fall on January 9, 2002, his earlier statements that Sullivan "cannot do his past occupation or any other occupation" should be given no weight as it is based on an incorrect assumption as to Sullivan's occupation.

Reassure referred Dr. Ackil's reports and the other medical records received during the consideration of the claim to Dr. Mark Doyne, an independent, consulting orthopedic surgeon, on two separate occasions – January 5, 2004 and November 17, 2004. Claim File at App. 457-58. On each occasion, Dr. Doyne concluded that Sullivan could work at a sedentary level of activity.

The foregoing discussion establishes that despite corresponding with Reassure for two and one-half years, Sullivan and his attorney have failed to carry their burden of providing Reassure with due written proof that Sullivan is totally unable to perform all of the substantial duties of his occupation as a security trader. Therefore, Sullivan has failed to satisfy a

necessary condition precedent to his recovery of disability benefits and summary judgment should be entered for Reassure on Counts I and II of the Complaint.

**3.      Sullivan's Mutual Fund Trading Activity at Fidelity Investments After January, 2002 Establishes That He Was Not Totally Disabled After January, 2002 and That During This Time Period He Actually Performed the Duties of a Security Trader.**

As discussed above, prior to his slip and fall on January 9, 2002, Sullivan worked out of his home and engaged in the trading of securities for his own account. Sullivan Dep. at App. 099. During 2000 and 2001, he primarily traded individual stocks in his non-retirement account at StockCross, but he occasionally traded mutual funds that were in his IRA retirement accounts at Fidelity Investments. During the year 2000, Sullivan engaged in 63 stock trades consisting of 25 sales and 38 purchases. Sullivan Dep. at App. 105-06; Ex. 10 at App. 275-76. These 63 trades resulted in a capital gain for the year of $41,399.18. Sullivan Dep.-Ex. 9 at App. 212-14. Sullivan did not trade any mutual funds or options in the year 2000.

In 2001, Sullivan's stock trading activity decreased significantly, as he engaged in only 31 total trades, consisting of 27 stock trades and 4 option trades. Sullivan Dep. at 216-18 at App. 106-07; Ex. 10 at App. 279, 282. In addition, he also engaged in 15 mutual fund trades (7 sales and 8 purchases) of mutual funds that Sullivan held in his IRA retirement accounts at Fidelity. Fidelity Stmts. At App. 296-97, 300, 302, 304, 306. Thus, for the year 2001, Sullivan engaged in a total of 46 transactions – 31 stock and option trades and 15 mutual fund trades. The stock and option trades were very unprofitable as the Sullivans' joint return for the year 2001 shows a short term capital *loss* for the year of $158,757.23. Sullivan Dep.-Ex. 9 at App. 225-28.

In 2002, despite having injured his back on January 9, 2002, Sullivan's trading activity actually increased over 2001. He did not engage in any stock trades, but he engaged in 8 option trades in his StockCross account, all after January 9, 2002, Sullivan Dep.-Ex. 10 at App. 285-92,

and 48 mutual fund trades in his retirement accounts at Fidelity, Fidelity Stmts. at App. 310-13, 318-21, 325, 334-37, 341, for a total of 56 security transactions for the year.

In years 2003 and 2004, Sullivan's trading activity was confined to his retirement accounts at Fidelity and the trading in each year was pretty similar. In 2003, he engaged in 27 mutual fund trades, Fidelity Stmts. at App. 344-46, 349, 356, 361, 364-67, 371, and in 2004 he engaged in 24 trades, Fidelity Stmts. at App. 374, 380-85, 389, 397.

In 2005, Sullivan's trading activity picked up considerably. As in 2003 and 2004, all of Sullivan's trading activity in 2005 was in his tax deferred retirement accounts at Fidelity, but Sullivan was much more active in 2005, as trading volume increased five-fold to 122 trading transactions over the months of January, March, April and December, 2005. Fidelity Stmts. at App. 402, 404-11, 415-16, 420, 422-28, 433-34, 438, 440-45, 449-50, 453.

Therefore, Sullivan's trading activity over the years 2000 through 2005 for stocks, options and mutual funds can be summarized as follows:

| Year | Stock Trades | Option Trades | Mutual Fund Trades | Total Trades |
|---|---|---|---|---|
| 2000 | 63 | | | 63 |
| 2001 | 27 | 4 | 15 | 46 |
| 2000-01 | 90 | 4 | 15 | 109 |
| | | | | |
| 2002 | 4 | 4 | 48 | 56 |
| 2003 | | | 28 | 28 |
| 2004 | | | 24 | 24 |
| 2005 | | | 122 | 122 |
| 2002-05 | 4 | 4 | 222 | 230 |

The following schedule shows the total dollar volume of the sales of stocks, options and mutual funds during the same six years:

| Year | Stocks | Options | Mutual Funds | Total Volume |
|---|---|---|---|---|
| 2000 | $1,413,617.19 | | | $1,413,617.19 |
| 2001 | 285,999.53 | 31,354.65 | 667,470.79 | 984,824.97 |
| 2000-01 | $1,699,616.60 | 31,354.65 | 667,470.79 | $2,398,442.16 |
| 2002 | | 31,950.00 | 1,023,861.90 | 1,055,811.90 |
| 2003 | | | 737,716.76 | 737,716.76 |
| 2004 | | | 364,500.00 | 364,500.00 |
| 2005 | | | 849,821.96 | 849,821.96 |
| 2002-05 | | 31,950.00 | 2,975,900.62 | $3,007,850.62 |

While the year 2000 was Sullivan's busiest year in terms of trading volume, the year 2002, when Sullivan claims to have been disabled following his fall on January 9, 2002, was his second busiest year, even busier than 2001 when Sullivan was still working full-time as a security trader. And Sullivan engaged in twice as many mutual fund trades in 2005, when he allegedly was totally disabled, as he did stock trades in 2000 when he was working full-time as a day trader. Overall, Sullivan engaged in twice as many trades during 2002-05 when he claimed to be disabled as he did during his disability-free period of 2000-01, and his trading volume was about $610,00.00 greater during his disability period than during his non-disability period.

The foregoing schedules show that Sullivan didn't stop trading securities after he slipped and fell on January 9, 2002. He simply stopped trading individual stocks and began trading options and mutual funds. Undoubtedly, the big capital loss ($158,757.23) that Sullivan suffered in 2001, not his slip and fall, caused him to give up on trading individual stocks in his taxable account and to switch to trading mutual funds in his tax-deferred retirement accounts. Regardless of the motivation for this switch, the undisputed fact remains that Sullivan was engaging in the same activity of trading securities, at the same level of activity, both before and

after January 9, 2002. He was not totally disabled before January 9, 2002, and since he was in fact engaging in the same occupational activities after January 9, 2002, it is undisputed that he was not totally disabled after this date either. Defendants' motion for summary judgment should therefore be allowed on this ground also with respect to Counts I and II of the Complaint.

**4.    Defendants Have Not Violated Mass. G. L. c. 93A or c. 176D**

The foregoing discussion also establishes beyond any question that Reassure's handling of Sullivan's claim was correct and proper in every respect and most certainly was not in violation of Massachusetts General Laws chapters 93A and 176D. It is axiomatic that if Sullivan failed to provide Reassure with due proof of his disability and was in fact working at his usual occupation during the time that he claims to have been disabled, Reassure's decision to deny his claim for benefits cannot be found to be an unfair or deceptive claim practice. Moreover, the documents in the Appendix clearly establish that Reassure conducted a detailed and timely review of Sullivan's claim, and dealt with Sullivan in a courteous and professional manner over the two and one-half years that his claim was pending. Therefore, summary judgment should be entered for the defendants on Count III of the Complaint as well.

## CONCLUSION

Based on the foregoing points and authorities, defendants' motion for summary judgment should be allowed on all three counts of the Complaint and a final judgment should be entered in favor of the defendants dismissing this action.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA and
REASSURE AMERICA LIFE
INSURANCE COMPANY

By their attorneys,

February 9, 2007

Edward S. Rooney, Jr.
BBO No. 426840
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
One International Place, 18th Floor
Boston, MA  02110
Tel.:  (617) 342-6800
Fax:  (617) 342-6899

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by overnight mail, postage prepaid, this 9th day of February, 2007.

Edward S. Rooney, Jr.