UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL D. SULLIVAN, )<br>Plaintiff )<br>)<br>v. )<br>)<br>THE PRUDENTIAL INSURANCE )<br>COMPANY OF AMERICA and )<br>REASSURE AMERICA LIFE )<br>INSURANCE COMPANY, )<br>Defendants )<br>) | CIVIL ACTION NO. 05 CV 10030 GAO |

### DEFENDANTS' REPLY MEMORANDUM
### IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**[LEAVE TO FILE GRANTED BY ORDER DATED JULY 24, 2007]**

Defendants The Prudential Insurance Company of America and Reassure America Life Insurance Company ("Reassure") (jointly "Defendants") submit this Reply Memorandum in order to respond to plaintiff Michael D. Sullivan's filings in opposition to Defendants' Motion for Summary Judgment. These filings consist of 1) Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, and 2) Plaintiff's Memorandum in Support of His Opposition to Defendants' Motion for Summary Judgment.

   I.   **DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendants respond as follows to "Plaintiff's Additional Undisputed Facts" which are set forth in Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

   1.   Defendants have no personal knowledge of the facts set forth in paragraph 1, but dispute the description of Sullivan's injuries as not entirely consistent with the descriptions

contained in Sullivan's medical records.

2. Defendants do not dispute the facts stated in paragraph 2.

3. Defendants do not dispute the facts stated in paragraph 3.

4. Defendants do not dispute the facts stated in paragraph 4. In addition, the policy of insurance requires that "Written proof of loss or total disability must be given to [Defendants]." Defendants' App. at 120 – "Proof of Claim."

5. Defendants do not dispute the facts stated in paragraph 5.

6. Defendants do not dispute that on January 30, 2003, Reassure received an undated certified mail letter from Michael J. Malloy, Esq. which stated in the first paragraph of the letter that he was writing "to formally make demand with respect to a claim submitted and denied for payment on behalf of the above-captioned client pursuant to M.G.L. Chs. 93A et seq. & 176D et seq."

7. Defendants do not dispute the facts stated in paragraph 7.

8. Defendants do not dispute that following receipt of a letter from Michael J. Malloy, Esq. dated December 10, 2003, in which Attorney Malloy requested reconsideration of the denial of benefits to Sullivan and in which Attorney Malloy provided updated medical reports from Dr. Ackil and Dr. Weller, Reassure notified Attorney Malloy in a letter dated December 29, 2003 that it would have its denial decision reviewed by an internal appeals panel consisting of persons who were not involved in the previous handling of the claim. Defendants also do not dispute that on January 5, 2004, Dr. Mark A. Doyne, an independent medical consultant and a Board Certified Orthopedic Surgeon, reviewed the recently provided medical reports of Dr. Ackil and Dr. Weller and concluded that "the records supported that the claimant would be limited to no greater than a sedentary work level, changing positions frequently."

9. Defendants do not dispute that Sullivan self-reported the symptoms listed in paragraph 9 to Dr. Ackil when he saw Dr. Ackil on July 9, 2003 and that Dr. Ackil recorded those symptoms in his report dated July 9, 2003.

10. Defendants do not dispute that on February 11, 2004 Mary Paine O'Malley, a vocational consultant, met with Sullivan and Attorney Malloy at Sullivan's home for the purpose of doing an occupational review and analysis of Sullivan's stated occupation of Day Trader. Plaintiff's App. – Ex. 15; Defendants' App. at 055-065.

11. Defendants do not dispute that in the last paragraph on page 10 of her report, Ms. O'Malley, the vocational consultant, makes the following statement: "Even when in a very active period of trading, a Day Trader, in most circumstances, could stand up in his/her work area while continuing to view the computer screen." Defendants also do not dispute that Ms. O'Malley never actually observed Sullivan "during his performance of work functions," but Ms. O'Malley did have Sullivan describe how he did in fact perform his work functions. Defendants' App. at 056-058.

12. Defendants do not dispute that the documents referenced in paragraph 12, and which are attached as part of Exhibit 12 in Plaintiff's Appendix, were provided to Reassure by Attorney Malloy. And responding further, defendants say that they have no personal knowledge of the information contained in said documents and object to said documents as containing hearsay and being irrelevant and immaterial to any of the issues in this case.

13. Defendants do not dispute that in a letter to Attorney Malloy dated November 23, 2004 (Plaintiffs' App. – Ex. 11; Defendants' App. at 075-078), Reassure advised Attorney Malloy that the appeal panel had concluded that the denial of benefits was correct according to the policy language and set forth a summary of the information considered by the panel.

Defendants also do not dispute that in the November 23, 2004 letter Reassure said it was prepared to proceed with an Independent Medical Evaluation in order to further clarify Sullivan's limitations, but said examination was never carried out because the present lawsuit was filed by Attorney Malloy on December 9, 2004. Plaintiffs' App. – Ex. 13, p. 1. Defendants also do not dispute that on December 1, 2004, PhysioMetrics, a service provider retained by Reassure, sent notice to Sullivan scheduling him for a Functional Capacity Evaluation at his home on December 22, 2004 (Plaintiffs' App. – Ex. 21), but the evaluation never took place because the present lawsuit was filed on December 9, 2004.

14.    Defendants dispute the facts stated in paragraph 14 as the statement does not accurately describe the document that is referenced – Plaintiff's App. – Ex. 22. The referenced document is a handwritten note dated March 26, 2001 from Sullivan to "IRS." Plaintiff's App. – Ex. 22. The note describes the "Subject" as "Section 475(f) Mark to Market Election for the tax year 2001," and states: "This letter will serve as notice of my election as described on page D-3 of the 2000 IRS 1040 instructions. As such, I will report all gains and losses with my trading business as ordinary income for my 2001 tax return."

15.    Defendants dispute the facts stated in paragraph 15 as the statement does not accurately describe the document that is referenced – Plaintiff's App. – Ex. 22, 3rd page. The referenced document is a notice addressed to Florence Sullivan from the Internal Revenue Service dated July 29, 2002 with reference to Form 1040 for the account of Michael D. and Florence Sullivan for the 2001 tax year. The notice states: "As you requested, we changed your account for 2001 to correct your investment gain or loss....This is a result of your correspondence of April 16, 2002." The notice shows that the account of Michael D. and Florence Sullivan would be entitled to a refund of $12,617.00 from the IRS. A refund check plus

interest was tendered to Michael D. and Florence Sullivan on July 26, 2002, Defendants' App. at 231, based on the Amended Tax Return filed by Mr. and Mrs. Sullivan on April 16, 2002. See, Defendants' App. at 232.

16. Defendants dispute and object to the statements made in paragraph 16. Defendants object to this paragraph on the ground that it does not contain any statements of fact, but only the personal conclusions, beliefs or contentions of Sullivan, all of which the defendants maintain are erroneous. To the extent that this paragraph contains any statements of fact, defendants dispute them.

## II. DEFENDANTS' RESPONSE TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1. Reassure's Review of Plaintiff's Claim Was Thorough, Fair and Objective.

A theme of plaintiff's Opposition Memorandum is that Reassure did not handle Sullivan's claim fairly and that the result that it reached was not based on all the information that Sullivan and Attorney Malloy presented. For example, on the very first page of the Opposition Memorandum, the statement is made that "Only after the second denial of Mr. Sullivan's claim [on March 25, 2003] and Mr. Sullivan's persistence, Reassure in January 2004 had Mr. Sullivan's medical records reviewed." Plf.'s Opposition Memo. at 1-2. However, this statement is simply not correct as Dr. Mark Doyne, an independent orthopedic consultant, reviewed the medical records submitted by Sullivan in August, 2002, and Dr. Doyne submitted a report to Reassure on August 16, 2002. See, Plaintiff's App. – Ex. 16 ("I had previously reviewed the records on Mr. Sullivan while working as an independent medical consultant to Reassure America Life Insurance Company on 8/16/02, 1/5/04 and 11/17/04."); Defendants' App. at 462 (8/16/02 – "OPINION: APS from 5/28/02 states patient can't lift > 20#, 'no prolonged bending,

sitting or standing.' The patient's clinical condition supports these L&R's [limitations & restrictions].").

Another example is at page 7 of the Opposition Memorandum, where the following statement is made: "It was not until February 2004, 20 months and two denials after Mr. Sullivan's initial claim, that Reassure obtained an occupational/vocational report by Mary Payne O'Malley." Plaintiff seems to be suggesting that an occupational review should have been done much earlier in the claims process and prior to the claim being denied twice. The obvious reason that Reassure scheduled a detailed occupational review at this point in time was that plaintiff had failed to provide Reassure with proof of his total disability as a security trader, or as a "day trader," and Reassure was trying to give plaintiff a further opportunity to provide this proof. However, the occupational review did just the opposite, as it confirmed that Sullivan's reported symptoms and limitations, as reported and recorded in his medical records, simply did not prevent him from engaging in the substantial duties of a security trader. See, Plaintiff's App. – Ex. 15 at 7-11.

Plaintiff appears to be critical of Mary O'Malley's occupational review report for assuming that Sullivan performed his duties as a "typical" securities trader and failed to take into account Sullivan's "individuality in technique and style." Plf.'s Opposition Memo. at p. 7. But plaintiff never identifies what was unique with respect to his technique and style. Moreover, plaintiff goes on to quote from former SEC Chairman Arthur Levitt about "day trading" and "day traders," who "buy and sell stock rapidly throughout the day," statements that were entirely consistent with Ms. O'Malley's description of day trading. See, Plaintiff's App. – Ex. 15 at 5-6. But none of this has anything to do with Sullivan as his records show that he did not buy and sell stocks rapidly throughout the day. To the contrary, he bought and sold stocks periodically over

the course of weeks or months. See, Defendants' App. at 275-76, 279. Ms. O'Malley never reached any conclusion on whether Sullivan was totally disabled under the terms of his disability policy. Rather, she learned from Sullivan what he did in fact do when he was buying and selling securities in 2000 – 2001, observed the actual environment in which Sullivan carried out these work activities and then did extensive research on the occupation of securities trader/day trader. Plaintiff is unable to identify any error or inaccuracy in any of the observations, analyses or conclusions recorded by Ms. O'Malley in her report.

Citing Exhibit 17 from Plaintiff's Appendix, Plaintiff makes the conclusory statement that whether Sullivan was considered a "day trader/securities trader and whether he would be able to continue his occupation with accommodations is a genuine issue of material fact." Opposition Memo. at 8. However, the document cited in support of this statement – Exhibit 17 – does not support plaintiff's statement. Exhibit 17 consists of an e-mail with an attachment to Pamela Jacques at Reassure from an individual named Bill Bristol of the Bristol Consulting Group. The e-mail discusses Internal Revenue Code section 475 (f) and a taxpayer's election to use the mark-to-market method of accounting with respect to reporting gains and losses from sale of stocks. The attachment to the e-mail is an explanation from the IRS on the tax treatment of sales of securities held in connection with a trading business and how one makes the election to change to the mark-to-market method. There is nothing in these documents that even suggests that there is a genuine issue of fact in dispute in this case.

2.   **Sullivan's Occupation "At the Onset of His Claim."**

At page 8 of his Opposition Memorandum, Sullivan has come up with a new and different explanation for why he said he was "unemployed" on the "Claimant's Initial Statement." Plaintiff's App. – Ex. 2. Previously, Sullivan maintained that he had said he was

7

"unemployed" because as of June, 2002, when he completed the initial claim statement, he had not yet been "approved" by the Internal Revenue Service to be a "Day Trader."[1] See, Plaintiff's App. – Ex. 5. Sullivan has not given up on this contention as he raises it at page 9 of the Opposition Memorandum, but this new contention now appears to be his primary argument on this point. However, as stated, this is a brand new argument, never having been raised before in any of Attorney Malloy's correspondence with Reassure or in any of Sullivan's deposition testimony.

In addition to being novel, this "onset of claim" argument is not supported by the plain wording of the claim form itself. First of all, the question that Sullivan is referring to is on page 3 of the claim form in a section entitled "Detailed Occupational Information." Plaintiff's App. – Ex. 2 at p. 3; Defendants' App. at 161. However, at the very top of page 1 of the form, under a section entitled "Your Employer," the question is asked "Type of Employment" and Sullivan responded "Unemployed." Plaintiff's App. – Ex. 2 at p. 1; Defendants' App. at 159. The specific question that Sullivan is referring to on page 3 of the form reads as follows: "What **was** your occupation at the onset of your claim?" (emphasis added). With the question worded in the past tense, it is hard to believe that anyone with a master's degree in business administration could read this as asking what your occupation was as of June 5, 2002, the date on which Sullivan completed and signed off on the claim form, as Sullivan now contends for the first time. Opposition Memo. at 8-9. Moreover, the very next question in this section asks Sullivan about his net monthly income "at the time **condition began**" (emphasis added), which can only refer to Sullivan's slip and fall on January 9, 2002. And the last question on page 4 of the form asks

---

[1] On this point it should be noted that at the bottom of page 4 of the "Claimant's Initial Statement" the question is asked: "Does your occupation require a license or other special privilege?" The answer given by Sullivan was "No." Plaintiff's App. Ex. 2 at p. 4. Defendants' App. at 162. This answer directly conflicts with his present position that he needed approval from the IRS before he could say he was a "day trader."

Sullivan to "List other employment prior to your current employment," and Sullivan accurately lists the Knights of Columbus Insurance where he "sold life insurance." If Sullivan understood his current employment on June 5, 2002 to be "unemployed" as he now contends, then he should have listed his employment prior to becoming "unemployed," as "security trader." Simply stated, this recently conceived "onset of claim" contention cannot be supported by the plain language of the claim form and puts Sullivan's credibility even further in question.

Finally, this contention totally ignores, and cannot be squared with, the information provided by Sullivan in his telephone conversation with Pamela Jacques of Reassure on March 19, 2002. Defendants' App. at 476-77. In this conversation, Sullivan was asked what his last day of work was and he responded that he was "semi-retired." When asked what he did, he said that "he does the books for his household." This conversation on March 19, 2002 is entirely consistent with the information provided by Sullivan in his initial claim form that on January 9, 2002, when he claims to have hurt his back and which was also the date of the "onset of his claim," his occupation was "unemployed."

### 3. Sullivan Has Failed to Create Any Genuine Issue of Material Fact With Reference to His Mutual Fund Trading Activity.

As Sullivan's own account statements establish his active mutual fund trading activity during 2002 – 2005, he can hardly contend that they are in any way inaccurate or incomplete.[2] The extent of the activity and the number of trades engaged in simply cannot be refuted. The only challenge that Sullivan makes is with reference to the summary of his stock trading on pages 16-17 of Defendants' Memorandum of Law. Sullivan contends that the summary of the

---

[2] In his responses to defendants' Statement of Undisputed Material Facts, Sullivan does not dispute the authenticity or accuracy of the Fidelity account statements included in Defendants' Appendix at 293-453. However, he does "dispute" the statements made with reference to his mutual fund trading activity at Fidelity, but his "disputed" statements are not responsive to the facts stated. See, Defendants' Statement of Undisputed Facts – nos. 33-38 and Plaintiff's Responses thereto.

dollar volume of his stock trading activity in 2000 and 2001 is understated. Plf.'s Opposition Memo. at 13. However, he mistakenly reads this volume summary as consisting of both purchases and sales, when in fact, as stated at the bottom of page 16 of Defendants' Memorandum, the summary only represents sales, and does not also include purchases. ("The following schedule shows the total dollar volume of the **sales** of stocks, options and mutual funds during the same six years: ..." Defs.' Memo. of Law at p. 16) (emphasis added). This statement applies to the summary on page 17 of the Memorandum for both stocks and mutual funds, that is only sales figures were summarized for the trading activity in stocks and mutual funds.[3]

Unable to question the accuracy of his trading activity as documented in his own account statements, Sullivan attempts to draw a distinction between individual securities held in a non-retirement account and mutual funds held in a retirement account. Plf.'s Opposition Memo. at 11-12. Without question, there are differences between these two investment situations, but none of these differences are relevant to the issues before the court on this motion. The fundamental issue on this point is not the technical differences between an individual security and a mutual fund, but rather whether the activities that one engages in while buying and selling individual securities are any different than the activities one engages in while buying and selling mutual funds. The defendants submit that there simply aren't any differences in the two forms of trading, and plaintiff has failed to show any such differences in his Opposition Memorandum which would create an issue of fact in this regard.

---

[3] The reason for only including sales was to maintain consistency in comparing Sullivan's trading activity in stocks during 2000- 2001 with his trading mutual funds during 2002-2005. Since every stock or mutual fund "sale" obviously required a previous "purchase," only sales figures were listed so that there was not any "double counting" in the volume of each purchase and sale transaction. For example, paragraphs 33 - 37 of the Statement of Undisputed Facts show Sullivan's mutual fund trades, which almost always involved an exchange from one fund to another fund. While this involved two transactions – a sale of one fund and the purchase of another – the dollar volume of the transaction was not included twice. If both purchase and sales were included in the summary, the volume totals for both stocks and mutual funds would each be much higher.

Given the ubiquitous role that the stock market now has through the media and advertising, it seems the court could take judicial notice of what activities are involved in the trading of stocks and mutual funds. However, in addition to judicial notice, the record Appendix of both the plaintiff and the defendants contain the occupational review report of vocational consultant Mary O'Malley, which sets forth considerable detail about investing and trading of securities. See, Plaintiff's App. – Ex. 15; Defendants' App. at 055-065. Ms. O'Malley's report goes into considerable detail on the activities involved in trading securities, including the physical demands and the equipment and services needed. However, it all comes down to two fundamental activities – research and execution – and this is true for both individual stocks as well as mutual funds. The execution part is simple and straightforward – once a decision is made to buy or sell a stock or mutual fund, this decision must be communicated to a stock broker or mutual fund company by phone or electronic communication. As Ms. O'Malley said in her report: "[I]nvestors place their buy and sell orders for a particular security or commodity by telephone, online by computer, or through a broker." Defendants' App. at 060. Clearly in this regard, there is no difference in executing a purchase or sale of a stock or a mutual fund, and neither transaction requires any significant physical activity. Sullivan could either pick up the phone and speak to a broker or mutual fund representative, or he could communicate his purchase or sale order electronically by using his computer keyboard. Sullivan told Ms. O'Malley that he carried out his stock trades by means of a cell phone call to his broker. Defendants' App. at 058. Whether he did the same thing with his mutual fund transactions is not known, but either telephonically or electronically, little or no physical activity is needed.

The research part of stock or mutual fund trading is not as simple as the execution part. This assumes that Sullivan did in fact conduct research on the several Fidelity mutual funds that

he traded, just as he said he did with respect to the individual stocks that he traded. See, O'Malley Report – Defendants' App. at 057. It is noteworthy that Sullivan only traded mutual funds sponsored by Fidelity Investments, so the scope of his research was limited to one mutual fund company, albeit one that sponsors hundreds of mutual funds. It is also noteworthy that in 2004 and 2005 Sullivan engaged in extensive trading of non-diversified "Select" funds that focused its investments on companies engaged in one specific industry, such as natural gas, energy and construction and housing. See, Defendants' Motion for Summary Judgment at pp. 15 – 17. Given that Sullivan periodically traded in and out of certain industry funds, as well as between stock funds and bond funds, it is reasonable to infer that he did conduct some research rather than simply trade these funds at random.

Sullivan's mutual fund trading shows certain trends which obviously were based on Sullivan's research of the overall financial markets. For example, in December, 2001 and March, 2002, Sullivan sold all of his shares in the High Income Fund, a bond fund, and purchased shares in several of Fidelity's diversified stock funds such as Spartan 500 Index Fund and the Puritan Fund. Defs.' Motion for Summary Judgment at pp. 11-12. However, in July, 2002, Sullivan reversed course and sold all shares in the diversified stock funds and used all of the proceeds to purchase the Government Income Fund. *Id.* at p. 12. In January and September, 2003, he sold off some of his government income funds and started buying back some of the diversified stock funds. *Id.* But then in October, 2003, he sold off the diversified stock funds and purchased the High Income Fund again. *Id.* at pp. 13-14.

In April, 2004, Sullivan reversed his investments once again by selling off the High Income Fund and purchasing the diversified stock funds. *Id.* at p. 14. In January, 2005, Sullivan transitioned out of the diversified stock funds and purchased, apparently for the first time,

"Select" funds that focused their investments in companies in certain industries, such as Select Energy, Select Energy Service, Select Natural Gas and Select Construction and Housing. *Id.* at 15. However, just two months later, in March, 2005 and again in April, 2005, Sullivan pretty much got out of the stock market entirely by selling off all of his stock funds, both diversified and Select, and going to all cash by purchasing the Cash Reserves Fund. *Id.* at p. 16-17. Finally, in December, 2005, he even sold off all of the U.S. Treasury Notes and put these proceeds in Cash Reserves as well. *Id.* at 17.

The foregoing summary shows that Sullivan's mutual fund trading was not done randomly with little or no thought or research. To the contrary, it shows a deliberate course of buying and selling mutual funds in selected segments of the financial markets apparently based on certain economic factors that Sullivan found to be important and predictive of future market movements. Over the course of these four years – 2002 thru 2005 – Sullivan sold (and bought) nearly $3 million of mutual fund shares for his own account, which was almost double the $1.7 million that he sold (and bought) in stocks during his two stock trading years of 2000 and 2001. See, Defts.' Memorandum of Law at p. 17. None of the funds that he traded were in his wife's name, nor were any of these funds held jointly with his wife. All of the 222 mutual fund trades that were made in Sullivan's four retirement accounts during these four years were made solely and exclusively by Sullivan himself based on Sullivan's own research. During these four years, Sullivan was doing precisely the kind of market trading that he was doing before he slipped and fell on January 9, 2002, with the only difference being the specific type of investment product that he was trading. However, this is really only a distinction without a difference on the issue of Sullivan's "inability to engage in all of the substantial duties of his regular occupation." His Fidelity account statements establish conclusively that he was in fact able to engage in all of the

substantial duties of his occupation as a security trader. There are no facts in dispute on this issue, and therefore the defendants' motion for summary judgment should be allowed.

### III. CONCLUSION

Based on the foregoing points and authorities, and the points and authorities recited in their previously filed Memorandum of Law in Support of Their Motion for Summary Judgment, the defendants submit that their motion for summary judgment should be allowed because the undisputed facts establish that plaintiff Michael Sullivan is not now totally disabled, nor has he been totally disabled at any time since January 9, 2002. Judgment should be entered for the defendants on all three counts of plaintiff's Complaint.

Respectfully submitted,

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA and
REASSURE AMERICA LIFE
INSURANCE COMPANY

By their attorneys,

April 19, 2007

/s/ Edward S. Rooney, Jr.
Edward S. Rooney, Jr.
BBO No. 426840
ECKERT SEAMANS CHERIN
& MELLOTT, LLC
One International Place, 18th Floor
Boston, MA 02110
Tel.: (617) 342-6800
Fax: (617) 342-6899
E-mail: erooney@eckertseamans.com